IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EOIR HOLDINGS LLC | : |
| Petitioner | : |
| v. | : Case No.: _____ |
| TECHNEST HOLDINGS, INC., | : |
| Respondent/Defendant | : |

**PETITIONER EOIR HOLDINGS LLC'S MEMORANDUM IN SUPPORT OF ITS
PETITION TO VACATE ARBITRATION AWARD**

Petitioner EOIR Holdings LLC, through undersigned counsel, respectfully submits this Memorandum in Support of its Petition to Vacate Arbitration Award.

**STATEMENT OF FACTS**

On or about September 10, 2007, following considerable due diligence, EOIR Holdings LLC ("Holdings") and Respondent/Defendant Technest Holdings, Inc. ("Defendant") entered into a Stock Purchase Agreement (the "Agreement") by which Defendant agreed to sell to Holdings all the outstanding stock of EOIR Technologies, Inc. ("EOIR"). *See* Stock Purchase Agreement by and among EOIR Holdings LLC, E-OIR Technologies, Inc. and Technest Holdings, Inc. (attached as Exhibit 1). Holdings' interest in purchasing EOIR stemmed almost entirely from EOIR's success in winning and performing work under a series of contracts with the U.S. Army's Night Vision and Electronic Sensors Directorate ("NVESD").

1

EOIR first began providing services to the NVESD approximately 25 years ago. *See* Respondent EOIR Holdings LLC's Post-Hearing Brief, at p. 3 (attached as Exhibit 2). From 1993 through 2007, EOIR won and performed technical support work to the NVESD under three consecutive contracts. Each of these contracts was "dedicated" to EOIR, meaning that the contract dollars were available only to EOIR and not to other contractors, and the NVESD spent at least 95% of the value of each of those three contracts. *See* Exhibit 2, at pp. 3-4. Therefore, while these contracts were what are known as Indefinite Delivery/Indefinite Quantity (ID/IQ)[1] contracts, EOIR had consistently provided extensive night vision and electrosensors products and labor to the NVESD for over two decades.

During the due diligence for the transaction, EOIR was in the midst of preparing to bid on the "follow-on" contract to the $406 million "Lo-Tech II" contract, which had been in place since 2001. Defendant and EOIR represented to Holdings during negotiations that they anticipated that the follow-on would have a $500 million contract value. *See* Exhibit 2, at p. 5. They also made representations to Holdings, orally and in writing, about the percentage increase that would be applied to the labor rates proposed in this new contract, which would enable EOIR to maintain its gradual rate escalation and maintain or exceed its historical profit margin. *See id.* at pp. 5-6. These factors regarding contract value, profit margin, and labor rate increases were essential aspects of the negotiations regarding the follow-on contract and EOIR as an ongoing business entity, as well as of the drafting of the transaction documents between the parties.

---

[1] ID/IQ contracts are used frequently in government contracting, most commonly for services. They permit the government to order an indefinite quantity of services or products during a fixed period of time, typically by individual delivery orders or task orders issued to the contractors working under that contract.

Consequently, the Agreement between the parties provided for payment of a "Closing Date Purchase Price" of approximately $11 million, and a possible additional payment of approximately $23 million, entitled the "Contingent Purchase Price." This Contingent Purchase Price was to be payable only in the event of satisfaction of certain conditions, as set forth in Exhibit A to the Agreement, pertaining to the award to EOIR of the "follow-on" contract with the NVESD. The two-payment structure of the transaction reflected the fact that over 90% of EOIR's revenues derived from the NVESD contract, and it also reflected the parties' expectations that EOIR would win a fourth consecutive contract with the NVESD, specifically, the $500 million contract represented during negotiations. *See* Exhibit 2, at p. 7. Notably, though, the Contingent Purchase Price was not made contingent upon simply the award of *any* contract. Specifically, Section 2 of Exhibit A of the Agreement provided that

> The Contingent Purchase Price will be payable only upon: (a) the award to [EOIR] of the follow-on of the NVESD contract . . . on substantially the economic terms and conditions set forth in [EOIR's] final price proposal, which price proposal shall be prepared in accordance with . . . the past practice of [EOIR] and which proposal, if successful, would not, or could not be reasonably be [sic] expected to, change the financial prospects or performance of [EOIR]....

