**EXHIBIT 2**

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| TECHNEST HOLDINGS, INC., | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | Case No. 16 180 Y 00615 08 |
| | ) | |
| EOIR HOLDINGS LLC, | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONDENT'S POST-HEARING BRIEF

Gary H. Nunes
Lesley Whitcomb Fierst
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA 22182
Telephone: (703) 394-2200
Facsimile: (703) 918-2248
Email:  gnunes@wcsr.com

*Counsel for EOIR Holdings LLC*

TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

SUMMARY OF DISCUSSSION ........................................................................ 9

DISCUSSION ................................................................................................ 12

   A.   THE STES CONTRACT AWARD WAS NOT MADE ON "SUBSTANTIALLY THE ECONOMIC TERMS AND CONDITIONS" SET FORTH IN EOIR'S FINAL PRICE PROPOSAL. .................................................................................... 12

      1.   The "Economic Terms and Conditions" of EOIR's Price Proposal Include Revenues, Costs and Profits, Not Merely, as Claimant Arbitrarily Suggests, the "Rates" Proposed By EOIR. .................................................................. 12

      2.   The NVESD Award Was On Substantially Different "Economic Terms And Conditions" Than EOIR's Proposal In Requiring EOIR To Participate With Two Other Contractors Under a "Program Ceiling." ............................................. 15

      3.   Contrary to Claimant's Suggestion, the Parol Evidence Rule Has No Relevance to the Panel's Consideration of the Record. ................................................. 19

   B.   EOIR DID NOT PREPARE THE PROPOSAL FOR THE STES CONTRACT IN ACCORDANCE WITH ITS PAST PRACTICE. ............................................. 21

      1.   In a Clear Departure from EOIR's Past Practice, EOIR Employed a "Top Down" Approach to Prepare the STES Contract Proposal Rather than the Reliable "Bottom Up" Approach Used to Prepare Earlier Proposals. ......................... 22

      2.   In a Further Departure from EOIR's Past Practice, EOIR's Shift to a "Top Down" Approach Required that Questionable Assumptions Be Built into the Proposal.. ..................................................................................... 23

      3.   EOIR's Failure to Prepare the STES Contract Proposal in Accordance with EOIR Past Practice Is Also Reflected By EOIR'S Breach of the Negative Covenants Provision of the SPA. ............................................................ 25

   C.   THE PROPOSAL, IF SUCCESSFUL, WOULD, OR COULD BE EXPECTED TO, CHANGE EOIR'S FINANCIAL PROSPECTS OR PERFORMANCE. ........... 29

i

**D.   CLAIMANT'S EXTRANEOUS ARGUMENTS UNRELATED TO THE THREE CONDITIONS ARE IRRELEVANT AND BASELESS.**............................................ 34

**1.   Technest's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Baseless.** ................................................................................. 34

**2.   Claimant's Repeated Attempts to Focus on "Valuations" of EOIR and on EOIR's Financial Performance Since the Acquisition Are Irrelevant and Misleading.** ............ 37

**3.   Claimant's Further Extraneous Arguments Are Equally Baseless and Irrelevant…** ....................................................................................................... 39

**E.   RESPONDENT IS ENTITLED TO AN AWARD OF ATTORNEYS' FEES AND COSTS.** ............................................................................................................. 41

**CONCLUSION** .................................................................................................. 42

## TABLE OF CASES

*Alliance Data Sys. Corp. v. Blackstone Capital Partners L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009) ................................................................................................................................. 34

*Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 344 (Del. Ch. 2003), *aff'd*, 903 A.2d 728 (Del. 2006) ............................................................................................... 15

*AT&T Corp. v. Lillis*, 953 A.2d 241, 252-53 (Del. 2008)................................................ 13, 21

*Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 921 (Del. Ch. 1999) ............................ 35

*Cornerstone Brands, Inc. v. O'Steen*, 2006 Del Ch. LEXIS 172 at *14 (Del. Ch. Sept. 20, 2006) ................................................................................................................................. 41

*Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005).................................... 35

*Gertrude L.Q. v. Stephen L.Q.*, 466 A.2d 1213, 1217 (Del. 1983)................................ 13

*Gildor v. Optical Solutions, Inc.*, No. 1415-N, 2006 Del. Ch. LEXIS 110 at *23 (Del. Ch. June 5, 2006) ......................................................................................................... 34, 37

*Haase v. Grant*, 2008 Del. Ch. LEXIS 16 at *12 (Feb. 7, 2008)................................................. 14

*Hercules Inc., v. Orbital Sciences Corp.*, No. 13633, 1995 Del. Ch. LEXIS 31 at *8 (Del. Ch. Mar. 15, 1995)............................................................................................................. 15

*In Re State of Delaware*, 708 A.2d 983, 989 (Del. 1998)................................................. 41

*Land-Lock, LLC v. Paradise Prop., LLC*, 963 A.2d 139, No. 384, 2008 Del. LEXIS 601 (Del. Dec. 23, 2008)............................................................................................................ 28

*Mapsco, Inc. v. Rapid Distrib. Serv., Inc.*, 509 A.2d 94; No. 297, 1986 Del. LEXIS 1073 at *2 (Del. May 2, 1986),............................................................................................... 20

*Oakes v. K-Mart*, No. 78C-OC-11, 1981 Del. Super. LEXIS 688 at *9 (Del. Super Sept. 28, 1981) ........................................................................................................................... 21

*Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992) ......................................................................................................................... 21

*Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986), *aff'd*, 538 A.2d 1113 (Del. 1988) ...................................................................................... 28

*True North Composites, LLC v. Trinity Indus., Inc.*, 191 F. Supp. 2d 484, 514-15 (D. Del. 2002) ................................................................................................................................. 20

*Twin Bridges Ltd. P'ship v. Draper*, No. 2351-VCP, 2007 Del. Ch. LEXIS 136 at \*60 (Del. Ch. Sept. 14, 2007) ................................................................................................................ 35

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| TECHNEST HOLDINGS, INC., | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | Case No. 16 180 Y 00615 08 |
| | ) | |
| EOIR HOLDINGS LLC, | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONDENT'S POST-HEARING BRIEF

Respondent, EOIR Holdings LLC ("Respondent" or "Holdings"), pursuant to the Panel's Order dated June 30, 2009, hereby submits its Post-Hearing Brief regarding the proceedings before this Panel on the claims of Claimant, Technest Holdings, Inc. ("Claimant" or "Technest").

The Panel is well aware of the facts and circumstances underlying this arbitration proceeding as a result of the pre-hearing activities and the hearing itself, which covered seven full days of testimony and argument. This brief is designed to supplement these proceedings and further aid the Panel in reaching a decision in this matter. Based on the testimony and evidence presented at the hearing, Respondent submits that Claimant has not met its burden of proof and an award must be entered in favor of Respondent as further detailed below.

## INTRODUCTION

The parties to this dispute, both sophisticated business entities, entered into a Stock Purchase Agreement, dated September 10, 2007 (the "SPA"). (Joint Ex. 101). Under the SPA, Respondent agreed to purchase from Claimant, and Claimant agreed to sell to Respondent, all of the outstanding stock of EOIR Technologies, Inc. ("EOIR") in return for payment by Respondent to Claimant of a Closing Date Purchase Price of $11 million. Under the SPA, Claimant would

1

be entitled to payment from Respondent of a Contingent Purchase Price of approximately $23 million if, and only if, certain specified conditions outlined in Exhibit A to the SPA were met.

Specifically, Section 2(a) of Exhibit A to the SPA provides that the Contingent Purchase Price would be payable only upon:

> (1)   the award to [EOIR] of the follow-on of the NVESD contract...on substantially the economic terms and conditions set forth in [EOIR's] final price proposal;
>
> (2)   which proposal shall be prepared in accordance with...the past practice of [EOIR]; and
>
> (3)   which proposal, if successful, would not, or could not reasonably be expected to, change the financial prospects or performance of [EOIR].

(Joint Ex. 101, at Exhibit A).

Claimant has brought a breach of contract claim under Delaware law, asserting that Respondent has breached the SPA by failing to pay the Contingent Purchase Price. Respondent denies that it has breached the SPA, asserting that the conditions precedent to payment of the Contingent Purchase Price were not satisfied. Though its argument at the close of the hearing would suggest otherwise, it is <u>Claimant</u> that has the burden of proving that each and every one of the three conditions listed above was met. Further, as Respondent's expert John Pachter opined, it is all or nothing.[1] (Hearing Tr., p. 1855). Claimant has failed to meet this burden with respect to <u>any</u> of these conditions, and its claims should be rejected on that basis alone. Moreover,

---

[1]   The Panel need only find that Claimant failed to meet this burden with respect to any one of the three conditions in order to reject Claimant's entire claim. Up front, it should be pointed out that the "all or nothing nature" of these conditions was specifically negotiated and agreed upon by Claimant. This payment structure benefited Claimant in that it provided immediacy and finality to Claimant at the time of award of the follow-on of the NVESD contract – if the three conditions are met, Claimant would get all of the Contingent Purchase Price – and Claimant would bear no risk of execution under the contract.

Respondent has presented compelling evidence that the conditions were not met, which provides further support for the Panel to deny Claimant's claim.

## BACKGROUND

To provide a context for the Panel's consideration of the issues addressed during the hearing, Respondent provides the following summary of the facts and circumstances surrounding the execution of the SPA, EOIR's proposal for the follow-on of the NVESD contract (the "STES Contract"), and the STES Contract ultimately awarded to EOIR (and two other competitors) by NVESD:[2]

1.      EOIR has provided sensor engineering products and services to the Department of Defense for almost 25 years. For the past 14 years, EOIR's principal activity has been to directly support NVESD.   Between 1993 and 2003, EOIR won awards from the NVESD three consecutive times. As of 2007, these NVESD contracts represented more than 90% of EOIR's total annual revenues. (Hearing Tr., pp. 678-680).

2.      First, in 1993, EOIR was awarded the SETA contract which was a three-year contract with a $30 million ceiling. EOIR was the sole awardee under the SETA contract. There was a $10 million increase in the ceiling for good performance. EOIR received all $40 million awarded under the SETA contract. (Hearing Tr., pp. 1154-1155).