*See* Exhibit 1, at Exhibit A. These three conditions – a) the award to EOIR of the follow-on on substantially the *"economic terms and conditions"* in the price proposal; b) the price proposal's preparation in accordance with EOIR's *"past practice,"* and c) the proposal, if successful, would not or could not reasonably be expected to change EOIR's *"financial performance or prospects"* – were intended "to translate . . . into legal terms" the extensive business negotiations between Holdings and Defendant regarding the expectations for the follow-on NVESD contract. *See* Transcript of Arbitration Hearing, *Technest Holdings, Inc. and EOIR Holdings LLC*, AAA Case No. 16 180 Y 0061508,

3

June 22, 2009, at p. 90 (Testimony of Gino Pereira, CEO of Defendant Technest Holdings, Inc.) (hereafter referred to as "Arbitration Hearing Transcript") (excerpts attached at Exhibit 3).

In October and November 2007, the "final price proposal" for the follow-on of the NVESD contract was prepared by EOIR, under Defendant's direction and control. *See* Exhibit 2, at p. 8. The proposal then was approved by Defendant's Board of Directors and submitted to the NVESD on November 24, 2007. *See* Arbitration Hearing Transcript, Exhibit 3, at p. 1190. Approximately one month later, on December 31, 2007, the transaction closed, and Holdings became the new owner of EOIR. Only after Holdings became the owner of EOIR did it receive a copy of the EOIR final price proposal or learn any information regarding the proposal. When it received the price proposal, among other things, Holdings learned that, contrary to EOIR's prior practice and in direct contravention of the negative covenants in Section 5.2 of the Agreement,[2] EOIR and Defendant had reduced the labor rates that EOIR offered to the U.S. government by nearly 8% from the rates used in the Lo-Tech II contract. *See* Exhibit 2, at pp. 26-27; Respondent EOIR Holdings LLC's Prehearing Statement, at pp. 5-8 (attached as Exhibit 4); Arbitration Hearing Transcript, Exhibit 3, at pp. 997-998; 1398-99. Additionally, Holdings learned that EOIR had submitted a bid totaling approximately $454 million, which was approximately 10% short of the $500 million that Defendant had represented during due diligence as the contract's value.

---

[2] For instance, in Section 5.2(o) of the Agreement, entitled "Negative Covenants of Company and Seller," Defendant covenanted that it would not, and would take all actions necessary to cause EOIR not to, "submit any new Government Bid which, if accepted, ... is a NVESD labor contract with terms less favorable to Company than established negotiated rates previously provided to Purchaser." Exhibit 1, at p. 57.

The entire purpose of Exhibit A to the Agreement and its three conditions was to ensure that the price proposal prepared by Defendant would maintain EOIR's profitability on the follow-on contract, as well as foster the growth that EOIR had experienced during its years of incumbency at the NVESD. As Jason Rigoli, lead negotiator on behalf of Holdings, testified regarding the structuring of the conditions set forth in Exhibit A, "[w]e wanted a business that was going to continue being a going, growing concern moving forward during our potential tenure of ownership. So we wanted to make sure that the contract itself was equally, if not more profitable than the Low Tech contract." Arbitration Hearing Transcript, Exhibit 3, at p. 753. Moreover, the purchase price for EOIR was premised upon the cash flow generated by EOIR and the profits it was able to produce. Arbitration Hearing Transcript, Exhibit 3, at pp. 717-20. Accordingly, based on the newly acquired information regarding the EOIR price proposal, Holdings became concerned about the negative effects that this proposal and the ensuing contract might have on EOIR, the business it had just purchased, as well as about what appeared to be Defendant's breaches of the Agreement.