3.      Next, in 1996, EOIR was awarded the Lo-Tech I contract, a follow-on to the SETA contract, in the amount of $248 million which was dedicated solely to EOIR.[3]   A

---

[2]      "NVESD" is the United States Army's Night Vision and Electronic Sensors Directorate. The NVESD contract in effect at the time that the SPA was entered into is commonly known as the "Lo-Tech II contract." The follow-on of the Lo-Tech II contract is titled "Sensor Technologies and Engineering Services" and is commonly known as "STES."

[3]      As acknowledged by Claimant's expert, Kevin Carroll, an "*individual*" or "*dedicated*" contract ceiling means that the government may issue task orders up to the ceiling amount to a single awardee and is distinguished from an "*overall*," "*aggregate*" or "*program*" contract

competitor, Fibertek, Inc., received its own dedicated ceiling award.   EOIR received approximately 95% of the $248 million awarded over five years. (Base year plus four option years). (Hearing Tr., pp. 1155-1157).

4.     In 2001, EOIR was awarded the Lo-Tech II contract, a follow-on to the Lo-Tech I contract, in the amount of approximately $406.5 million. The period of performance was a base year plus four option years and two one-year options based upon good performance. Fibertek received a separate award in the amount of approximately $383 million.  Under Lo-Tech II, EOIR and Fibertek each had its own contract with a dedicated ceiling valued at approximately $500 million.   To date, EOIR has received approximately $487 million over the period of performance which has been extended and allows for spending of all of the available ceiling of $500 million. (Hearing Tr., pp. 1157-1164; Joint Ex. 19).

5.     In May 2006, EOIR first learned of the "recompete" of the Lo-Tech II contract. At its 2006 Advanced Planning Briefing to Industry ("APBI"). the U.S. Army stated its intent to award two contracts at $500 million each. This was consistent with the Lo-Tech II procurement. Diane Moulton, EOIR's STES proposal manager, reviewed and shared this information with the STES proposal team, including Dr. Joseph Mackin, then CEO of EOIR and a member of the Technest Board of Directors. Ms. Moulton testified that she fully expected that EOIR would be a recipient of one of these two awards. (Hearing Tr., pp. 1166-1171; Joint Ex. 23).

6.     On May 16, 2007, the government released the first draft performance work statement for the STES procurement. (Joint Ex. 56). The draft performance work statement, at page 4, Section 1.3.7, states:

---

ceiling under which the government may issue task orders up to the ceiling amount to multiple awardees. (Hearing Tr., p. 514)

> It is anticipated there will be two contracts awarded. The estimated value of all work and services to be rendered under these contracts is $495 million, at approximately $99 million per year.

(Joint Ex. 56). Ms. Moulton testified that she disseminated the draft performance work statement to the leadership within EOIR and the proposal team members. Ms. Moulton also testified that, based on this information, it was her view and understanding, which she shared with the proposal team, that there would be two awardees, each with its own ceiling of $495 million, and she fully expected EOIR to be one of the awardees. No one on her team advised her that they had a different view. (Hearing Tr., pp. 1171-1176; Joint Ex. 56). Ms. Moulton further testified that her understanding that there would be two awardees, each with its own ceiling of $495 million, had not changed as of September 2007. (Hearing Tr., p. 1176).

7. Beginning in late May 2007, Respondent conducted its due diligence in connection with its proposed purchase of EOIR. This effort was led by Jason Rigoli. Mr. Rigoli was advised by Dr. Mackin and Gino Pereira, then CFO of Technest and of EOIR and a member of the Technest Board of Directors, that, with respect to the follow-on of the NVESD contract, they expected that the contract would be awarded to EOIR with a dedicated ceiling of approximately $500 million and that the contract itself would be as profitable as the Lo-Tech II contract, if not more profitable. (Hearing Tr., p. 703).

8. Also during this due diligence period, Dr. Mackin, Mr. Pereira and others at EOIR informed Mr. Rigoli that in connection with the follow-on of the NVESD contract, the government would require a reduction in the pass-through rate to 4%. This would represent a significant decrease from the 7.8% pass-through rate that was used under the Lo-Tech II contract. (Hearing Tr., pp. 710-716; Joint Ex. 73). When Mr. Rigoli expressed concern about the impact on EOIR of this reduced pass-through rate, Mr. Rigoli was told by Dr. Mackin that there

5

are "two 'fixes'" to this situation – a large drop in overhead costs and an increase in the load factor on direct rates. (Joint Ex. 73; Hearing Tr., pp. 710-713). Both Dr. Mackin and Mr. Pereira told Mr. Rigoli that the decrease in the pass-through rate would be made up for by increasing direct labor rates 10-15%. (Hearing Tr., pp. 697-703). These representations made to Mr. Rigoli were corroborated and confirmed by at least two financial documents provided to Mr. Rigoli by Mr. Pereira showing a projected 10% increase in the labor rates under the STES Contract and projected revenue for the STES Contract of approximately $480 million. (Joint Exs. 79 and 80; Hearing Tr., pp. 710-716). Dr. Mackin also advised Mr. Rigoli that the Night Vision Lab understood the reduction in the pass-through rate to 4% would require EOIR to increase its direct labor rates and approved the increase. (Hearing Tr., p. 710).

9.    During this same time period, Respondent and Claimant, aided by their counsel, were actively negotiating the SPA. Mr. Rigoli took the lead on these negotiations for Respondent and Mr. Pereira took the lead on these negotiations for Claimant. As described by Mr. Pereira, Mr. Rigoli and Mr. Pereira agreed on the business terms and their lawyers translated these business terms into legal terms for the SPA. (Hearing Tr., p. 90).

10.    The timing of the follow-on of the NVESD contract, however, was not tracking well with Technest's eagerness to sign and close under the SPA. Mr. Rigoli offered to Mr. Pereira to postpone signing of the SPA until the government issued the impending Request for Proposals ("RFP") for the follow-on of the NVESD contract. Mr. Pereira declined. (Hearing Tr., pp. 182-183).[4]

---

[4]    Technest's eagerness to sell was driven in large part by the serious accounts payable situation at EOIR caused by the upstreaming of EOIR's cash to Technest in lieu of paying EOIR's subcontractors. The director of the Night Vision lab advised Mr. Rigoli that this was an extremely significant problem and that it put at risk EOIR's position at the lab, which could have jeopardized EOIR's chances to win the follow-on of the NVESD contract. According to Mr.

11.    As a result, the parties had to address in the SPA the uncertainties relating to the follow-on of the NVESD contract.  First, since the Lo-Tech II contract was clearly winding down and EOIR's future was almost entirely dependent on a successful recompete of the NVESD contract, the purchase price was divided into two parts:  $11 million to be paid up front and a contingent price of $23 million to be paid upon, and only upon, the successful recompete of the NVESD contract.  Second, the parties set forth the conditions which, if met, would constitute a successful recompete of the NVESD contract and trigger payment of the $23 million Contingent Purchase Price.

12.    Recognizing the risk to Claimant that EOIR might not be awarded the follow-on of the NVESD contract or that an award to EOIR of the follow-on of the NVESD contract might not be on the terms and conditions set forth in the SPA that would trigger the payment of the Contingent Purchase Price, Mr. Rigoli also offered to build into the SPA that the closing under the SPA would be deferred until the follow-on of the NVESD contract had been awarded.  That would have given Technest the opportunity not to close on the transaction under circumstances in which the Contingent Purchase Price would not be paid.  Again, Mr. Pereira declined. (Hearing Tr., p. 184).

13.    On September 10, 2007, Respondent and Claimant executed the SPA.  (Hearing Tr., p. 1180; Joint Ex. 101).

14.    On October 24, 2007 (i.e., after the SPA was signed, but before the closing), the government issued the RFP for STES Contract.  (Hearing Tr., pp. 1181-1182; Joint Ex. 138).

---

Rigoli, when he advised the director of the lab that Respondent would shore up EOIR's balance sheet and commit to resolving the accounts payable problem, the director said that he would support the acquisition.  (Hearing Tr., pp. 681-685 and 1291-1293).

15.   EOIR, while still a wholly-owned subsidiary of Technest, prepared and submitted its final price proposal for the STES Contract on November 24, 2007.  Respondent did not participate in the preparation of the final price proposal nor did Respondent review the final price proposal prior to the time it was submitted to the U.S. Army. (Hearing Tr., pp. 778-779).

16.   The proposal for the STES Contract submitted by EOIR sought, and was predicated on, a dedicated ceiling of approximately $454 million over five years and a 40% growth in direct labor force at NVESD. (Hearing Tr., pp. 1190-1191; Joint Exs. 190 and 193).[5]

17.   In July 2008, NVESD issued final awards under the STES Contract to Fibertek and Sentel Corporation, two of EOIR's competitors.  Only at that time did EOIR learn that, unlike all previous awards under the NVESD contract, the STES Contract was a multiple-award program and the final award under the STES Contract established an "aggregate" or "program" ceiling of $495 million for all awardees, rather than dedicated contract ceilings for each awardee. (Hearing Tr., pp. 812-817; Joint Ex. 262).

18.   On or about August 6, 2008, after expiration of a protest period, NVESD issued a final award under the STES Contract to EOIR which was consistent with the earlier awards to Fibertek and Sentel.  (Hearing Tr., pp. 819-821; Joint Ex. 286).

19.   On the date of the awards to each of Fibertek, Sentel and EOIR, NVESD also issued initial task orders to each company of approximately $6,000,000 each.  The task order issued to Sentel included work that had been performed by EOIR under the Lo-Tech II contract.

---

[5]   Diane Moulton, EOIR's STES proposal manager, however, was never advised by Dr. Mackin or Mr. Pereira that there were terms of the SPA that related to EOIR's preparation of the STES price proposal, that rates for the STES proposal could not be lower than they were for Lo-Tech II or that the direct labor rates were to be increased by 10% in order to compensate for the government's lowering of the pass-through rate. (Hearing Tr., pp. 1184-1185).

Accordingly, instead of 40% growth in its direct labor force, on the date of award, EOIR actually lost 10% of its incumbent workforce. (Hearing Tr., pp. 822-824; Joint Ex. 289).

## SUMMARY OF DISCUSSION

Claimant has failed to meet its burden of proof that each of the conditions to payment of the Contingent Purchase Price has been met.