Commencing early in 2008 and continuing throughout that year, Holdings started to assess the possible financial impact of the price proposal's deviation from the terms of the Agreement and from the expectations that had been built by Defendant and EOIR personnel during due diligence. *See, e.g.*, Arbitration Hearing Transcript, Exhibit 3, at pp. 797-98; 826-27. Then, on August 6, 2008, EOIR was awarded a "follow-on" contract with the NVESD. This contract was not for the approximately $454 million that EOIR had bid, nor for the $500 million that Defendant had represented to Holdings during due diligence, but rather, was a three-contractor, "program ceiling" contract valued at $495

million total. This staggering difference in contract value also factored into Holdings' ongoing financial impact analysis. Holdings concluded that this follow-on contract was made on substantially different and inferior economic terms and conditions than those set forth in EOIR's price proposal. In addition, EOIR's price proposal was prepared in contravention of its past practice, and the proposal could reasonably have been expected to change EOIR's financial prospects or performance.

Therefore, because the "follow-on" contract did not satisfy all of the terms of Section 2 of Exhibit A of the Agreement, the Contingent Purchase Price did not become payable. Nonetheless, on September 23, 2008, Defendant filed a Demand for Arbitration, alleging that Holdings breached the terms of the Agreement by failing to pay the Contingent Purchase Price. On October 27, 2008, Holdings responded in its Answering Statement that it had not breached the Agreement because the conditions precedent to payment had not been satisfied and accordingly, the Contingent Purchase Price was not due and payable.

The parties filed preliminary motions and commenced extensive discovery. During the deposition of Joseph Mackin, currently the CEO of EOIR and formerly Defendant's CEO and Chairman of its Board of Directors, Dr. Mackin made reference to a "valuation" that he believed had been undertaken regarding EOIR. Holdings asserted the attorney-client privilege and work product doctrine regarding the valuation and any related testimony. Several weeks later, Defendant asked that the three-member arbitration panel of the American Arbitration Association (the "Panel") compel production of the valuation. In response, Holdings submitted a letter explaining the basis for the privilege assertion, as well as a sworn affidavit provided by the attorney involved

in the preparation of the valuation. *See* June 8, 2009 Letter to Panel and Affidavit of Helen N. Cleveland (attached as Exhibit 5). The Panel did not rule on the valuation's admissibility, nor did it opine on the claim of privilege. It simply directed Holdings to provide Defendant with a copy of the valuation, which Holdings did.[3]

After discovery concluded, the parties commenced a hearing in Washington, DC before the Panel. This valuation quickly became the centerpiece of Defendant's Prehearing Statement, Defendant's opening statement and its entire theory of the case. Upon Holdings' objection at the outset of the hearing to Defendant's attempt to introduce additional witnesses to testify regarding the valuation, counsel for Defendant tried to minimize the importance of the valuation – a document that would go on to be mentioned *46 times on just the first morning of the seven-day hearing* – by stating, "I don't think it's the mountain, I think it's more the molehill at this point." Arbitration Hearing Transcript, Exhibit 3, at p. 20. Defendant's lead counsel then argued in his opening statement, "[a]nd to put the icing on the cake, to put the icing on the cake [sic], just within 10 days, [Holdings] produced, after being compelled to do so by the panel, a valuation of the subject company." Arbitration Hearing Transcript, Exhibit 3, at p. 49. Defense counsel continued, "[Holdings] should pay fair value for this company based on their own valuation," notwithstanding the irrelevance of the 2009 valuation to the purchase price

---

[3] Holdings contended, and maintains today, that the valuation is both privileged and not relevant to the issues before the Panel. The valuation was performed in February 2009, more than a year after the purchase price for EOIR had been determined and the price proposal had been submitted. The valuation concluded for purposes of FAS 142 that EOIR had a value of $34.9 million. The valuation was prepared with a lawyer's advice in order to comply with Internal Revenue Code section 409A, and the valuation included assumptions regarding future contract revenues, projected revenues from 2009 acquisitions and other business decisions made after Holdings took ownership of EOIR. Ironically, while Defendant extensively relied on the valuation and the revenues earned by Holdings under the follow-on contract for prejudicial atmospherics, Defendant then argued in closing that the Panel ought to assess the third condition of Exhibit A at the time that the price proposal was submitted to the government, in November 2007. *See* Arbitration Hearing Transcript, Exhibit 3, at pp. 1901-02. The Panel's opinion states that it used this approach. *See* Final Award, at p. 8 (attached as Exhibit 6).