First, Claimant has failed to prove that the award of the follow-on of the NVESD contract to EOIR was on "substantially the economic terms and conditions" set forth in EOIR's price proposal. Claimant's only argument regarding this condition is that the Panel, in making this determination, should not look at such fundamental economic matters as revenues, costs and profits, which are the primary economic terms taken into account by buyers of businesses, but should instead limit itself to determining whether the "rates" proposed by EOIR were accepted by the government. Such a strained reading of the parties' contract is plainly improper. Had the parties intended that the Contingent Purchase Price be paid as long as the "rates" proposed by EOIR were the same as those accepted by NVESD, without considering whether the broader "economic terms and conditions" were substantially the same, they would have said so. When reviewed in the context of the SPA's purpose and giving the broad terms used by the parties their "plain, ordinary meaning," as required under Delaware law,[6] the evidence makes it overwhelmingly clear that the award was <u>not</u> made on substantially the economic terms set forth in the price proposal.

Second, Claimant has failed to prove that EOIR prepared its proposal in accordance with the "past practice" of EOIR. Boiled down, Claimant's arguments that this condition was met are that (i) the same personnel allegedly worked on both the STES proposal and the Lo-Tech II

---

[6]     Section 21 of the parties' agreement specifies that the agreement is to be construed in accordance with Delaware law (without giving effect to Delaware's conflicts of laws principles).

proposal and (ii) Larry Bramlette and Claimant's expert, Mr. Carroll (who relied solely on Mr. Bramlette's testimony and did no analysis of his own), said that the proposal was prepared in accordance with the past practice of the company and, therefore, it must be so. These simplistic arguments fall well short of meeting Claimant's burden. Here, again, Claimant asks the Panel to simply ignore critical aspects of EOIR's final price proposal to NVESD and EOIR's past practices. Specifically, and as acknowledged by Mr. Bramlette, in submitting its proposal for the follow-on contract, EOIR departed from its previous practice of employing a "bottom up" approach to preparing its bid pursuant to which it would carefully assess the level of work anticipated to meet the needs set out by the government in the RFP, calculate the costs of providing the work and propose labor rates in a manner that permitted the company to reliably predict its financial performance over the life of the contract.   Instead, as empirically demonstrated by Respondent's expert, Michael Smigocki, and as acknowledged by Claimant's expert, Mr. Carroll, EOIR employed a "top down" approach in which it first determined the total price it wanted to bid and, then, manipulated the various rates to be charged to achieve that figure.

Third, Claimant has failed to prove that EOIR's price proposal, "if successful, would not, or could not reasonably be expected to, change the financial prospects or performance of" EOIR. In this regard, Respondent has presented evidence that, in an attempt to compensate for the substantially reduced pass-through rate required by the government, the proposal submitted by EOIR incorporated overhead and G&A rates which were built on highly questionable assumptions, including, among others, the need for EOIR to increase NVESD direct labor by 36 new employees who would generate higher returns and on "mapping" other EOIR employees into higher paying labor categories. The evidence is overwhelming and irrefutable that EOIR's

price proposal would, and could reasonably be expected to, have a substantial negative impact on the financial prospects and performance of EOIR.

Essentially conceding that it cannot prove that each of these three conditions to payment of the Contingent Purchase Price has been met, Claimant has attempted, throughout this arbitration process, to divert the Panel's attention from the real issues with a number of extraneous arguments. This tactic is epitomized by Claimant's claim that Respondent breached the implied covenant of good faith and fair dealing under Delaware law. This claim should be rejected as baseless. As addressed below and in Respondent's Motion to Dismiss Claim of Breach of Implied Covenant of Good Faith and Fair Dealing, the law in Delaware is clear that such a claim applies in this case *only* if Claimant shows that there is a "gap" in the provisions of the parties' contract—*i.e.*, language that the parties failed to supply in the agreement—that must be filled by the Panel in order to carry out the parties' intent. Claimant, however, has not even alleged, much less proven, that there is any such "gap" in the Contingent Purchase Price provisions. To the contrary, the conditions precedent to payment of the Contingent Purchase Price are clearly discernible and there is no "gap" required to be filled by the Panel to carry out the parties' intentions. Claimant did not satisfy those conditions precedent, and it is not entitled to any recovery in this matter.[7]

---

[7]    Claimant's tactic of throwing out various and sundry arguments to see what might stick is similarly reflected in its assertions that "valuations" of EOIR prove that Respondent got what it bargained for, that since the acquisition EOIR has been making money "hand over fist" that Respondent failed to perform adequate due diligence, that Respondent did not have funds to pay the Contingent Purchase Price, and that Respondent will get the benefit of a new recompete of the NVESD contract. As addressed below, besides being completely irrelevant to the issues before the Panel, each of these of these assertions, when scrutinized, fails to stand up.

## DISCUSSION

A.  **THE STES CONTRACT AWARD WAS NOT MADE ON "SUBSTANTIALLY THE ECONOMIC TERMS AND CONDITIONS" SET FORTH IN EOIR'S FINAL PRICE PROPOSAL.**

To succeed with its breach of contract claim, Claimant must prove that NVESD's STES Contract award to EOIR was made on "substantially the economic terms and conditions set forth in [the] Company's final price proposal." The only argument that Claimant has advanced to support its position is that the contractual language "economic terms and conditions" is synonymous with "labor rates" and the labor rates proposed by EOIR were incorporated in the STES Contract award. It is clear from (1) the plain language of the SPA, (2) the testimony of several key witnesses, (3) the terms of the proposal and the award themselves and (4) the documentation provided by Claimant to Respondent during the due diligence process that "economic terms and conditions" means much more than "labor rates" and that Claimant has failed to meet its burden that the first condition for payment of the Contingent Purchase Price has been satisfied. Furthermore, contrary to Claimant's suggestion, the parol evidence rule has no relevance or application to the Panel's consideration of the record on whether Claimant met this first (or any other) condition.

1.  **The "Economic Terms and Conditions" of EOIR's Price Proposal Include Revenues, Costs and Profits, Not Merely, as Claimant Arbitrarily Suggests, the "Rates" Proposed By EOIR.**

Claimant would have the Panel believe that the only "economic terms and conditions" in its proposal to NVESD were the "proposed rates," apparently referring to the labor rates included in EOIR's final price proposal. (*See* Claimant's Pre-hearing Statement, p. 6). There is no support under Delaware law or in the SPA for this argument.

It is well established in Delaware that "[i] n construing a contract, a court will interpret the contract as a whole and *give words in the contract their plain, ordinary meaning.*"

*Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983). (emphasis added). Stated another way, "[c]ourts will not torture contractual terms…where ordinary meaning leaves no room for uncertainty. The true test is…what a reasonable person in the position of the parties would have thought it meant." *AT&T Corp. v. Lillis*, 953 A.2d 241, 252-53 (Del. 2008).

There is absolutely no basis for Claimant to suggest that the plain, ordinary meaning of the phrase "economic terms and conditions" would be understood by a reasonable person in the position of these parties, as they negotiated the SPA, to include only the labor rates that were the subject of EOIR's proposal to NVESD. This "analysis" includes only one of the two basic variables dictating the scope of the award and the value of the STES Contract to Respondent. One would be the rates at which the work would be billed, and the other, which Claimant ignores, is the number of hours of work to be provided. It simply cannot be credibly argued that the amount of work to be provided under the STES Contract is not an "economic term and condition" of EOIR's proposal and NVESD's award. More specifically, Claimant ignores the fact that the "accepted" rates were premised on a level of effort that could only result from a dedicated and unencumbered ceiling of approximately $500 million in revenue and a 40% growth in the direct labor supporting the NVESD.

Notably, in submitting its proposal, EOIR was required to provide a specific response to the NVESD Pricing Format, Attachment 007 to the government's solicitation, also referred to as the "level of effort" or the "cost model." (Hearing Tr., pp. 1187-1190; Joint Ex. 139). This Pricing Format contained an assessment of the number of man hours that the government anticipated would be required to complete all the work envisioned under the STES Contract. (Hearing Tr., pp. 1187-1190; Joint Ex. 139). EOIR's assessment of the level of effort required to complete the hours set forth in Attachment 007 was, thus, an integral component of its proposal,

as it provided the framework upon which all of EOIR's work under the STES Contract would be based.  In short, EOIR's $454 million bid was premised on this pricing format, which included a specific "level of effort" to be provided to EOIR if the proposal was accepted.  EOIR's proposal could not be more clear in this regard, stating: ***"To arrive at our total bid price, we utilized the Pricing Format as set forth in Section J, Attachment 007."*** (Joint Ex. 191, p. 7 (EOIR 0000444)).  Plainly, while EOIR's rates may have been accepted, EOIR's proposed "level of effort" was *not* accepted by NVESD, which, instead, awarded an "aggregate program ceiling," dividing the labor that EOIR sought to provide by itself among three different contractors.  (Joint Ex. 191, p. 2).  Even Mr. Carroll, Claimant's expert, conceded as much, agreeing that EOIR's proposal for the STES Contract included a "level of effort" required to complete the work described in NVESD's solicitation, which "level of effort" had been awarded under the earlier Lo-Tech II contract, but was not awarded under the STES Contract. (Hearing Tr., pp. 541-542).

Furthermore, had the parties intended to require only that the labor rates awarded match those in the proposal, then, that is what the contract would have said—it did not.  Delaware law does not permit a contract to be interpreted in such a manner.  *See, e.g., Haase v. Grant*, No. 3041-CC, 2008 Del. Ch. LEXIS 16 at *12 (Del. Ch. Feb. 7, 2008) (holding, in an analogous context, that the courts will not adopt a contract interpretation which the parties could have shown by using express language where such language was not used).  Referring, as it does, broadly, to "economic terms and conditions," the Contingent Purchase Price provision can only reasonably be understood to include *all* of the key financial issues about which the parties were concerned in negotiating the price to be paid for EOIR—the revenues to be generated under the contract, the costs imposed on EOIR, and the profits, which ultimately and reasonably dictated whether EOIR would obtain sufficient value from the STES Contract to meet the conditions for

payment of an additional $23 million above the base price under the SPA. To read it otherwise would impermissibly ignore the plain purpose of the SPA— to entitle Claimant to payment of the Contingent Purchase Price *only* if the NVESD award substantially matched the "economic" terms and conditions of EOIR's proposal. *See Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 344 (Del. Ch. 2003), *aff'd sub nom.*, 903 A.2d 728 (Del. 2006). ("[W]ell established canons of contract interpretation require courts to read a contract as a whole, and consistent with its purpose."); *Hercules Inc., v. Orbital Sciences Corp.*, No. 13633, 1995 Del. Ch. LEXIS 31 at *8 (Del. Ch. Mar. 15, 1995). ("The language of a contract is interpreted in light of the parties' purpose.")