7

that was determined by the parties in September 2007. *See id.* Holdings again objected to the valuation at the time that Defendant attempted to have it admitted into evidence. The Panel heard argument on the claim of privilege, took a brief recess, and then announced it was admitting the document, without making any findings regarding the privileged nature of the valuation. *See* Arbitration Hearing Transcript, Exhibit 3, at pp. 750-51.

Following a seven-day hearing, the Panel rendered its decision on August 21, 2009. The Panel found for Defendant and ordered Holdings to pay the Contingent Purchase Price, plus interest. A copy of that decision is attached hereto as Exhibit 6.

## SUMMARY OF ARGUMENT

The Panel's decision exceeded its powers under the Federal Arbitration Act as well as under the Agreement, and therefore, the award must be vacated. Regarding the first condition of Section 2 of Exhibit A of the parties' contract– whether the award was made on "substantially the economic terms and conditions" in EOIR's proposal – the Panel apparently determined that the follow-on award was made on "substantially the economic terms and conditions" simply because the award incorporated the labor rates proposed by EOIR. By considering the incorporation of the rates to be synonymous with the "economic terms and conditions," the Panel chose to ignore obvious terms of the parties' contract and thereby exceeded its powers.

The Panel also exceeded its authority by redefining the term "financial prospects or performance," as used in the third condition. Holdings presented uncontradicted evidence and testimony at the hearing regarding the 8% decrease in labor rates touted in EOIR's final price proposal, and the inhibiting effect that such a precipitous decrease

would have on any future or subsequent contracts with the NVESD. Yet the Panel, without any citations to the record, accorded weight to certain deposition testimony that the Panel believed supported the inferences that "the proposed award was likely to be more profitable than the prior contracts" and that "it was a very good pricing strategy." Final Award, Exhibit 6, at 9. This selective reading and reinterpretation of a clear term in the parties' contract exceeded the Panel's authority, as expressly written in the Agreement.[4]

The Panel also exhibited a manifest disregard of the law by ordering the disclosure of a privileged document, then admitting that document into evidence and considering it in its decision. In the final award, the Panel stated that the valuation, "while interesting," did not factor into its decision. *See* Final Award, Exhibit 6, at 11. However, the bell could not be unrung once the valuation had been ordered produced and admitted into evidence erroneously. Moreover, when it requested briefing and argument on the issue of privilege, the Panel demonstrated an awareness of the controlling law on privilege, but it then ordered disclosure of the document without any finding that the privilege did not obtain or that there had been a waiver of the privilege. Finally, the related prejudice from the disclosure of the valuation and its admission into evidence permeated the proceeding and further compounded the Panel's error.

Accordingly, pursuant to 9 U.S.C. section 10(a)(4), the arbitration award should be vacated, because the Panel exceeded its powers when it modified the Agreement by ignoring unambiguous terms in the contract between the parties. The Panel also acted in

---

[4] Section 6(g) of Exhibit A of the Agreement states that the arbitrators are "limited to interpreting (i) the applicable provisions of the Agreement and any document incorporated into the Agreement and (ii) any facts and evidence presented to them." The Panel "shall have no authority or power whatsoever to (i) alter, amend, modify, revoke or suspend any condition or provision of the Agreement . . . ." Exhibit 1, at Exhibit A.

manifest disregard of the law by admitting a privileged, irrelevant document, without making any findings regarding privilege or admissibility, and considering the valuation in their decisionmaking process.