  **2. The NVESD Award Was on Substantially Different "Economic Terms and Conditions" Than EOIR's Proposal in Requiring EOIR to Participate with Two Other Contractors under a "Program Ceiling."**

  While the Panel could reject Claimant's claim based simply on the fallacy of its argument that "labor rates" equals "economic terms and conditions," there is also overwhelming evidence in the record that further demonstrates how NVESD's award was made on substantially different economic terms and conditions than EOIR's proposal. Perhaps most obviously, EOIR submitted a bid of $454,500,999 for a five year contract. Consistent with prior history, EOIR's proposal sought, and was predicated upon, an award with a ceiling "dedicated" solely to EOIR. Instead, the government issued an award with a "program" ceiling of $495 million to be shared with two of EOIR's competitors. Simply stated, an award of $495 million, split three ways, is not "on substantially the economic terms and conditions" of a proposal that requests an award with a dedicated contract ceiling of at least $454 million. Describing the enormous gulf between what was proposed and what was awarded, even Claimant's counsel conceded in his closing: "It's true the award was not quite as expected by the Respondent...." (Hearing Tr., p. 1902).

15

On this subject, the testimony of key EOIR employees involved in the proposal/award process could not be clearer. These witnesses plainly testified that the NVESD award was *not* on "substantially the economic terms and conditions" of the proposal. The most important of these statements comes from Dr. Mackin. The parties expressly gave Dr. Mackin responsibility for preparation of the proposal for the follow-on of the NVESD contract. (Joint Ex. 101 at p. 55 and Exhibit A). Dr. Mackin continued at his deposition that the NVESD did *not* award a contract as proposed by EOIR, testifying that "[t]he Army took our rates and our G&A rate and awarded those. *They did not award the contract as we proposed it....*" Dr. Mackin went on to state that

> A       We expected *and we bid* to $495-million contract with essentially 90-something-million dollars a year, and we made the assumption of so many direct labor hours. And by doing that, that, of course, derives our G&A pool and our overhead pool. And so by assuming we're going to have so many hours and we're going to have so much money every year, that's how we structured our G&A rate -- our labor rates and our G&A rate. *They did not award that, because they awarded to an aggregate ceiling,* so our expectation was, we were going to get five years and that these G&A rates were structured along those lines.

(Deposition of Joseph Mackin, Joint Ex. 349. pp. 268-270). Dr. Mackin's deposition testimony is particularly compelling because, as pointed out by Mr. Pachter, Dr. Mackin stands to gain $700,000 if the Contingent Purchase Price is paid; as such, his statement is inherently credible as an admission against interest. (Hearing Tr., pp. 1752-1754).

Dr. Mackin's conclusions were supported by others at EOIR. Larry Fillian, EOIR's strategic consultant and formerly the Deputy Director of the NVESD with over 25 years of experience there, also testified, in detailed terms, how the NVESD award differed from EOIR's proposal. Questioned at the hearing about his reaction upon learning of the awarding of an "aggregate" contract rather than a dedicated contract sought by EOIR, Mr. Fillian responded as follows:

Q     So in your years in the Army, had you come across aggregate contracts before?

A     *I had never heard of it.* . . .

Q     And upon receiving this explanation regarding what an aggregate ceiling is, what was your reaction?

A     *I was actually shocked,* but more than that, I was very concerned about, one, what it meant to the contractors, and, two, what it meant for the laboratory in terms of their ability to do their mission and our ability to help them do their mission.

Q     And did you talk with them about your feelings as to how this corresponded to EOIR's bid on the contract?

A     Yes. My thoughts went along if it's a half a billion dollar contract, there's four companies, that's $125 million a piece. That's significantly different than a $500 million contract. *I felt that the contracting office and the laboratory had asked us to bid on a half a billion dollar contract, and I felt that if they had asked us to bid on a $125 million contract, our rates, our overhead structure, everything could have been significantly different.*

(Hearing Tr., pp. 1297-1299).

Diane Moulton, EOIR's proposal manager for the STES proposal, likewise testified at her deposition about how the proposal and the award substantially differed in their respective economic terms and conditions:

Q     Was the award different than you expected?

A     Yes, it was.

Q     How was it different than you expected?

A     *We expected the award to be an individual ceiling, granted to EOIR based upon our bid of the $454,500,999.*

Q     Were there any other expectations that were different?

A     That was the main difference, that we expected it to be an individual contract ceiling, not to be shared with other primes, other awardees. . . .

Q     And I think you said that that expectation was based on the bid?

17

A    That expectation was based on our understanding of the RFP, *as well as our bid that we provided to the government.* . . . Our understanding of the contract ceiling was based on a number of factors. One is historical based upon our historical knowledge of the Night Vision Lab contracts that we have been incumbents on have been an individual ceiling, and our incumbency knowledge of that ceiling on the previous efforts have always been a dedicated individual ceiling. Two, we did have information from the APBI from 2006 that we had gathered that stated it was to be a dual award, and I believe -- and I don't have the document in front of me -- that it stated $500 million each contract. That was another data point. We also read in the PWS, Exhibit 4, May 16th, 2007 draft PWS, on the EOIR page 0024857, Section 1.3.7, we anticipate two contracts awarded, and estimated value of all work and services rendered under these contracts is 495 million. We understood that to be 495 million for each of the contracts that they were going to award, and they were planning on awarding two contracts at that period of time. . . .

Q    Go ahead.

A    And so the other factors besides the PWS and the APBI, historical knowledge of the contracts and history to date with our support to the Night Vision Lab, the -- see, this does help me -- the pricing volume in which we had to identify the level of effort, the number of hours per. . . . *The level of effort also dictated the amount of work, and the number of hours for a prime or team to bid would dictate that that amount of hours would be at an individual or would be recognized that that amount of work would be close to the 495 million, which is what they had previously disclosed was the ceiling. So based upon our history, several documents, the APBI in 2006, we were confident that the award should have been a ceiling that would be dedicated to EOIR at the 454 million and change that we had bid.*

(Transcript of Deposition Testimony of Diane Moulton, Joint Ex. 352, pp. 159-164).

The witnesses' testimony regarding the nature of EOIR's proposal (as compared to NVESD's eventual award) is directly supported not only by the history of EOIR's contracts with NVESD, but also by the documentation regarding EOIR's STES Contract proposal that was provided to Respondent by Claimant during the due diligence process. Claimant specifically provided Respondent with a going-forward budget that was based on obtaining an award from NVESD of a $500 million STES Contract. (Joint Ex. 80). Mr. Rigoli explained in detail during the hearing how this budget reflected an understanding on the part of both parties that the

proposal for the STES Contract would result in an dedicated award to EOIR of approximately $500 million. (Hearing Tr., pp. 703, 708). Mr. Rigoli also testified during the hearing that Mr. Pereira and Dr. Mackin both communicated their expectation that EOIR would receive an award of $500 million:

> Q    Now, did you also have conversations with Dr. Mackin and Mr. Pereira about what they anticipated in terms of the recompete, the value of the recompete?
>
> A    Sure, yeah.  They anticipated that the contract would be awarded with approximately a $500 million dedicated ceiling to EOIR, which was in line with the prior contracts; *that the contract itself would be equally if not more profitable than the Low Tech II contract.*

(Hearing Tr., p. 703). (emphasis added).[8]

In short, the evidence is overwhelming that EOIR submitted a proposal to NVESD for an award of a dedicated contract of approximately $454 million with an unencumbered opportunity to achieve the full ceiling of $495 million dollars.  Since NVESD made an award on dramatically different (and substantially less attractive) terms, Claimant did not satisfy the first condition for payment of the Contingent Purchase Price, and its breach of contract claim should be rejected on that basis alone.

### 3.    Contrary to Claimant's Suggestion, the Parol Evidence Rule Has No Relevance to the Panel's Consideration of the Record.

Throughout these proceedings, Claimant has asserted that the Panel should simply ignore the overwhelming evidence reflecting its failure to meet the conditions required for the payment of the Contingent Purchase Price, citing the parol evidence rule and the "integration clause" contained in the parties' contract. Claimant's position on this issue is groundless.

---

[8]    Even Claimant's expert, Mr. Carroll, acknowledged that "the contract ceiling in STES is not based on EOIR's proposal." (Hearing Tr., p. 511).

The parol evidence rule "bars the admission of extraneous evidence that *varies or contradicts* the terms of a unified [*i.e.*, integrated] written instrument." *Mapsco, Inc. v. Rapid Distrib. Serv., Inc.*, 509 A.2d 94; No. 297, 1986 Del. LEXIS 1073 at *2 (Del. May 2, 1986). (emphasis added). The Delaware courts have plainly held that this rule has no application where, as here, the evidence presented does not "vary the terms of the parties'...contract." *See, e.g., Mapsco* 509 A.2d 94, 1986 Del. LEXIS at *2 (rejecting an argument that cost schedules submitted by the defendant were barred by the parol evidence rule where this evidence was consistent with the court's interpretation that the parties' agreement was a cost plus contract); *True North Composites, LLC v. Trinity Indus., Inc.*, 191 F. Supp. 2d 484, 514-15 (D. Del. 2002) (rejecting an argument that testimony regarding the parties' contractual obligations was barred by the parol evidence rule or the existence of a contractual integration clause where the witnesses' testimony "[did] not vary or contradict" the terms of the contract.").

As is clear from the record before the Panel, Respondent did not present *any* evidence at the hearing seeking to "vary" or "contradict" the parties' contract. In fact, the evidence presented by Respondent simply demonstrates how, in applying the unambiguous terms of that contract, Claimant failed to satisfy the conditions (on which it has the burden of proof) for payment of the Contingent Purchase Price. Indeed, even Claimant's counsel conceded at the hearing that "*[c]ertainly extrinsic evidence could be considered to determine whether these conditions precedent to payment of the Contingent Purchase Price] occurred....*" (Hearing Tr., p. 1887).