## I. THE ARBITRATORS EXCEEDED THEIR POWERS BY IGNORING UNAMBIGUOUS LANGUAGE AND ALTERING KEY PROVISIONS IN THE PARTIES' AGREEMENT.

Section 10(a)(4) of the Federal Arbitration Act provides that an arbitrator's award may be vacated on the ground that the "arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Admittedly, "it is well-settled that the courts play only a limited role when asked to review the decision of an arbitrator." *Teamsters Local Union No. 61 v. United Parcel Service, Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001) (quoting *United Paperworks Int'l Union v. Misco*, 484 U.S. 29, 36 (1987)); *see also Harry Hoffman Printing, Inc. v. Graphic Communications Int'l Union*, 950 F.2d 95 (2d Cir. 1991); *Federated Dep't Stores, Inc. v. J.V.B. Indus. Inc.*, 894 F.2d 862 (6th Cir. 1990). However, courts consistently have held that an award should be vacated where, as here, an arbitration panel exceeds its authority by ignoring or redrawing plain and unambiguous terms in the parties' agreement.

In *United Paperworks Int'l Union v. Misco*, 484 U.S. 29, 38 (1987), the Supreme Court recognized that, while deference must be given to the arbitrator's interpretation of the parties' agreement, the arbitrator "may not ignore the plain language of the contract." Accordingly, the arbitration award must "draw[] its essence" from the parties' agreement. *United States Postal Service v. American Postal Workers Union*, 553 F.3d 686, 689 (D.C. Cir. 2009) (citing *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363

U.S. 593, 597 (1960)). And "while [the arbitrator] may give his own construction to ambiguous language, he is without any authority to disregard or modify plain and unambiguous provisions." *Monongahela Power Co. v. Int'l Bhd. of Elec. Workers*, 566 F.2d 1196, 1199 (4th Cir. 1976).

In this case, the arbitrators exceeded their powers by rendering an award that disregarded unambiguous terms of the parties' contract, and in this manner, the award failed to "draw its essence" from the Agreement. Exhibit A of the Agreement makes clear that the three conditions set forth had to be met in their totality in order for the Contingent Purchase Price to become due. The three conditions provided the Panel with clear, unambiguous terms to apply in reviewing the evidence presented:

> (a) the award to [EOIR] of the follow-on of the NVESD contract . . . on substantially the economic terms and conditions set forth in [EOIR's] final price proposal, which price proposal shall be prepared in accordance with . . . the past practice of [EOIR] and which proposal, if successful, would not, or could not be reasonably be [sic] expected to, change the financial prospects or performance of [EOIR] . . . .

Exhibit 1, at Exhibit A. In reviewing these conditions and the evidence presented, the Panel was constrained by Section 6(g) of Exhibit A of the Agreement, which states:

> The arbitrators shall be limited to interpreting (i) the applicable provisions of the Agreement and any documents incorporated into the Agreement and (ii) the facts and evidence presented to them. The arbitrators shall have no authority or power whatsoever to (i) alter, amend, modify, revoke or suspend any condition or provision of the Agreement . . . .

With respect to the first condition, the Panel concluded that the follow-on contract was awarded on "substantially the economic terms and conditions" because the rates proposed by EOIR were incorporated into the final contract award. However, "economic terms and conditions" means more than "rates," and Holdings presented uncontradicted expert and fact witness testimony and evidence on this point. "Economic" is defined as

"of or relating to the production, development, and management of material wealth, as of a country, household, or business enterprise." http://www.thefreedictionary.com/economic. The plain and ordinary meaning of "terms and conditions" is "general and special arrangements, provisions, requirement, rules, specifications, and standards that form an integral part of an agreement or contract." http://www.businessdictionary.com/definition/terms-and-conditions.html. Accordingly, "economic terms and conditions," by its plain meaning, consists of all of the requirements and specifications, general and special, to produce and develop material wealth – not simply the labor rates a company is billing – and as such, would include revenues, costs and profits. Yet rates equals "economic terms and conditions" was the shorthand that the Panel used in its decision, and by ignoring unambiguous terms of the parties' contract, the Panel altered the terms of the Agreement and therefore exceeded its power and authority.