In short, there is no basis whatsoever for the Panel to adopt Claimant's strained application of the parol evidence rule to any evidence presented by Respondent at the hearing.[9]

## B. EOIR DID NOT PREPARE THE PROPOSAL FOR THE STES CONTRACT IN ACCORDANCE WITH ITS PAST PRACTICE.

To succeed with its claim, Claimant also must prove that EOIR's proposal for the STES contract was prepared "in accordance with…the past practice of [the] Company." Boiled down to their substance, the arguments advanced by Claimant to support this position are:  (i) that the same personnel allegedly worked on both the STES proposal and the Lo-Tech II proposal and (ii) that Mr. Bramlette and Claimant's expert, Mr. Carroll (who relied solely on Mr. Bramlette's testimony and did no analysis of his own), said that the proposal was prepared in accordance with the past practice of the company and therefore it must be so. These simplistic arguments come nowhere close to meeting Claimant's burden of proof, and the Panel may reject Claimant's

---

[9]    Technest's counsel similarly argued at closing that EOIR's "[p]recontractual expectations are not enforceable." (Hearing Tr., p. 1918)  It is clear that testimony presented as to Respondent's expectations regarding the financial prospects or performance of EOIR in connection with EOIR's proposal to NVESD is not barred by the parol evidence rule. Such testimony is admissible, first, because it was not presented for the purpose of "varying" or "contradicting" the parties' contract. Further, such testimony is plainly admissible as bearing on whether the final condition for payment of the Contingent Purchase Price—a determination that the proposal to NVESD, "if successful, would not, or could not be reasonably expected to, change the financial prospects or performance of"[EOIR].  In determining what the parties' intended to require by inclusion of this condition, the Panel should look to what "a reasonable person *in the position of the parties* would have thought it meant." *AT&T Corp. v. Lillis*, 953 A.2d 241, 252-53 (Del. 2008) (emphasis added) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992)).  Evidence of the parties' expectations with regard to the financial prospects and performance of the company if the proposal to NVESD was successful is plainly admissible as relevant, and in fact essential, to determining what a reasonable person in their position would have understood this condition to require. *See, e.g., Oakes v. K-Mart*, No. 78C-OC-11, 1981 Del. Super. LEXIS 688 at *9 (Del. Super Sept. 28, 1981) (admitting in a civil action for false imprisonment defendant's internal operating rules for security guards as relevant to the issue of the "care which a *reasonable person* might be expected to take under the circumstances.") (emphasis added)

claim because it has entirely failed to provide even prima facie evidence in support of its having satisfied this condition.[10]  Further, the record before the Panel reflects several practices adopted by EOIR in making the price proposal to NVESD that dramatically differed from its past practice.

1.  **In a Clear Departure from EOIR's Past Practice, EOIR Employed a "Top Down" Approach to Prepare the STES Contract Proposal Rather than the Reliable "Bottom Up" Approach Used to Prepare Earlier Proposals.**

As addressed by Respondent's experts during the hearing, in submitting prior proposals to NVESD, EOIR had employed a "bottom up" approach pursuant to which it carefully analyzed the tasks projected to fulfill NVESD's contract needs and, on that basis, determined the categories of employees, and number of man hours, costs and expenses to include in its bid proposal.   Thus, in previous proposal efforts, EOIR's bid price had been reached by first conducting a careful examination of the company's *actual* costs to meet the level of effort required by the government's solicitation.   Based on this "bottom up" approach, EOIR, then, determined labor rates based on actual costs, including employee salaries, G&A and other overhead expenses.   This approach allowed EOIR to predict with reasonable certainty the profit that it was likely to make on the contract because the data being used were historically reliable. (*See* Smigocki Report, Joint Ex. 356, p. 13).

The sole fact witness on whom Claimant entirely relies in arguing that the second condition was met, Mr. Bramlette, has acknowledged that EOIR abandoned this "bottom up"

---

[10]     Besides being simplistic and missing the point of the "past practice" condition, the first of these arguments is also not true.  Historically, EOIR's Chief Financial Officer had overall responsibility for EOIR's pricing proposal.  As testified to by Diane Moulton, for the Lo-Tech II contract, Greg Williams, EOIR's CFO at the time, was responsible for EOIR's pricing proposal. (Hearing Tr., p. 1165)  Here, the record is quite clear that for the STES, Mr. Pereira, EOIR's CFO at the time, completely abdicated any responsibility for preparation of the STES pricing proposal and left the responsibility solely to Dr. Mackin, Mr. Bramlette and others.

approach in preparing its proposal for the STES Contract. Mr. Bramlette, the person responsible for preparing proposed labor rates for the STES contract, testified at his deposition that he instead started with an "initial goal" of capping costs at $458 million and made it a personal goal to get below that number and artificially manipulated the labor rates to do so. (Smigocki Report, Joint Ex. 356, p. 13; Bramlette Deposition, Joint Ex. 345, pp. 157-159). Indeed, even Claimant's expert, Mr. Carroll, had to concede that EOIR had adopted such a "top down" approach in preparing the STES Contract bid. (Hearing Tr., pp. 556-557).

**2.    In a Further Departure from EOIR's Past Practice, EOIR's Shift to a "Top Down" Approach Required that Questionable Assumptions Be Built into the Proposal.**

Respondent's experts have also explained, in detail, how this shift to a "top down" approach required that several highly questionable assumptions be built into the proposal, further exacerbating EOIR's departure from past practice. These assumptions included the need for EOIR to hire dozens of new employees who would generate higher returns on direct labor and the "mapping" of all EOIR employees into higher paying labor categories. Mr. Smigocki addressed, for instance, EOIR's assumption, made without any historical basis, that it would add 36 new employees thereby increasing its direct labor revenues, explaining as follows:

> According to the provisional rate submission, 200 employees were being forecast in total for EOIR, which included the addition of the 36 new direct labor hires that would result from the STES award. This meant that EOIR was contemplating an increase of 22% of its workforce as a result of the STES award.
>
> Utilizing such a large growth assumption such as this in its provisional rates had the effect of *lowering* the overhead and G&A rates that EOIR projected then utilized in its STES proposal. This approach not only differed from the past practice of EOIR, it also can *materially impact* the actual profitability of EOIR should this assumption not be realized. As will be discussed and demonstrated in the next section of the report, not only did this assumption not materialize, the direct workforce of EOIR was actually *reduced* as a result of the introduction of Sentel to the STES contract and the award of work effort EOIR was performing under the Low Tech II contract to Sentel, but now under the STES contract.

(Smigocki Report, Joint Ex. 356, pp. 19-20).

Addressing another example of EOIR's dramatic shift from past practices, Mr. Smigocki also noted the following regarding EOIR's new and unfounded assumption that it could "map" existing employees into higher paying jobs:

> Another assumption that was built into the pricing model was that EOIR would be able to map existing employees into new labor categories that contained higher billing rates under the STES contract. With this mapping strategy, it was assumed that EOIR would be able to sustain its prior profitability levels even with the reduction in the handling fee down to effectively 4%. The issue with this assumption however, is whether the government will accept the change in the labor categories for the existing personnel. According to Bramlette, the government does not want to necessarily pay a higher rate in the new contract for an existing person performing work under the predecessor contract. Thus, the mapping strategy may not be successful unless EOIR is able to convince the government that these existing personnel should be slotted into new and different labor categories that contained the higher billing rates.

(Smigocki Report, Joint Ex. 356, p. 20). Had the STES price proposal been prepared in the same manner as the proposal for Lo-Tech II, all rates would have been profitable and EOIR would not have had to resort to this type of artificial, and unreliable, exercise to have the chance of earning a profit on the contract.

EOIR's departure from past practices is further addressed in Mr. Smigocki's expert report, Joint Ex. 356, pp. 12-21.[11] Notably absent from the record is any refutation whatsoever of Mr. Smigocki's analysis by Mr. Carroll or any other Technest witness, despite the fact that Claimant had access to all the same documents as did Mr. Smigocki. Incredibly, Claimant did not prepare any analysis of its own despite having the burden of proof in this proceeding.

---

[11]   As discussed below, these same unrealistic assumptions resulted in unrealistic projections of EOIR's revenues and profits under the STES Contract and consequently resulted in a failure of the third condition to be met.

3.    **EOIR's Failure to Prepare the STES Contract Proposal in Accordance with EOIR Past Practice Is Also Reflected by EOIR'S Breach of the Negative Covenants Provision of the SPA.**

Claimant's failure to meet the condition requiring adherence to past practice is further reflected by its breach of at least one of the "negative covenants" of the SPA, Section 5.2(o), which required, among other matters, that Claimant "take all actions necessary" to cause EOIR not to "submit any new Government Bid which, if accepted,…is a NVESD labor contract with terms less favorable to [EOIR] than established negotiated rates previously provided to [Respondent]…."[12]  (Joint Ex. 101, pp. 57-58).  Section 5.2(o) was negotiated to ensure that EOIR did not submit labor rates to NVESD that materially differed from those which EOIR had previously negotiated with the government on Lo-Tech ll.  On this issue, Mr. Rigoli specifically testified that "the negative covenant was designed as a box to outline the past practices of the company as it relates to the financial aspects of bids to the government."  (Hearing Tr., p. 758).  Mr. Rigoli also testified that "[t]he negative covenant is oriented around the financial past practices of the company as a whole.  We wanted to make sure that any bid that was submitted in this interim period between signing and closing was not going to materially impact the future prospects of this business."  (Hearing Tr., p. 756-757).  This clearly encompasses the STES proposal which was submitted after execution of the SPA but before the closing of the sale, yet

---

[12]    Technest's counsel made the argument in his closing that Section 5.2 has no application to the parties' dispute because it addresses government  bids that result in a "contract," postulating that EOIR's proposal did "not result in a contract.  It result[ed] in an award." (Hearing Tr., p. 1916).  This argument is specious on its face, and, frankly a little desperate.  Any reasonable reading of the SPA makes it absolutely clear that the term "Government Bid" encompasses the STES proposal — it is undisputed that EOIR's STES proposal resulted in the execution by the government and EOIR of the STES <u>contract</u>.  (**See Ex. 286 which is entitled "Award/Contract"**).  It is also absolutely clear that Section 5.2 was intended to address the STES proposal in particular.