EOIR also offered expert and fact witness testimony regarding the phrase "economic terms and conditions," as used in the parties' contract. Holdings' expert witness, Certified Public Accountant Michael Smigocki, testified that "economic terms and conditions" means the "revenue, the cost and the profits related to the contract and related to the price proposal." Arbitration Hearing Transcript, Exhibit 3, at pp. 1344-46. Mr. Smigocki also discussed in his expert report, as well as in his live testimony, the crucial economic assumptions and rules regarding profitability underlying the calculations in the price proposal. *See, e.g., id.*; *see also* Expert Report of Michael

Smigocki (attached as Exhibit 7).[5] Jason Rigoli, the primary negotiator of the Agreement on behalf of Holdings, testified as to how the award deviated from the economic terms and conditions of EOIR's price proposal:

> [T]he award of the follow-on was an award of $495 million, versus the company's price submission of 454, which was based on a Performance Work Statement, labor rate buildup, which assumed that that labor was going to be part of the EOIR's dedicated ceiling, and that EOIR was going to deliver 53-ish percent of that. Clearly what we got was not that outcome. It was an aggregate or program ceiling . . . .

Arbitration Hearing Transcript, Exhibit 3, at p. 761. Even Defendant's own CEO and its lead negotiator testified that the Agreement was meant to "translate . . . into legal terms" the extensive negotiations regarding all of the business terms that the parties had discussed, including the value of the contract and the profitability of EOIR as a business. *See* Arbitration Hearing Transcript, Exhibit 3, at p. 90. However, the Panel ignored all of this clear-cut testimony regarding the meaning of "economic terms and conditions." Because the Panel altered the contractual provision "economic terms and conditions" by essentially substituting the word "rates," it exceeded its authority under the Agreement, as well as under the FAA.

## II. THE ARBITRATORS EXCEEDED THEIR AUTHORITY BY OMITTING UNAMBIGUOUS TERMS FROM THE PARTIES' AGREEMENT.

Similarly, the Panel exceeded its authority when it redefined "financial prospects or performance," as written in the third condition of Exhibit A of the Agreement. This phrase applies not only to EOIR's current financial performance, but additionally, to EOIR's ability to grow, increase labor rates, and, relatedly, increase profits in the years to

---

[5] Defendant's expert, former government employee Kevin Carroll, testified that he believed that the award was made on the economic terms and conditions in the price proposal because the rates were incorporated into the award. *See* Arbitration Hearing Transcript, Exhibit 3, at pp. 381-82.

come. Holdings presented uncontradicted expert and fact witness testimony as to the meaning of these terms. Expert witness Michael Smigocki described his analysis of the phrase "financial prospects or performance":

> Low Tech II had a revenue stream. It appeared that at the end of this contract, the full value of the contract was going to be received by the contractor – in this case, EOIR – and then profits were going to be earned under this particular contract. So I was looking at it from that perspective that we've got a baseline, let's compare the proposal and what we have against that baseline to see whether those assumptions, the profit assumptions, the revenue assumptions, are consistent.

Arbitration Hearing Transcript, Exhibit 3, at p. 1424. "Financial prospects or performance" was a term chosen by the parties in their contract to address Defendant's and EOIR's need to prepare the final price proposal in a manner that ensured continued profits for EOIR and its new owner, Holdings. As Jason Rigoli testified,

> our hope was that the bid would be submitted with the understandings that we had agreed to, that it would adhere to the negative covenants of the Stock Purchase Agreement, and that the end result of this contract would be a dedicated $500 million ceiling contract and an overall award that provided the same, if not better, bottom line economics profitability as the Low Tech II contract.

*Id.*, at p. 760. Additionally, Mr. Rigoli testified about Holdings' concern during negotiations that EOIR maintain its profitability in this long-term contract and beyond:

> Where we did orient our attention was around the area of the proposal where a bidder has the most latitude and where it happens to have the greatest impact on the future prospects of the business, and that's the cost side of the bid, and so we oriented the contingent payment provisions, requirements around the cost aspects of the proposal.