Mr. Bramlette and Ms. Moulton were never shown the negative covenant in connection with their work on the STES proposal. [13] (Hearing Tr., p. 1185; Deposition of Larry Bramlette, Joint Ex. 345, p. 142).

The record is clear that Claimant breached Section 5.2(o) by failing to have EOIR incorporate, at a minimum, direct labor rates that EOIR had previously used on the Lo-Tech II contract. EOIR, while under Claimant's ownership, provided these labor rates to Respondent during due diligence (Joint Ex. 24, Hearing Tr., pp. 694-697 and 765-766). Further, in response to Mr. Rigoli's concern regarding the government's capping of the pass-through rate at 4%, thereby lowering revenues and profits, Dr. Mackin informed Respondent that one of the "fixes" to be employed by EOIR was "an increase in load factor on our direct rates." (See emails exchanged between Mr. Rigoli and Dr. Mackin, June 13, 2007, Joint Ex. 73). Shortly thereafter, Mr. Pereira forwarded to Mr. Rigoli a "Profitability Sensitivity Analysis for fiscal year 2008" expressly incorporating an across the board "labor rate increase" of "10%" in the budgeting reflecting Technest's plan to maintain EOIR's profitability under the STES Contract. (Joint Ex. 79). These communications were plainly understood by the parties as establishing the basis upon

---

[13]    It should not go unnoticed that Dr. Mackin was the *only* link at Technest or EOIR between the requirements of the SPA and EOIR's price proposal. Dr. Mackin testified in his deposition that, with respect to the negotiation of the SPA, Mr. Pereira took the lead for Technest and EOIR and kept him informed. (Deposition of Joseph Mackin, Joint Ex. 349, pp. 67-69). Ms. Moulton and Mr. Bramlette, who were charged with preparing EOIR's price proposal, each testified that they never saw the SPA while they were preparing the price proposal. (Hearing Tr., p. 1185; Deposition of Larry Bramlette, Joint Ex. 345, p. 142). By the same token, Mr. Pereira testified that he had no involvement with the preparation of the price proposal. (Hearing Tr., p. 204)  Therefore, of all the players for Technest and EOIR, only Dr. Mackin had visibility into both the SPA and the price proposal.   While Dr. Mackin was the *only* link at Technest and EOIR between the SPA and the price proposal, he appears to have played a secondary role in both the negotiation of the SPA and the preparation of the price proposal. Claimant's failure to submit a price proposal that would have met the second and third conditions of the SPA likely can be attributed to the fact that nobody at Technest or EOIR was charged with this responsibility.

which EOIR would make its proposal for an award under the STES Contract. (Hearing Tr., pp. 710-716).

John Pachter, one of Respondent's experts, has explained how EOIR's failure to incorporate this 10% increase in labor rates in the STES proposal not only constituted a breach of Section 5.2(o) and a departure from past practice, but also imposed substantial financial risk on Respondent materially impacting, the future prospects of EOIR.  As stated by Mr. Pachter:

> EOIR increased the rates for thirteen labor categories relating to positions that were currently filled under LoTech ll, i.e., those positions that EOIR thought it would fill under STES Task Orders, and *decreased* the margin for *fifty-five* labor categories relating to positions that were not currently filled and that EOIR believed it would not fill under Task Orders. ***Upon analysis of the rates post-closing, EOIR Holdings found that the profitability of the STES contract based on the proposed labor rates on the STES contract is "much lower" than the predecessor contract.*** Rigoli Dep. 97:11-12, 17-21, 98:1-7. "The current rates on [the] current contract are below the required profitability." Rigoli Dep. 197:22-198:2. See Attachment 2.17.

> In addition, this "gaming" of the solicitation created a two-fold risk: (1) as acknowledged by Mr. Bramlette in his deposition, NVESD might "snap up" the decreased rates by ordering significant amounts of work to be filled by those positions; and (2) the higher rates for incumbent positions could work to EOIR's disadvantage in competing with the other two multiple-award contractors for Task Orders under the STES contract.  Both factors pose a serious risk of a drag on profitability.

(Pachter Report, Joint Ex. 358, pp. 17-18).[14]  Notably, and likely explaining his failure even to address this departure from EOIR's past practice, Claimant's expert, Mr. Carroll, acknowledged during the hearing that he never even reviewed either the email communications between Mr. Rigoli and Dr. Mackin or the 2008 budget material forwarded to Mr. Rigoli by Mr. Pereira concerning this 10% increase in labor rates. (Hearing Tr., pp. 491, 549-550).

---

[14]   Claimant's expert, Mr. Carroll, plainly acknowledged the riskiness of EOIR's attempt to "game" the government's contracting system, testifying at the hearing that as a former Army procurement officer, the government would attempt to "counter" any such "gaming." (Hearing Tr., pp. 558-559).

Based on its arguments at the hearing, it appears that Claimant is seeking to convince the Panel that Respondent is somehow precluded from claiming that this egregious breach of Section 5.2(o) of the SPA may not be relied upon as evidence of Claimant's failure to meet a condition for payment of the Contingent Purchase Price.[15]   Any such argument is without merit.  Under fundamental rules of contract interpretation, clearly recognized in Delaware, the provisions of Section 5.2 must be read together with the Contingent Purchase Price provision so as to give meaning to each.  *See, e.g., Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986), *aff'd*, 538 A.2d 1113 (Del. 1988) ("a contract must be construed as a whole, giving effect to all of its provisions and avoiding a construction which would render any of those provisions illusory or meaningless.")  Thus, there is no legal basis for any suggestion that the Panel should artificially determine that the breach of one or more negative covenants of the SPA by Claimant, which also caused the failure of one or more of the prerequisites for the payment of the Contingent Purchase Price, should simply be ignored in determining the parties' rights under the Contingent Purchase Price provision.  Such a reading of the SPA would result in a failure to construe the agreement as a whole and give effect to all provisions within the agreement.

This point was illustrated by the Delaware Supreme Court in *Land-Lock, LLC v. Paradise Prop., LLC*, 963 A.2d 139, No. 384, 2008 Del. LEXIS 601 (Del. Dec. 23, 2008).  There, rejecting an argument, similar to Claimant's, that the language of one provision in a contract should somehow trump the application of another, the Court noted:

> In analyzing disputes over the content of a contract, we give priority to the intention of the parties.  We start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language.  "In interpreting contract language, clear and unambiguous terms are

---

[15]      During his closing argument, Technest's counsel claimed that it is somehow relevant that "a condition is not the same as a covenant under Delaware law, and we'll address that question in our final hearing brief." (Hearing Tr., p. 1915).

interpreted according to their ordinary and usual meaning." *We will also "construe the agreement as a whole, giving effect to all provisions therein," conscious of the fact that "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." Keeping these rules in mind, we should look to harmonize the entire agreement and remain consistent with the objective intent of the parties that drafted the contract.*

*Id.* at *9-10 (emphasis added) (footnotes and citations omitted).

In short, there is no basis in the SPA, or under Delaware law, for any argument that the Panel should not be able to consider a breach of Section 5.2 of the SPA in determining whether Claimant met the conditions for payment of the Contingent Purchase Price. The facts show that Claimant's decrease of the labor rates both breached a covenant and led to its failure to satisfy one or more of the conditions precedent to payment of the Contingent Purchase Price. Further, and in any case, as addressed above, there is ample evidence, outside of the evidence showing Claimant's breach of Section 5.2, demonstrating Claimant's failure to satisfy the condition that EOIR prepare the STES proposal in accordance with "past practices," and its claim should be rejected on the basis of any one or all of these departures.

## C.   THE PROPOSAL, IF SUCCESSFUL, WOULD, OR COULD BE EXPECTED TO, CHANGE EOIR'S FINANCIAL PROSPECTS OR PERFORMANCE.

To succeed with its claim, Claimant must finally prove that the proposal submitted to NVESD "if successful, would not, or could not reasonably be expected to, change the financial prospects or performance of [the] Company." Claimant tries to establish that this condition was met by drawing a very simplistic comparison between the STES award and the Lo-Tech 11 award which focuses only on the revenues generated under these two contracts and which pays

absolutely no attention to profits.[16]  The comparison is also false in looking to 2001 when the Lo-Tech II contract was awarded as opposed to EOIR's much more recent, and relevant, performance under the Lo-Tech II contract, which was the focus of the parties' discussion when this condition was negotiated.  These simplistic arguments, without any meaningful analysis of the impact that EOIR's proposal, including the questionable assumptions incorporated therein, could be expected to have on EOIR's performance and prospects, do not and cannot meet Claimant's burden of proof that the third condition was met.

Respondent, on the other hand, has presented overwhelming evidence, which is left wholly unaddressed by Claimant or its expert, that the price proposal submitted by EOIR could, and would reasonably be expected to, have a substantial negative impact on the financial prospects and performance of EOIR.  First, as discussed, above, the parties understood that under the STES Contract, the pass-through rate would be reduced from 7.8% to 4%.  Without a "fix," that reduction, in its own right, would have had a material adverse effect on EOIR's prospects and performance.  The "fix" proposed by Dr. Mackin and Mr. Pereira was a 10% increase in the labor rates, but, as discussed above, that "fix" was not included in the proposal.  Indeed, not only did EOIR's proposal for the STES award not incorporate such an increase, it expressly stated that "our average labor rate on the new contract is 7.8% less than the average billing rate we are currently charging [under the Lo-Tech II contract]."  (Joint Ex. 191, p. 1 (EOIR 0000438)) (emphasis in the original).