*Id.*, at pp. 752-53. This testimony further clarified for the Panel the clear, explicit terms of the phrase "financial prospects or performance."

However, in the face of all of this unchallenged evidence, the Panel's decision only made vague reference to the deposition testimony of an EOIR engineer who had

worked on the preparation of the rates, stating in its award that this employee "believed that the proposed award was likely to be more profitable than the prior contracts."[6] Final Award, Exhibit 6, at p. 9. This redefinition by the Panel ignored the full meaning of the terms "financial prospects and performance" that were specifically negotiated and included by the parties in their contract. Again, the Panel exceeded its authority by modifying the Agreement, and the award should be vacated on this basis.

While judicial review of an arbitration award is somewhat restricted, numerous federal court decisions have concluded that arbitrators exceeded their powers by ignoring or modifying unambiguous terms within a contract. *See, e.g., Hoteles Condado Beach, La Concha and Convention Ctr. v. Union de Troquistas*, 763 F.2d 34, 41-42 (1st Cir. 1985); *see also Beaird Indus., Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir. 2005) (vacating award where agreement was unambiguous as to a subcontracting right, and the arbitrator exceeded his authority in limiting such a right); *Timken Co. v. United Steelworkers of America*, 482 F.2d 1012, 1015 (6th Cir. 1973) (vacating award because arbitrator did not abide by contractual requirement that definitions in the agreement must be followed); *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187-188 (8th Cir. 1988) (vacating award where arbitrator modified contract terms); *Detroit Coil Co. v. Intl. Ass'n of Machinists & Aerospace Workers*, 594 F.2d 575 (6th Cir. 1979) (vacating award on the ground that a contract term was unambiguous and should have been given its plain meaning by arbitrator); *Johnston Boiler Co. v. Intl. Bhd. of Boilermakers, Iron*

---

[6] Holdings countered this contention with, among other evidence, email correspondence from EOIR's Lead Financial Officer Turia Day, evidencing her grave concerns with the ability of the new labor rates to maintain EOIR's profitability. In the email, she wrote, "they may still be profitable, but not profitable enough to cover our financing costs. We really cannot cut anything further to meet our targets." And after a like-minded response from EOIR's long-tenured accountant Debbie Brown, Ms. Day again wrote, "[When we were preparing the proposal] [i]t seemed that everyone was more concerned about being competitive rather than being realistic. Now we have to live with it." Arbitration Hearing Transcript, Exhibit 3, pp. 1988-89.

*Ship Builders, Blacksmiths, Forgers and Helpers,* 753 F.2d 40 (6th Cir. 1985) (vacating award because arbitrator improperly interpreted plain and precise contract terms). Applying the same reasoning, this Court should vacate the arbitration award because the panel exceeded its authority by disregarding and modifying the plain and unambiguous terms of the Agreement.

### III. THE ARBITRATION AWARD WAS IN MANIFEST DISREGARD OF THE LAW.

An arbitration award also should be vacated when an arbitration panel exceeds its authority by entering an award that is in "manifest disregard of the law." *Cole v. Burns Int'l Security Services,* 105 F.3d 1465 (D.C. Cir. 1997) (citations omitted). An award may be vacated if "the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether . . . [and] the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Kurke v. Oscar Gruss & Son, Inc.,* 454 F.3d 350, 354 (D.C. Cir. 2006). In this case, the arbitrators first ordered the production of a privileged document and then admitted the document into evidence and considered it in reaching its award. The Panel did not find that the privilege did not obtain or that there had been a waiver of the privilege. This action was in manifest disregard of the law, and the award should be vacated on that basis.