As explained by Mr. Smigocki, the omission of a 10% increase in labor rates in EOIR's STES Contract proposal dramatically reduced EOIR's financial prospects.  Reviewing, for

---

[16]     Indeed, Claimant's expert acknowledged in his testimony that he performed no review of "any of the financial documentation in this case to assess the profit margin of either the Lo-Tech II contract or the STES contract."  (Hearing Tr., p. 571)

analytical purposes, four EOIR employees, Mr. Smigocki demonstrated that "just for those four individuals, in excess of $150,000 of profits was lost for just one year ($760,000 over 5 years)," further noting that "[w]hen all employees bid under STES are taken into consideration, the impact on profitability is quite substantial."[17]   (Smigocki Report, Joint Ex. 356, p. 26).   Mr. Pachter's report supports Mr. Smigocki's conclusions that the failure to incorporate the 10% increase in labor rates had a material impact on EOIR's profitability and future prospects, noting, for example, that, in the proposal, rates were increased on only 13 labor categories  while they were decreased on 55 labor categories.[18]

To cure the obvious negative impact on EOIR's future profitability (*i.e.*, financial prospects and performance) resulting from the reduction in the pass-through rate and the overall decrease in labor rates that were built into the proposal, Mr. Bramlette resorted to highly unrealistic assumptions. First, he devised a "mapping" strategy in which direct labor employees

---

[17]   These employees occupy the same labor category under STES as they did under Lo-Tech II.  In addition to thereby providing an apples to apples comparison of labor rates and profits, these employees also provide proof that the "mapping" heavily relied on by Larry Bramlette and Claimant's expert to maintain profitability did not and cannot occur.

[18]   In his closing argument, Claimant's counsel tried to make something out of what he perceived to be inconsistent positions taken by Respondent's experts Mr. Smigocki and Mr. Pachter on the point in time at which to measure whether the proposal, if successful, would, or could reasonably be expected to change the financial prospects or performance of EOIR.  To the extent it has any relevance, the positions of Respondent's expert are entirely consistent.  As stated by Mr. Smigocki, one must first look at the proposal, at the time that it was submitted, to determine whether that proposal, were it to be successful, would, or could reasonably be expected to change the financial prospects or performance of EOIR.  Mr. Smigocki determined that because of the failure to address the reduction in the pass-through rate and the questionable assumptions built into the proposal, this proposal, at the time that it was submitted, indeed, would, or could reasonably be expected to, change the financial prospects or performance of EOIR.  (Smigocki Report, Joint Ex. 356, pp. 21-28)  Mr. Smigocki then looked at actual results as further proof that his conclusion was correct.  Mr. Pachter also focused on actual results as evidence that the proposal, if successful, would, or could reasonably be expected to, change the financial prospects or performance of EOIR.

would be "mapped" into the few profitable labor categories. Claimant tries to latch on to this mapping strategy to salvage its position that the third condition for payment of the Contingent Purchase price was met. This presents several problems for Claimant.[19] As both Mr. Smigocki and Mr. Pachter pointed out, and as discussed above, this mapping strategy is highly risky. It can only be implemented with the government's approval and, as Mr. Bramlette acknowledged, the government likely would not want to pay a higher rate under the new contract for an existing person performing the same work under the predecessor contract. Claimant's expert, Mr. Carroll, also acknowledged that this "gaming" was something that the government tried to counteract. (Hearing Tr., pp. 558-559). Finally, there is no actual evidence that this "mapping strategy" was ever incorporated in the pricing proposal or implemented under the STES Contract.

Mr. Carroll also claimed that EOIR would have control over the task order process and therefore could bid only into profitable labor categories. (Hearing Tr., pp. 433, 452-455). As Ms. Moulton pointed out, however, NVESD has asked all of the awardees to bid on each of the task orders that are released from the lab, testifying "[i]f we do not bid an RTEP, we must provide an explanation as to why we are not stepping up and bidding that effort." (Hearing Tr., pp. 1197-1198). Even if this instruction does not rise to the level of a formal requirement, given EOIR's dependency on its strong relationship with NVESD (particularly in light of a new recompete of the STES Contract), it is simply not a practical solution for EOIR to pick and choose only profitable task orders on which to bid.[20]

---

[19]     Not to mention that this strategy requires the new owner, Respondent, to do the "mapping" and fix other problems associated with the proposal.

[20]     The problem with the mapping strategy is perhaps most starkly illustrated in the email exchange between Turia Day, EOIR's then Controller, and Debbie Brown, EOIR's Accountant since 1995. In discussing actual implementation of the STES Contract in July 2009, Ms. Day

In addition to this highly questionable mapping strategy, as pointed out by Mr. Smigocki and as discussed above, Mr. Bramlette also relied on another unrealistic assumption, namely, that EOIR would hire 36 new direct labor employees to fill positions under the STES Contract - an unprecedented projected 22% increase in EOIR's workforce and 40% increase in EOIR's workforce at the NVESD lab.  Mr. Smigocki demonstrated the material impact on the actual profitability of EOIR should this assumption not be realized.[21]  (Smigocki Report, Joint Ex. 356, pp. 26-28).

Given (i) the known reduction in the pass-through rate, (ii) the overall reduction in the direct labor rates (as opposed to the promised 10% increase), (iii) the unrealistic assumptions regarding a 22% increase in direct labor (40% at the NVESD lab) and (iv) an unproven, non-existent and highly risky mapping strategy (vs. Lo-Tech II where all rates were profitable), all of which were built into the price proposal at the time that it was submitted, by any reasonable measure, EOIR's proposal, if successful, "would, or could reasonably be expected to, change [EOIR's] financial prospects or performance" in violation of the third condition for payment of the Contingent Purchase Price.

---

refers back to the time that the proposal was prepared and explains how she tried to convince management not to reduce labor rates by an average of 7.8%:  *"I know.  I tried, but I was pretty much ignored by all.  It seemed that everyone was more concerned about being competitive rather than being realistic.  Now we have to live with it."*  Ms. Brown replied:  *"well, i honestly feel our rates our good and they are still profitable . . . and they won us the contract, but i just think its going to be hard to get everyone to a higher position . . . but obviously its what we have to do."*  (Joint Ex. 260)  Ms. Brown's comment makes unambiguously clear that the "mapping" had not occurred at that time.

[21]     It should also be pointed out that Claimant seeks to have it both ways on this argument.  On the one hand, as earlier pointed out, to maintain profitability, Claimant relies on Mr. Bramlette's projection of 36 new direct hires.  On the other hand, Claimant argues that EOIR can pick and choose only profitable task orders on which to bid.  Even Claimant cannot argue that all 36 new hires could be expected to be placed in the 13 profitable labor categories.

**D.    CLAIMANT'S EXTRANEOUS ARGUMENTS UNRELATED TO THE THREE CONDITIONS ARE IRRELEVANT AND BASELESS.**

Because Claimant has not proven, and cannot prove, that each of the three conditions to payment of the Contingent Purchase Price has been met, Claimant attempts to salvage the situation by repeatedly trying to divert the Panel's attention from these three conditions to other extraneous arguments. Each of these arguments should be rejected by the Panel as meritless.

**1.    Technest's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Baseless.**

Claimant claims that Respondent, in some as of yet unspecified manner, breached an implied covenant of good faith and fair dealing. This claim does not stand up under even the most basic scrutiny.

The Delaware courts have made it abundantly clear that the implied covenant of good faith and fair dealing "is not an exception to the rule that courts will not alter the terms of a bargain sophisticated parties entered into willingly because a party now regrets the deal." *Alliance Data Sys. Corp. v. Blackstone Capital Partners L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009) ("*ADS*"). As noted by the court in *ADS*, "the implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract. *Id. See also Gildor v. Optical Solutions, Inc.*, No. 1416-N, 2006 Del. Ch. LEXIS 110 at *23 (Del. Ch. June 5, 2006) ("implied covenant of good faith and fair dealing 'cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract.'"). (citations omitted).

The Delaware courts are reluctant to apply the implied covenant of good faith and fair dealing *even* in circumstances where the outcome from enforcing the express terms of a contract might seem severe. The *Gildor* court put it this way:

34

A court should not read a reasonableness requirement into a contract entered into by two sophisticated parties. It is *imperative* that contracting parties know that a court will enforce a contract's clear terms and will not judicially alter their bargain, *so courts do not trump the freedom of contract lightly.*"

*Id.* (emphasis added). Indeed, a case cited by Claimant in its pre-hearing brief, *Chamison v. Healthtrust, Inc.,* 735 A.2d 912, 921 (Del. Ch. 1999) underscores this point, noting that "*[t]he implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written agreement,*" and noting further that "[d]espite these restrictions, Delaware courts apply this legal theory only in narrow circumstances." *Id.* at 921.

The implied covenant of good faith and fair dealing is simply not, as Claimant seems to suggest, a vehicle for recovering money to which a party is not contractually entitled. Rather, the courts have plainly held that this judicial construct has a very narrow application and is only to be "employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 441 (Del. 2005). (quotations and citations omitted). Directly applicable here, the Delaware courts have cautioned:

> [I]mplying contract terms is an occasional necessity to ensure that parties' reasonable expectations are fulfilled, but that this quasi-reformation...should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness and that only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of...had they thought to negotiate with respect to that matter may a party invoke the covenant's protections. *Thus, a claim for breach of an implied covenant generally cannot be based on conduct authorized by the terms of the agreement.*

*Twin Bridges Ltd. P'ship v. Draper,* No. 2351-VCP, 2007 Del. Ch. LEXIS 136 at *60 (Del. Ch. Sept. 14, 2007) (emphasis added) (citing *Cypress Assocs., LLC v. Sunnyside Cogeneration Assocs. Project,* 2006 Del Ch. LEXIS 61 at *30 (Del. Ch. Mar. 8, 2006)). [22]

---

[22]     Consistent with Delaware law, the parties, in fact, expressly agreed in Section 6(g) of the Exhibit A to the SPA that:

35

The plain purpose, then, of the covenant of good faith and fair dealing is to "fill in the gap" where the parties have been silent regarding an unforeseen event, and under no circumstances may a party rely on the covenant of good faith and fair dealing to overcome another party's contractual rights.  Here, Claimant has not even alleged, much less presented any evidence, that the parties' dispute involves any failure to address the conditions for payment of the Contingent Purchase Price, such that it would be even remotely arguable that the covenant of good faith and fair dealing has any application.  In order for this covenant to apply here, Claimant must first show that the Agreement lacks specific language governing an issue before the Panel, and, second, that in the absence of this as-yet-unspecified language, the parties would have reached agreement on some as-yet-unstated provision.