Shortly before the hearing in this case was scheduled to commence, Defendant asked the Panel to compel Holdings to produce the valuation that had been mentioned at Dr. Mackin's deposition. The Panel directed Holdings to explain its claim of privilege, and Holdings submitted a letter objecting on relevance grounds, discussing the basis for the privilege claim, and attaching a sworn affidavit from Helen Cleveland, Esq., an Atlanta attorney upon whose advice the valuation was obtained and prepared. The Panel

then directed Holdings to produce the document, with no explanation, findings of fact or ruling regarding the relevance or privilege of the valuation, despite the Panel's awareness of the claim of privilege.

After the valuation was produced, Defendant sought to call two additional witnesses to opine on the valuation at the hearing. Defendant also made this valuation the linchpin of its opening brief, contending that "[i]f there were any doubts about the just and fair outcome of this arbitration, they were resolved . . . when [Holdings] produced, for the first time, a valuation of the acquired company, EOIR Technologies, Inc. . . ." Defendant's Prehearing Statement, at 2 (attached as Exhibit 8). Prior to the hearing, Holdings again objected on privilege and relevance grounds to the testimony and to the admission of the valuation. The Panel first allowed extensive testimony from one of Defendant's previously noticed witnesses on the valuation issue and, two days later, heard argument as to the valuation's admissibility. Both parties presented argument, with Holdings proffering additional information from the attorney who had assisted in the valuation's preparation about her involvement in the document's design and preparation, her comments to the document, the importance of her involvement to safeguard the document's compliance with Internal Revenue Code provisions, and the high likelihood of litigation involving the IRS or company employees. After a ten-minute recess, the Panel announced its decision to admit the document, with no findings regarding the assertion of privilege or whether any privilege had been waived.

The Panel was aware of Holdings' claim of privilege regarding the valuation and the law regarding attorney-client and work product privileged documents. Each party presented argument as to the applicability of the privilege to the valuation. Holdings

informed the Panel of its obligation to continue to assert the privilege. However, the Panel ignored the law regarding privilege, made no specific findings regarding any privilege or relevance, and simply ordered the document produced and admitted. *See, e.g., Reliant Energy Power Generation, Inc. v. FERC*, 520 F.Supp.2d 194, 206-07 (D.D.C. 2007) (discussing court review of documents *in camera*, as well as declaration from party asserting privilege, before reaching finding that party had met burden of demonstrating attorney-client privilege); *General Elec. Co. v. Johnson*, 2007 WL 433095, at *1 (D.D.C. Feb. 5, 2007) (court reviewed documents *in camera* and attached table to opinion explaining findings regarding privilege claims); *In re Apollo Group Sec. Litigation*, 251 F.R.D. 12 (D.D.C. 2008). This decision to admit the valuation was in manifest disregard of the law, even under the standard set forth in *Oscar Gruss*, and accordingly the award should be vacated.

Moreover, while *Oscar Gruss* does not discuss a prejudice prong to the determination regarding an arbitrator's disregard of the law, the Panel's indifference to the strictures of privilege law in this case directly contributed to the unfavorable outcome for Holdings. Again, Defendant premised its request for a "just and fair outcome" in the arbitration on this valuation. The Panel commented in its ruling that the valuation was "interesting," yet it concluded that the valuation had "no bearing on the conditions [of Exhibit A] described above." Final Award, Exhibit 6, at p. 11. Therefore, in addition to ignoring the law on privilege, the Panel allowed into evidence and argument an admittedly irrelevant document that it found "interesting" in reaching its decision. This prejudice cannot and should not be ignored in the assessment of the Panel's disregard of the law.

## CONCLUSION

For these reasons, Petitioner EOIR Holdings LLC respectfully requests that this Court vacate the arbitration award and grant such other relief as it deems proper.

Dated: September 8, 2009

Respectfully submitted,

*/s/ Lesley Whitcomb Fierst*
Gary H. Nunes (DC Bar # 417623)
Keith J. Mendelson (DC Bar # 385882)
Lesley Whitcomb Fierst (DC Bar # 478176)
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, Fourth Floor
Tysons Corner, VA 22182
703-790-3310 (phone)
703-918-2243 (fax)
*Counsel for EOIR Holdings LLC*