The reality, however, is that there is no "gap" in the parties' agreement regarding the conditions under which the Contingent Purchase Price is to be paid.  The SPA provides that the Contingent Purchase Price will be payable "only upon" Claimant's satisfaction of express conditions negotiated by the parties.  To alter these terms because Claimant regrets that it failed to meet the required conditions would clearly, and impermissibly, contradict the express terms of the parties' contract.  Because the parties set forth specific language in the Agreement that all three conditions would have to be met for Claimant to be entitled to payment of the Contingent

---

The arbitrators shall have *no authority or power whatsoever* to (i) *alter, amend, modify, revoke or suspend any condition or provision* of the Agreement or the documents incorporated into the Agreement, (ii) create, draft, or *form a new agreement* between the parties, (iii) render an award that, by its terms, has the effect of *altering or modifying any condition or provision hereof,* or (iv) terminate the Agreement or any other agreement between the parties. (Joint Ex. 101 at Exhibit A)

Purchase Price and because Delaware courts *"do not trump the freedom of contract lightly,"* *Gildor*, 2006 Del. Ch. LEXIS 110 at *23, Claimant's claim for breach of the implied covenant of good faith and fair dealing must be rejected.

> 2.   **Claimant's Repeated Attempts to Focus on "Valuations" of EOIR and on EOIR's Financial Performance Since the Acquisition Are Irrelevant and Misleading.**

Claimant has also attempted to create a diversion from the real issues before the Panel with its repeated references to two "valuations" of EOIR – one performed by Claimant's investment banker, Rodman & Renshaw, and one performed by Taylor Consulting. The first point that must be made about these valuations, of course, is that they have absolutely no relevance to a determination of whether the three conditions to payment of the Contingent Purchase Price have been met. Beyond that, as Mr. Rigoli definitively demonstrated in his hearing testimony, these valuations do not represent what Claimant would like to have the Panel believe they represent.

Focusing on the Taylor Consulting valuation, Mr. Rigoli testified that the valuation was prepared principally for accounting purposes and to set a value upon which incentive equity membership interests in EOIR Holdings would be granted to certain employees. Mr. Rigoli demonstrated that, among other things, the valuation does <u>not</u> represent either: (1) the price that a third party would pay for the EOIR business today (and certainly not in August 2008 when the conditions for payment of the Contingent Purchase Price are evaluated) or (2) the value of the EOIR business based upon the STES Contract that Claimant delivered to Respondent. Mr. Rigoli also established that the valuation incorporates a number of actual and assumed events that not even Claimant could reasonably argue should be taken into account in this proceeding, including: (a) the optimistic assumption that EOIR will win an award under a brand new, future re-compete of the STES Contract and (b) the CSP Technologies business acquired by EOIR

nearly 12 months after the closing of the sale of EOIR by Claimant to Respondent with new funds invested into EOIR by Respondent.[23]   As Mr. Rigoli testified, if these and other appropriate adjustments are taken into account, the valuation on which Claimant places great emphasis would be substantially reduced. (Hearing Tr., pp. 857-881).   In short, this valuation has no relevance to the matters before the Panel and is simply not what Claimant would have the Panel believe it is.

Separately, Claimant has continuously brought to the Panel's attention EOIR's financial performance since the closing of the acquisition on December 31, 2007 characterizing this performance as "[blowing] the roof off the house" in 2008 and "making money hand over fist." (Hearing Tr., p. 48; Claimant's Pre-Hearing Statement, p. 1).   Again, the first point that must be made about these assertions, of course, is that they have absolutely no relevance to a determination of whether the three conditions to payment of the Contingent Purchase Price have been met.   As Mr. Rigoli pointed out in his testimony, EOIR's performance in 2008 includes miniscule contributions from the STES Contract.   With respect to the STES Contract, as Mr. Rigoli testified, the "success" that EOIR has recently realized is due to Respondent's fixing of the accounts payable issues created by Claimant which enabled and encouraged the government to provide EOIR more pass-through task orders.[24]   Additionally, EOIR's profitability in 2009 has

---

[23]   Claimant's counsel argued at closing that "[t]here is no way that an acquisition that occurred in February of 2009 would be included in a valuation that is as of December 31st, 2008 . . . ." (Hearing Tr., p. 1922)   He is wrong. It was proper for the "valuation" to take into account the CSP Technologies acquisition, even though it occurred after the effective date of the valuation, as a probable or known event at the time that the valuation was prepared, and, were the Panel to give any weight to this "valuation" for purposes of this arbitration, it would be proper, and necessary, as Mr. Rigoli testified, to remove revenue and profits related to that acquisition to get an accurate picture of the "value" of EOIR.

[24]   As a result, to date, EOIR has received approximately 66% in value of the task orders issued under STES with total value of approximately $237 million, $90 million of which relates

mostly been driven by the company's acquisition of CSP Technologies in February 2009. (Hearing Tr., pp. 1090-1093).  Claimant apparently believes that it should get credit for this performance in the form of payment of the Contingent Purchase Price even though this financial performance has exceedingly little to do with the STES Contract or final pricing proposal that was prepared on Claimant's watch.

### 3.   Claimant's Further Extraneous Arguments Are Equally Baseless and Irrelevant.

Claimant's other extraneous arguments, worthy of only minor mention, also fail because they are both irrelevant and simply wrong.

First, Claimant has suggested that Respondent failed to perform adequate due diligence in purchasing EOIR, apparently trying to shift to Respondent responsibility for Claimant's failure to deliver a STES Contract with the expected $500 million dedicated ceiling. This assertion is wrong.  As with any acquisition, Respondent, as the buyer, was primarily dependent on Claimant, the seller, for relevant information about the company.  The evidence shows that everyone from Claimant, EOIR and Respondent, during the entire due diligence process and up to the date of award, believed that the STES Contract would have a ceiling of approximately $500 million dedicated to EOIR. More or different due diligence would not have changed that.[25]

Second, Claimant has attempted to establish that Respondent did not have the funds to pay the Contingent Purchase Price perhaps implying that this was the reason that Respondent did

---

to a single contract. Most significantly, 90% of those task orders are pass-throughs at the 4% rate, which is significantly less profitable than direct labor task orders.

[25]     Respondent also refers the Panel to Section 10.4 of the SPA which provides, in relevant part, that "[n]otwithstanding any right of Purchaser fully to investigate the affairs of Company and Seller and notwithstanding any Knowledge of facts determined or determinable by Purchaser pursuant to such investigation or right of investigation, Purchaser has the right to rely fully upon the representations and warranties of Seller and Company contained in this Agreement." (Joint Ex. 101, p. 79)

not pay the Contingent Purchase Price.[26]  Again, Claimant is wrong.  First, as Mr. Rigoli testified, Respondent secured financing for the SPA through RBC Centura and Acacia Federal. The financing included a revolving credit facility in the amount of $6 million and a term loan of about $16 million for a total of $22 million.  (Hearing Tr., pp. 793-795; Joint Ex. 187).  And, as clearly established through the uncontroverted deposition testimony of Mark Mykityshyn, one of the managing directors of the White Oak Group, Inc., the White Oak Guggenheim Aerospace & Defense Fund had the remaining funds to pay the Contingent Purchase Price if the three conditions to payment of the Contingent Purchase Price were met.  (Deposition of Mark Mykityshyn, Joint Ex. 350, pp. 86, 96, 97; Hearing Tr., pp. 1964-1966).

Finally, Claimant has tried to persuade the Panel that even if the STES Contract did not turn out the way that the parties had hoped, expected and contracted for, Respondent should be required to pay the Contingent Purchase Price because Respondent will get the benefit of a new recompete of the STES Contract.  The SPA, of course, makes no mention of, and certainly gives Claimant no entitlement to any benefit from, any contracts entered into by EOIR other than the STES Contract.  The parties could have negotiated that into the SPA but clearly did not. Moreover, any recompete of the STES Contract will require substantial new investment by EOIR – at Respondent's ultimate expense.  And, ultimately, a recompete of the STES Contract is highly risky to EOIR.  EOIR could lose in a recompetition bid or could be required to bid in ways that would be far less profitable to EOIR than the STES Contract would have been had Claimant submitted a proposal that met the terms of the SPA.  Again, this diversion is without merit.

---

[26]    Claimant's argument here directly conflicts with its argument that EOIR has been earning record revenues.  Claimant cannot have it both ways.

## E.   RESPONDENT IS ENTITLED TO AN AWARD OF ATTORNEYS' FEES AND COSTS.

Section 6(i) of Exhibit A to the SPA, addressing "Dispute Resolution Related to Contingent Purchase Price," provides that "[t]he arbitrators shall have authority to levy attorneys' fees and/or costs (including the costs of the arbitrators) against the non-prevailing party...." Inasmuch as Respondent is entitled to the denial of Claimant's claims in their entirety, it is entitled, as well, under the parties' express agreement, to an award of attorneys' fees and costs, including all fees paid to the AAA in connection with the resolution of this matter. *See In Re State of Delaware*, 708 A.2d 983, 989 (Del. 1998) (recognizing the propriety of an award of attorneys' fees where provided for by contract); *Cornerstone Brands, Inc. v. O'Steen*, No.. 1501-N, 2006 Del Ch. LEXIS 172 at *14 (Del. Ch. Sept. 20, 2006) (same).

## CONCLUSION

For these reasons, Respondent respectfully requests that the Panel find in favor of Respondent, deny any and all relief requested by Claimant, and award Respondent the attorneys' fees and costs it has incurred in connection with these proceedings.

Dated:  July 22, 2009

Respectfully submitted,

Gary H. Nunes
Lesley Whitcomb Fierst
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA 22182
Telephone:  (703) 394-2200
Facsimile:  (703) 918-2248
Email:  gnunes@wcsr.com
*Counsel for EOIR Holdings LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Respondent's Post-Hearing Brief was sent via electronic mail and Federal Express on this 22nd day of July 2009 to:

Carmine R. Zarlenga, Esq.
Nabina J. Sinha, Esq.
Howrey LLP
1299 Pennsylvania Avenue. NW
Washington, DC 20004-2402
Telephone:  (202)783-0800
Facsimile:  (202)383-6610
Email: zarlengac@howrey.com
Email: sinhan@howrey.com

Gary H. Nunes