IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                 :

EOIR HOLDINGS LLC              :

                                 :

          Petitioner          :

                                 :

v.                               :     1:09-cv-01707-RWR

                               :

TECHNEST HOLDINGS, INC.,    :     <u>Oral Argument Requested</u>

                               :

                               :

        Respondent/Defendant   :
_____:

## PETITIONER EOIR HOLDINGS LLC'S MEMORANDUM IN SUPPORT OF ITS SUPERSEDING PETITION TO VACATE ARBITRATION AWARD

Petitioner EOIR Holdings LLC ("Holdings"), through undersigned counsel, respectfully submits this Memorandum in Support of its Superseding Petition to Vacate Arbitration Award in favor of Technest Holdings, Inc. ("Technest").[1]

## INTRODUCTION

This Superseding Petition to Vacate arises from an arbitration award issued on August 21, 2009, in the District of Columbia.  In that award, the Panel purported to interpret a Stock Purchase Agreement ("SPA") between Holdings and Technest, but its award that Technest carried its burden in demonstrating that it was entitled to a $23 million bonus payment was

---

[1] Holdings filed its original Petition to Vacate on September 8, 2009.  Holdings has engaged additional counsel and files this Superseding Petition to Vacate.  Holdings notes that under the Federal Arbitration Act, its time to file a Petition to Vacate does not run until November 21, 2009, and thus it would have been fully within its rights to withdraw its Petition to Vacate and file a new Petition.  Moreover, as no response has been filed to the Petition to Vacate, under Fed. R. Civ. P. 15, an amendment would be permitted.  *See, e.g., Bonar v. Dean Witter Reynolds, Inc.,* 835 F.2d 1378, 1382 (11th Cir. 1988) (amendment of Petition to Vacate governed by Fed. R. Civ. P. 15); *Passa v. City of Columbus,* 2008 WL 687168, *5-6 (S.D. Ohio Mar. 11, 2008) (same).

predicated upon three critical errors, any one of which satisfy the standard for vacating an arbitration award.

First, the Panel acted in manifest disregard of the law by declining to apply fundamental principles of contract interpretation under Delaware law.  It refused to read the SPA as a whole, instead creating a new *ad hoc* standard completely foreign to the governing Delaware jurisprudence: the Panel found that other obviously relevant provisions of a contract may only be considered in interpreting another contractual clause (indeed, the central one) if the other clauses are "cross-referenced or otherwise explicitly incorporated" into the clause at issue.  This had the effect of ignoring critical portions of the SPA and rendering them superfluous in complete disregard for clear requirements of Delaware law.  In doing so, the Panel rendered a critical negative covenant a nullity by refusing to apply it in interpreting other provisions of the contract.

Second, in violation of the American Arbitration Association rules, the Panel ordered the production of a privileged document without first addressing Holdings' claim of privilege.  The Panel compounded the error by allowing Technest to use the document extensively throughout the hearing.  Large portions of the arbitration turned into a contest about the value of the company that had been acquired under the SPA, EOIR Technologies, Inc. ("EOIR"), rather than an analysis of the terms of the contract, which required Technest to prove that the new government procurement contract to be economically equivalent to both the bid made and EOIR's prior award.  Indeed, the privileged valuation became the linchpin of Technest's case and was used to the considerable prejudice of Holdings.  In its award, the Panel belatedly acknowledged that the document should not have been considered in the proper resolution of the issues before it, although its pervasive use in the hearing and post-hearing brief made sufficient

impression on the Panel that it pointedly characterized the document as "interesting" in the award.

Third, the Panel ignored the unambiguous language of the parties' contract in its application of the key provision that Technest must satisfy to be entitled to the award.  Technest was required to show both that the contract awarded to it was on the same "economic terms and conditions" as its bid and that it was consistent with its prior contracts.  Neither condition was satisfied.  EOIR's bid was predicated on being the <u>sole</u> recipient of an approximately $500 million procurement, as had been the prior history.  Instead, it is undisputed that the $495 million procurement award was divided among <u>three</u> government contractors, rather than awarded solely to EOIR.  Because the express conditions in the SPA did not specify that EOIR would be the sole contracting party – although that was logically and obviously implicit – the Panel held that Technest had met its burden.

Holdings recognizes that the federal policy in favor of arbitration affords arbitral awards considerable deference.  That deference is not unlimited.  Nor is the policy in favor of arbitration advanced by blind confirmation of awards.  Parties will lose confidence in arbitration, and decline to opt for it, absent a minimal level of judicial scrutiny to ensure that arbitrators do not exceed their authority and disregard applicable law.  Such judicial scrutiny is recognized under the law.  It should be exercised here.  The Panel's violations are plain on the face of its award and consideration of the unambiguous terms of the written documents.  The violation of core arbitration principles means the award here must be vacated and a new arbitration commenced in which the panel adheres to the standards of the contract and the Federal Arbitration Act.

## STATEMENT OF FACTS

In the SPA, dated September 10, 2007, Holdings agreed to buy from Technest all of the outstanding stock of EOIR. *See* Ex. 1. The SPA provided for a closing to take place in the future, after the satisfaction of various conditions. *Id.* § 2.2(a).

EOIR is a government contractor whose value is based in large part on the work it performs for the U.S. Army's Night Vision and Electronic Sensors Directorate ("NVESD"). At the time of the execution of the SPA, EOIR had been providing services to the NVESD for approximately 24 years. *See* Respondent EOIR Holdings LLC's Post-Hearing Brief, at p. 3 (attached as Ex. 2). From 1993 through 2007, EOIR won and performed technical support work to the NVESD under three consecutive contracts. Each of these contracts was "dedicated" to EOIR, meaning that the contract dollars were available only to EOIR and not to other contractors, and the NVESD spent at least 95% of the value of each of those three contracts. *See* Ex. 2, at pp. 3-4.[2] At the time the SPA was signed, over 90% of EOIR's revenue was derived from its contract with NVESD. *See* Ex. 4, Hearing Transcript at 678-81 (testimony of Jason Rigoli) (90-95% of EOIR's revenues were coming from one customer, the NVESD); 687 (same); 718-19 (same).

At the time the SPA was signed, but before the sale closed, EOIR was in the midst of preparing its bid for the "follow-on," or successor, contract to the soon-to-expire current contract with the NVESD. Because the terms and conditions of the "follow-on" contract would have a material impact on the value of EOIR, the SPA contained a number of key provisions relating to

---

[2] These contracts were what are known as Indefinite Delivery/Indefinite Quantity (ID/IQ) contracts, meaning they permit the government to order an indefinite quantity of services or products during a fixed period of time, typically by individual delivery orders or task orders issued to the contractors working under that contract, subject to an overall contract ceiling.

the bidding and award of that contract that impacted Holdings' obligations and the price it paid

for EOIR.

In particular, because between the signing of the SPA and the closing, Technest would

remain in control of EOIR and make the critical bid on the new NVESD contract, but Holdings

would bear the consequences of that bid once it owned EOIR, Technest and EOIR made the

following "Negative Covenant" that applied until the closing:

> [EOIR] shall not do and [Technest] shall take all actions necessary
> to cause [EOIR] not to do any of the following…:
>
>                            \*    \*    \*
>
> (o) submit any new Government Bid which, if accepted, . . . (ii) is
> a NVESD labor contract with terms less favorable to [EOIR] than
> established negotiated rates previously provided to [Holdings];

Ex. 1 § 5.2.

This negative covenant was sufficiently critical to their agreement that the parties further

provided that its breach would relieve Holdings of what would otherwise be Holdings' obligation

to consummate the transaction set forth in the SPA.  Ex. 1 § 6.2.

The importance of the bid and award on the "follow on" contract is further reflected in

the SPA's two-tier price for the sale of EOIR.  At closing, approximately $11 million was to be

paid to Technest.  Technest could receive significantly more—an additional $23 million (the

"Contingent Purchase Price")—if it could satisfy certain conditions based on the nature of the

award issued:

> The Contingent Purchase Price will be payable only upon: (a) the
> award to [EOIR] of the follow-on of the NVESD contract . . . on
> substantially the economic terms and conditions set forth in
> [EOIR's] final price proposal, which price proposal shall be
> prepared in accordance with . . . the past practice of [EOIR] and
> which proposal, if successful, would not, or could not be

> reasonably be [sic] expected to, change the financial prospects or
> performance of [EOIR]. . . .

Ex. 1, at Ex. A § 2.

After the SPA was executed, but before closing, the "final price proposal" for the follow-on NVESD contract was prepared by EOIR under Technest's direction and control.  *See* Ex. 2 at 8.  The price proposal was approved by Technest's Board of Directors and submitted to the NVESD on November 24, 2007.  *See* Ex. 3 (Arbitration Hrg. Tr.) at 1190.

On December 31, 2007, the transaction contemplated by the SPA closed, and Holdings became the new owner of EOIR.  Only after the closing, when Holdings became the owner of EOIR, did it receive a copy of the EOIR final price proposal and learn its contents.  *See*, Ex. 4, Hearing Transcript at 778-80 (testimony of Jason Rigoli); 999-1000 (same).

The price proposal submitted by EOIR materially differed from EOIR's existing contract. As page one of the executive summary for the price proposal submitted by EOIR to the government revealed:

> EOIR Technologies, Inc. (EOIR) is pleased to present our cost and
> pricing data in response to solicitation W15P7T-08-R-P401, . . .
>
> \*       \*       \*
>
> We are pleased to announce internal changes that will considerably
> reduce the Government's overall cost of doing business with
> EOIR on the STES contract. . . .  [O]ur average labor rate on the
> new contract is 7.8% **less** than the average billing rate we are
> currently charging the government on the Low Technology
> Research Development and Engineering support Services
> (LowTech) contract.  This maximizes the Government's savings of
> approximately $25 million over the 5-year contract period, relative
> to our existing rates on the LowTech contract.

Ex. 7 (Arbitration Ex. 190 at 1; emphasis in bold in original).

As a consequence of these reduced labor rates, EOIR's proposal was considerably less attractive relative to its then-existing contract.  Reinforcing the quantitative significance of this

difference, EOIR represented to the government that the government would <u>save</u> $25 million as compared to its prior contract.  That $25 million revenue reduction, as compared to EOIR's existing contract terms, was highly material for a company being sold for $11 million

More to the point, the price proposal, clearly breached the negative covenant in the SPA.  The SPA covenanted that Technest and EOIR would not submit a bid on a "NVESD labor contract with terms less favorable to [EOIR] than established negotiated rates previously provided to [Holdings]."  Ex. 1 § 5.2(o).  As discussed above, the rates included in the November 2007 bid were substantially lower than EOIR's established rates under the then-current contract.

On August 6, 2008, EOIR was awarded the "follow-on" contract with the NVESD.  That contract differed substantially from the terms and conditions contained in the price proposal that had been made by EOIR in November 2007.  The award of the NVESD contract adopted the much lower labor rates offered in EOIR's final price proposal and the award introduced a material, additional and decidedly negative term that was absent from EOIR's price proposal and contrary to EOIR's historic experience.  <u>The award specified that EOIR would share the award with additional contractors – two others as it turned out</u>.  *See* Ex. 10, Arbitration Ex. 286, at 9.[3]  Thus, rather than becoming the sole contractor on a contract in which it could earn up to $454 million in revenue, as set forth in the submitted price proposal, the award made EOIR one of three contractors sharing a contract that had a $495 million ceiling.

Technest made a demand for payment of the Contingent Purchase Price.  That demand was rejected by Holdings.  On September 23, 2008, Technest filed a Demand for Arbitration with the American Arbitration Association ("AAA") seeking the payment of the Contingent Purchase Price.  Pursuant to the SPA, the arbitrators had a narrow mandate.  First, they were

---

[3] Holdings later learned that the award would be shared amongst three contractors.

limited to claims related to the Contingent Purchase Price.  Ex. 1, Ex. A § 6(a).  Furthermore,

their authority was expressly circumscribed by the parties as follows:

> The arbitrators shall have no authority or power whatsoever to (i)
> alter, amend, modify, revoke or suspend any condition or provision
> of the [SPA] or the documents incorporated into the [SPA], . . .
> [or] (iii) render an award that, by its terms, has the effect of
> altering or modifying any condition or provision hereof[.]

Ex. 1, Ex. A § 6(g).

A seven-day hearing was held in Washington, DC before the Panel.  Prominent in

Technest's presentation to the arbitrators was its use, over the objection of Holdings, of a draft

valuation of EOIR performed in February 2009.[4]  This draft valuation had been prepared at the

direction of counsel, but had nonetheless been summarily ordered to be produced by the Panel in

discovery (again, over the objection of Holdings that it was both privileged and irrelevant).  *See*

June 8, 2009 Letter to Panel and Affidavit of Helen N. Cleveland (attached as Ex. 5); June 10,

2009 email ruling of Panel (attached as Ex. 11).[5]  The valuation was not only privileged, but took

into account subsequent events since the purchase, including EOIR's acquisition of a new

business, and the optimistic assumption that EOIR would win a future contract that had not yet

been awarded.  Ex. 2 at 37-38.  The valuation was raised by Technest at least *46 times on just the*

*first morning of the hearing*.  Technest used the valuation to beseech the Panel to award Technest

a monetary windfall based on a standard not set forth in the contract, arguing: "[Holdings] should

pay fair value for this company based on their own valuation."  Ex. 3 at 49.  Even assuming the

---

[4] The Panel's overruling of Holdings' objection is found in Ex. 3 at 750-51.

[5] The draft valuation was performed in February 2009, more than a year after the purchase price for EOIR had been determined and the price proposal had been submitted.  The valuation was prepared with a lawyer's advice in order to comply with Internal Revenue Code section 409A, and the valuation included assumptions regarding future contract revenues, projected revenues from 2009 acquisitions and other business decisions and investments made after Holdings took ownership of EOIR.

valuation presented the "fair value" of EOIR (which it did not), the question before the Panel was *not* the "fair value" of EOIR.  It was whether the conditions required for the Contingent Purchase Price to be paid had been met.

The Panel issued its award on August 21, 2009.  Ex. 6.  The Panel found that there were three express conditions in order for the Contingent Purchase Price to be paid: (1) whether the award was "on substantially the economic terms and conditions set forth in [EOIR's] final price proposal"; (2) whether the price proposal had been "prepared in accordance with the past practices of [EOIR]"; and (3) whether "the proposal, if successful, would not or could reasonably be expected to change the financial prospects or performance of [EOIR]."  Ex. 6, Award, at 2.

As to the first condition, the Panel focused exclusively on whether the terms and conditions in the price proposal were contained within the government's contract award.  Ex. 6, Award, at 5.  Because it found they did, the Panel concluded the condition had been satisfied. This rigid view, however, ignored the undisputed fact that the award had *additional* economic terms and conditions that were far different than those set forth in the price proposal, namely, that the award required EOIR to share a contract that had a $495 million ceiling with two other contractors, rather than have a $454 million ceiling contract to itself.

As to the second condition, there had been a debate before the Panel as to how to interpret the meaning of a "price proposal prepared in accordance with . . . the past practice of [EOIR]."  Holdings, in its post-hearing brief, urged the Panel to read the contract as a whole—in accordance with Delaware law.  Ex. 2 at 25-29.  In particular, Holdings asked the Panel to take into account the violation of the negative covenant in Section 5.2(o), which forbid EOIR from submitting a bid on a NVESD labor contract "with terms less favorable to [EOIR] than established negotiated rates previously provided to [Holdings]."  *Id.* at 25.  Because a deviation

from established negotiated rates violated a covenant in the SPA, then surely a price proposal with such a deviation could not be one "prepared in accordance with the past practices" as that term was used in the conditions for a Contingent Purchase Price payment.  The Panel, however, held that because the negative covenant was "not cross-referenced or otherwise explicitly incorporated into the conditions for payment of the Contingent Purchase Price," that Holdings' argument was "not persuasive."  Ex. 6, Award, at 10-11.  It cited no Delaware law to support its reading.[6]  The Panel found the second condition was met.  *Id.* at 7.

As to the third condition, the Panel concluded the price proposal would not, or could not reasonably be expected to, change the financial prospects of EOIR.  Ex. 6, Award, at 8-9.  Although the Panel discusses at pages 8 and 9 various factors it expressly considered in reaching that conclusion, in an unguarded aside, it describes the privileged valuation document that had been presented, over Holdings' objection, as "interesting."  *Id.* at 11.  The Panel was quick to follow that conclusion with a statement that this valuation evidence, which figured prominently in Technest's presentation and which the Panel allowed, in fact was irrelevant and should have no bearing on the determinations in the case.  *Id.*

---

[6] The Panel went on to state that "it has not been demonstrated that the previous rates were better."  Ex. 6, Award, at 11.  To the extent the Panel reached that question, after having announced it would not, the Panel made two errors.  First, it reversed the burden of proof by suggesting it was Holdings that had to demonstrate that the previous rates were better.  Technest plainly had the burden of proof to demonstrate the bid had been in accordance with past practices, including historic rates.  Second, there is a fundamental inconsistency in how the Panel addressed rates.  When it came to comparing the bid and the award, the Panel relied on the fact that the rates were facially the same, and ignored the substance that the bid assumed the rates were for a contract on which Holdings was the sole provider, while the award required the work to be shared with two additional contractors.  When it came to comparing the rates in the bid and the past, established rates, the Panel appears to have looked beyond the fact that the bid labor rates were 7.8% lower, and put a burden on Holdings to show that the higher rates were in fact better.

## SUMMARY OF ARGUMENT

An arbitration panel's award, while entitled to considerable deference, remains subject to supervision by the judiciary.  *See* 9 U.S.C. § 10(a); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486 (D.C. Cir. 1997) (arbitration awards may be set aside on the basis of (1) the enumerated reasons in the FAA, (2) when the award is in violation of public policy, or (3) when the award is "in manifest disregard of the law." (internal quotation marks omitted)).  The award here falls into that admittedly small category of cases where there has been such a serious departure from well-established legal principles that this Court must vacate the award.

The Panel made three critical errors, each of which independently requires that this Court vacate the award.[7]  **First**, the Panel erred by limiting its analysis to parts of the SPA that were "cross-referenced or otherwise explicitly incorporated" into a later document.  Ex. 6, Award, at 10-11.  By failing to consider the totality of the contract signed by the parties and rendering superfluous critical portions of that contract, the Panel acted in manifest disregard of the law and exceeded its authority under 9 U.S.C. § 10(a)(4) by violating fundamental tenets of contract interpretation.  In doing so, moreover, the Panel exceeded the express limitations the parties had placed on their authority in the governing law clause and the arbitration clause, as well as the strictures of the Federal Arbitration Act.  **Second**, the Panel violated the due process rights of Holdings when it summarily forced disclosure of a privileged and confidential draft valuation, admitted the valuation into evidence, and pronounced it "interesting" in its analysis.  This document was privileged attorney work product and was irrelevant to the issues before the Panel. The Panel's forced disclosure and consideration of this document was in violation of 9 U.S.C. §

---

[7] To be sure, there are additional elements of the Award with which Holdings vigorously disagrees and which it believes to be erroneous, but Holdings raises here only those errors that are of a nature that requires vacating the Award.

10(a)(3) and in manifest disregard of the law.  **Third**, the Panel exceeded its power by ignoring

unambiguous contract language and altering key provisions in the parties' agreement.  The

Panel's conclusion that being one of three contractors required to share a $495 million

procurement has the same economic condition and effect as being the <u>sole</u> contractor on a $454

million procurement resulted from its plain manifest disregard of the terms of the contract.

These conclusions arise from the face of the award and the plain meaning of the contract at issue.

They require no inquiry into the testimony (much less credibility) of any witness at the

arbitration.

I.     **The Panel Acted in Manifest Disregard of the Law by Failing To Address**
       **Technest's Violation of the Negative Covenant in Section 5.2(o) of the SPA Requires**
       **Vacatur of the Award.**

       A.     **The Panel Failed to Apply Established Principles of Delaware Law.**

       Section 5.2(o) of the SPA states that Technest "shall take all actions necessary to cause

[EOIR] not to . . . submit any new Government Bid which, if accepted, . . . (ii) is a NVESD labor

contract with terms less favorable to [EOIR] than established negotiated rates previously

provided to [Holdings]."  Ex. 1, § 5.2.  The Panel rejected the argument that a violation of

Section 5.2(o) would be considered on the grounds that "[n]egative covenants were not cross-

referenced or otherwise explicitly incorporated into the conditions for payment of the Contingent

Purchase Price."  Ex. 6, Award, at 10-11.[8]  In doing so, the Panel failed to apply two basic and

widely accepted principles of Delaware law.[9]

---

[8] Although the Panel followed its legal conclusion with a two sentence aside on rates, that aside
cannot be fairly read to have been an alternative holding.  The Panel had already announced its
novel legal conclusion – that only expressly incorporated and cross-referenced sections may be
considered in interpreting another clause in a contract.  Based on that legal determination, the
Panel had plainly shut its mind to the question of whether Technest's failure to comply with
Section 5.2(o) had any implications for the Contingent Purchase Price.  Moreover, the Panel's
aside does not suggest it affirmatively reached a conclusion as to whether Technest could show it
had met the standard in Section 5.2(o) that no rate in the bid was "less favorable to [EOIR] than

Under Delaware Law and widely accepted rules of contract interpretation, contracts must be read as a whole. *See* Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."); *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("[w]ell-settled rules of contract construction require that a contract be construed as a whole"); *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) ("The principles governing contract interpretation are well settled. Contracts must be construed as a whole, to give effect to the intentions of the parties." (citing *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)); *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996) (in discerning the intent of the parties, the contract should be read as a whole); *OSI Systems, Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1092 & n.19 (Del. Ch. 2006) (contracts are best interpreted by considering the parties' language in the context of their entire agreement).

Furthermore, a contract should not be interpreted in a way that omits unambiguous contractual language. *See* Restatement (Second) of Contracts § 203(a) (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"); *Warner Communications, Inc. v. Chris-Craft Industries, Inc.*, 583 A.2d 962, 1184 (Del. Ch. 1989)

---

established negotiated rates…." Instead, the Panel simply stated that "it has not been demonstrated that the previous rates were better." The burden, of course, was on Technest to demonstrate that the rates in the bid were in accordance with past practices. It was not Holdings' burden to show they were not. Second, in assessing whether the bid and the contract award were on the same terms and conditions, the Panel did not look behind the rates, accepting that so long as the rates in the bid and the contract were the same, it did not matter if the fundamental assumption behind the rates (that there would be a single contractor) was met in the award. Here, the aside on rates looks behind that rates, as it was undisputed that the rates in the bid were on average lower than those in the bid. *See* Ex. 7 at 1.

[9] The SPA's Choice of Law provision dictates that the agreement be construed under Delaware law. *See* Ex. 1 § 21.

(contracts should be read in a manner that gives effect to each term); *Council of The Dorsett Condo. Apts. v. Gordon*, 801 A.2d 1, 7 (Del. 2002) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument[.]"); *New Castle County v. Nat'l Union Fire Ins. Co*, 174 F.3d 338, 349 (3d Cir. 1999) (applying Delaware law and holding that "this Court takes care not to render other portions of a provision or contract superfluous when construing contract language"); *Council of Dorset Condo. Apts v. Gordon*, 801 A.2d 1, 7 (Del. 2001) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.").

Despite the clear direction of Delaware law and its awareness of these guiding principles, the Panel created its own *ad hoc* rule for contract interpretation.  The Panel refused to consider Section 5.2(o) because it was not "cross-referenced or otherwise explicitly incorporated into the conditions for payment of the Contingent Purchase Price."  Ex. 6., Award, at 10-11.  The Panel thereby substituted its own *ad hoc* rule of contract interpretation—that the other provisions in a contract must be *explicitly* incorporated in another section of a contract in order to be considered in interpreting a portion of the contract—for well-accepted and long-held Delaware law.  By excluding the strictures of Section 5.2(o) from their consideration of whether Technest was entitled to its bonus under the Contingent Purchase Price, the Panel excluded a provision of the SPA that spoke directly to the interpretation issue before it (what constitutes a deviation from prior practice on rates).  Section 5.2(o) was, moreover, a critical clause of the contract, as it was one whose violation excused what would otherwise be Holdings' obligation to consummate the transaction.  *See* Ex. 1, §§ 6, 6.2 ("The obligations of [Holdings] to consummate [the SPA] . . .

are subject to the satisfaction of . . . conditions on or prior to the Closing Date" including

compliance with "[a]ll of the covenants[.]").

### B.    The Panel's Manifest Disregard of Delaware Law and Actions in Excess of its Authority Require the Award to be Vacated.

Where a panel exceeds its powers or exhibits manifest disregard for the law and the terms

of a contract a court should vacate the arbitration award.  *See Davis v. Chevy Chase Fin. Ltd.*,

667 F.2d 160, 168 (D.C. Cir. 1981) (vacated arbitration decision where arbitrator exceeded his

authority); *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187-88 (8th Cir. 1988)

(vacating award where arbitrator modified contract terms); *Hoteles Condado Beach, La Concha*

*& Convention Ctr. v. Union de Tronquistas Local 901*, 763 F.2d 34, 41-42 (1st Cir. 1985)

(vacating award where arbitrator ignored language of the agreement and refused to consider

relevant evidence); *Beaird Indus., Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir.

2005) (vacating award where agreement was unambiguous as to a subcontracting right, and the

arbitrator exceeded his authority in limiting such a right).[10]

An arbitration award must be vacated where the Panel has acted with "manifest disregard

for the law."  *See, e.g.*, *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

Judicial review under this standard must be "sufficiently rigorous to ensure that arbitrators have

properly interpreted and applied" the law.  *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1487

(D.C. Cir. 1997).  As demonstrated, *supra*, the Panel's decision failed to properly interpret or

---

[10] While some courts and commentators have suggested the Supreme Court's decision in *Hall Street Associates LLC v. Mattel, Inc.,* 128 S. Ct. 1396 (2008) abrogated the "manifest disregard" ground for vacating an award, the vast majority of courts have recognized the continuing validity of that doctrine.  *See, e.g., Stolt-Nielson SA v. AnimalFeeds Int'l Corp.,* 548 F.3d 85, 94 (2d Cir. 2008), *cert. granted*, 174 L. Ed. 289 (2009) (recognizing that "manifest disregard," as a judicial gloss on the FAA, "remains a valid ground for vacating arbitration awards"); *Qorvis Communications, LLC v, Wilson,* 549 F.3d 303, 312 (4th Cir. 2008); *Coffee Beanery, Ltd. v. WW, LLC,* No. 07-1830, 2008 U.S. App. LEXIS 23645, at *10-11 (6th Cir. Nov. 24, 2008); *Comedy Club, Inc. v. Improv West Assocs.,* 553 F.3d 1277, 1281 (9th Cir. 2009).

follow basic tenets of Delaware law.  As a result, instead of reading the SPA as a whole, the Panel ignored Section 5.2(o) because it had not been "cross-referenced" or "explicitly referenced."  *See* Award, Ex. 6, at 10.  This manifest disregard for the well-established law of contract interpretation by the Panel requires vacating the award.

The Panel's refusal to consider the negative covenant is a clear violation of the FAA.  The Panel's decision demonstrates a "refus[al] to hear evidence pertinent and material to the controversy" and constitutes such imperfect execution of the arbitrators' duty that a "definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(3), (4).  The Panel's decision to ignore a crucial contractual provision necessitates vacatur of the award.  A provision that allows a party to void a contract and walk away before closing, is clearly material.  *Chem-Met Co. v. Metaland Int'l, Inc.*, No. Civ. A. 96-02548, 1998 WL 35272368 (D.D.C. Mar. 25, 1998) (order vacating the arbitrators' award as exceeding the scope of the arbitrators' powers and for refusal to hear material evidence); *McDonald v. Rodriguez*, 184 B.R. 514, 517 (S.D. Tex. 1995) (arbitration award must be vacated where the "[a]ctions of an arbitrator [are] contrary to express contractual provisions" (citation omitted)); *Timken Co. v. Local Union No. 1123, United Steelworkers of Am.*, 482 F.2d 1012, 1015 (6th Cir. 1973) (vacating award because arbitrator did not abide by contractual requirement that definitions in the agreement must be followed).

The violation here is all the more egregious because the parties here had given the arbitrators a limited mandate rather than the broad discretion sometimes granted by parties.  *Pennzoil Exploration and Production Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (courts distinguish between broad and narrow arbitration clauses); *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, (2d Cir. 1988) ("With narrower clauses . . . a court considering the appropriate range of arbitrable issues must 'consider

whether the [question at] issue is on its face within the purview of the clause.'" (citing *Rochdale*

*Village, Inc. v. Pub. Serv. Employees Union, Local No. 80*, 605 F.2d 1290, 1295 (2d Cir.1979))).

The parties specifically prevented the arbitrators from suspending any condition of the agreement

either directly or indirectly through the effect of an award.

> The arbitrators shall have no authority or power whatsoever to (i)
> alter, amend, modify, revoke or suspend any condition or provision
> of the [SPA] or the documents incorporated into the [SPA], . . .
> [or] (iii) render an award that, by its terms, has the effect of
> altering or modifying any condition or provision hereof[.]

Ex. 1, Ex. A § 6(g).  The Panel's decision had the effect of suspending Section 5.2(o) of the

SPA, thus exceeding its authority under the SPA, and thus under Section 10(a)(4) of the Federal

Arbitration Act as well.

### C.    The Failure to Consider the Violation of Section 5.2(o) Leaves Critical Issues Unanswered by the Award.

The Panel's award purports to order a payment by Holdings to Technest.  The Panels'

refusal to consider the impact of a violation of Section 5.2(o) not only rendered its interpretation

of the Contingent Purchase Price clause incomplete (for all the reasons discussed above) but also

left open a critical issue: was Technest in material breach of the SPA such that Holdings'

obligations are either excused, or should Holdings prevail on an offsetting claim for damages?

No Award can be rendered where those issues are left unaddressed.  If the Panel's refusal to

consider Section 5.2(o) is not the basis for vacatur because those issues were properly excluded,

those issues must be addressed outside the arbitration before the Award is implemented.  This

Court has the inherent power to stay confirmation of the Panel's award pending a determination

of the damages caused by Technest's breach of Section 5.2(o).  *See, e.g.*, *Stone v. I.N.S.*, 514

U.S. 386, 411 (1995) ("we have long recognized that courts have inherent power to stay

proceedings"). The First Circuit relied on an opinion by now-Justice Breyer to justify a stay of

an arbitration award pending the result of related litigation.

> Domestic arbitrations are governed by the United States Arbitration Act (chapter 1 of Title 9) . . . [.] The Act states that, upon application, "the court *must* grant [a confirmation] order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9 (emphasis added). But courts routinely grant stays in such cases for prudential reasons not listed in sections 10 and 11. *E.g., Middleby Corp. v. Hussmann Corp.*, 962 F.2d 614, 615-16 (7th Cir. 1992).
>
> Similarly, this court has held that district courts have discretion to stay an action to compel arbitration pending the outcome of related litigation, even though the Act states that on a motion to compel the court "shall hear the parties" and "shall proceed summarily to trial." 9 U.S.C. § 4; *see Acton Corp. v. Borden, Inc.*, 670 F.2d 377, 383 (1st Cir.1982). In *Acton*, then-Judge Breyer held that, in drafting the statute, Congress did not "intend [ ] a major departure from the ordinary rule allowing one federal court to stay litigation when another federal court is on the process of deciding the same issue."

*Hewlett-Packard Co., Inc. v. Berg*, 61 F.3d 101, 106 (1st Cir. 1995); *see also Anderson v. Nyack*

*Hosp.*, No. No. 02 Civ. 2985, 2002 WL 1149443, (S.D.N.Y. 2002) ("The Court assumes

*arguendo* that it is empowered in appropriate circumstances to stay confirmation or enforcement

of an arbitration award pending the outcome of related litigation that might afford the respondent

a set-off."). Here, the related question of the impact of a violation of Section 5.2(o)—left

undecided by the Panel—requires redress before the Award is implemented.

## II.     The Panel's Consideration of an Irrelevant and Privileged Valuation of EOIR Requires Vacatur.

Under the FAA and related precedent discussed *supra*, this Court may vacate an award if

"the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether

. . . [and] the law ignored by the arbitrators was well defined, explicit, and clearly applicable to

the case." *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (quotation

marks omitted).  In this case, over the objections of counsel, the arbitrators first summarily

ordered the production of a privileged draft valuation that reflected counsel's thoughts and

impressions, then admitted the document into evidence, and finally considered it in reaching the

award.  This action was in manifest disregard of the law.  Furthermore, the arbitrators' action

constitutes "misbehavior by which the rights of [Holdings] have been prejudiced."  9 U.S.C.

§ 10(a)(3).

    Shortly before the hearing in this case was scheduled to commence, Technest asked the

Panel to compel Holdings to produce the draft valuation.  Holdings objected, both on relevance

and privilege grounds, explaining in detail the privileged nature of the document and attaching a

sworn affidavit from Helen Cleveland, Esq., an Atlanta attorney upon whose advice the valuation

was obtained and prepared.  *See* June 8, 2009 Letter from Gary H. Nunes to Panel and Aff. of

Helen N. Cleveland, Ex. 5.  The facts supporting the claim of privilege were entirely unrebutted.

The Panel, however, without granting a hearing, reviewing the document *in camera,* or

appearing to have analyzed the issue in any way, sent a five line email that ordered Holdings to

produce the document, apparently concluding that by applying the protective order to the

valuation that the issue was resolved.  June 10, 2009 e-mail ruling of Panel, Ex. 11.  The email

order did not provide an explanation, findings of fact, or so much as mention the claim of

privilege and irrelevance that had been made with respect to the valuation, despite the Panel's

awareness of such claims.  *Id.*

    Over Holdings objections, the Panel allowed extensive argument from Technest's

counsel during opening statements and testimony from a Technest witnesses on the valuation

issue and then, two days <u>later</u>, heard argument as to the valuation's admissibility.  Both parties

presented argument, with Holdings proffering additional information from the attorney who had

assisted in the valuation's preparation about her involvement in the document's design and preparation, her comments to the document, the importance of her involvement to safeguard the document's assumption, compliance with Internal Revenue Code provisions, and the fact that this document was prepared in preparation for the high likelihood of litigation involving the IRS or company employees.  After a ten-minute recess, the Panel announced its decision to admit the document; again making no findings regarding the assertion of privilege.

Technest made this valuation the linchpin of its case, contending that "[i]f there were any doubts about the just and fair outcome of this arbitration, they were resolved . . . when [Holdings] produced, for the first time, a valuation of the acquired company, EOIR Technologies, Inc. . . ."  Technest's Prehr'g Statement at 2 (attached as Ex. 8).  The appeal for a "just and fair outcome"—divorced from the parties' agreed contractual rights—was highly improper and was fueled exclusively by the Panel's admission of an irrelevant and privileged valuation.

The Panel should not have considered this irrelevant and prejudicial evidence during the proceeding.  The AAA Rules, under which the arbitration was conducted, require the arbitrator to respect the confidentiality of legally privileged information.  *See* Ex. 9, AAA R-31(c).  The privilege is a bedrock concept within Anglo-American practice.  *See* 8 John Henry Wigmore, *Evidence in Trial at Common Law* § 2290, at 542 (McNaughton rev. 1961) ("The history of this privilege goes back to the reign of Elizabeth I, where the privilege appears as unquestioned.  It is therefore the oldest of the privileges for confidential communications." (footnote omitted)).  The AAA rules likewise require arbitrators to exclude evidence that is irrelevant.  Ex. 9, AAA R-31(b).  Only after admitting the valuation and allowing its ubiquitous use and references to the theme of valuation to infect the hearing, did the Panel belatedly recognize that "such valuations

have no bearing on the conditions" at issue in determining whether Technest was entitled to its bonus payment for complying with the terms and conditions of the SPA.  *See* Award, Ex. 6, at 11.  Nevertheless, the damage had been done.  The draft valuation served as a focal point of Technest's case.  While reaching a determination that the Panel did in fact act improperly does not require an *admission* by the Panel that its award was tainted by consideration of irrelevant and prejudicial evidence, the Panel's candid statement in the Award describing the valuation as "interesting" reveals that it was in fact considered.  *Id.*

The privileged nature of this document compounds the harm done by the Panel's consideration of it.  The Panel was aware of Holdings' claim of privilege regarding the valuation and the law regarding attorney-client and work product privileged documents.  Each party presented argument as to the applicability of the privilege to the valuation.  However, the Panel ordered it produced without any discussion of the privilege issue.  It compounded that error by allowing its use at the hearing without any findings as to relevance or admissibility.

The Panel's decision to admit and pronounce this "interesting" valuation was in manifest disregard of the law under the standard set forth in *Oscar Gruss & Son*, and accordingly this Court should vacate the award.  454 F.3d at 354.  This Court cannot and should not ignore the extreme prejudice suffered by Holdings as a result of the Panel's disregard of the law.

**III.   The Panel Exceeded Its Power by Ignoring Unambiguous Contract Language and Altering Key Provisions in the Parties' Agreement.**

An arbitrator "may not ignore the plain language of the contract."  *United Paperworkers Int'l Union  v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *see also* 9 U.S.C. § 10(a)(3), (4). Accordingly, the arbitration award must "draw[] its essence" from the parties' agreement.  *U.S. Postal Serv. v. Am. Postal Workers Union*, 553 F.3d 686, 689 (D.C. Cir. 2009) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)).  Moreover, "while

[the arbitrator] may give his own construction to ambiguous language, he is without any authority to disregard or modify plain and unambiguous provisions." *Monongahela Power Co. v. Local No. 2332, Int'l Bhd. of Elec. Workers*, 566 F.2d 1196, 1199 (4th Cir. 1976) (footnote omitted); *see also Detroit Coil Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Lodge No. 82*, 594 F.2d 575 (6th Cir. 1979) (vacating award on the ground that a contract term was unambiguous and should have been given its plain meaning by arbitrator); *Johnston Boiler Co. v. Local Lodge No. 893, Int'l Bhd. of Boilermakers*, 753 F.2d 40 (6th Cir. 1985) (vacating award because arbitrator improperly interpreted plain and precise contract terms).

The SPA provided for payment of additional funds to Technest only if Technest could prove it satisfied three conditions: (1) the award was "on substantially the economic terms and conditions set forth in [EOIR's] final price proposal"; (2) the price proposal was "prepared in accordance with . . . the past practices of [EOIR]"; and (3) whether the "proposal, if successful, would not, or could not reasonably be expected to, change the financial prospects or performance of [EOIR]." Ex. 1, Ex. A § 2(a).

In considering the first condition, the Panel focused exclusively on the "rates" contained in the award without consideration of additional requirements that altered the terms and conditions. The most important of these alterations was the fact that the expected contract was a five-year dedicated contract with a ceiling of $454 million. In contrast, the award provided a contract with a $495 million ceiling to be *split three ways*. It is self-evident that terms and conditions granting an opportunity to *share* in a $495 million contract is not substantially the same as a dedicated contract with a $454 million ceiling for one party.[11] The unambiguous

---

[11] The testimony presented at the hearing likewise confirmed the substantial economic difference between a price proposal in which one had the exclusive opportunity to earn $454 million and an

meaning of "economic terms and conditions" consists of all of the requirements and specifications even those so obvious and implicit that reason suggests that they need not be expressly set forth.  Indeed under the Panel's "logic", a $500 million contract awarded to EOIR and 499 other contractors would be equivalent to EOIR being the sole contractor on a $500 million contract.  The Panel altered the plain, unambiguous language and meaning of the contract by essentially substituting the word "rates" in place of "economic terms and conditions," and in doing so ignored the award's condition that the work be split among three contractors.  The Panel far exceeded its authority under the SPA, and correspondingly its authority under the Federal Arbitration Act.

The second condition considered by the Panel was whether the price proposal was "prepared in accordance . . . with the past practices of [EOIR]."  Ex. 1, Ex. A § 2(a).  It was not. The new proposal, which among other things violated the negative covenant in Section 5.2(o) by decreasing labor rates, was plainly not one prepared in accordance with past practice.  A contract with "terms less favorable" than a prior contract simply cannot meet the second condition for Technest's bonus.  The Panel, however, ignored the plain language of the contract and therefore failed to evaluate Section 5.2(o).  If it had read the second condition in light of Section 5.2(o), the result of its analysis would necessarily have been different.

In evaluating the third condition—whether the "proposal, if successful, would not, or could not reasonably be expected to, change the financial prospects or performance of [EOIR]," Ex. 1, Ex. A § 2(a)—the Panel improperly considered the "interesting" draft valuation that should never have been ordered produced or admitted.  The "essence" of the parties' agreement, *Am. Postal Workers Union*, 553 F.3d at 689, stands in stark contrast to the irrelevant and

---

award in which three parties received the opportunity to split amongst them $495 million.  *See, e.g.,* Arbitration Hrg. Tr., Ex. 3, at pp. 761, 1344-46.

privileged draft document.  The Panel's decision to ignore evidence that new the price proposal reduced average labor rates by 7.8% and promised a $25 million cost reduction to the government and to conclude that the price proposal did not change EOIR's "financial prospects or performance" requires vacatur.

In ruling on each of these three conditions, the Panel exceeded its authority and acted in manifest disregard for the law.  This Court should vacate the award on this basis.

## CONCLUSION

For these reasons, Petitioner EOIR Holdings LLC respectfully requests that this Court vacate the arbitration award and grant such other relief as it deems proper.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

/s/      John K. Villa
John K. Villa (DC Bar No. 220392)
John J. Buckley, Jr. (DC Bar No. 925081)
Kenneth C. Smurzynski (DC Bar No. 442131)
Steven M. Pyser (DC Bar No. 502618)
725 Twelfth Street, N.W.
Washington, DC  20005
202-434-5000 (phone)
202-434-5029 (fax)

Gary H. Nunes (DC Bar No. 417623)
Keith J. Mendelson (DC Bar No. 385882)
Lesley Whitcomb Fierst (DC Bar No. 478176)
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, Fourth Floor
Tysons Corner, VA  22182
703-790-3310 (phone)
703-918-2243 (fax)
Counsel for Respondent EOIR Holdings LLC

## **Certificate of Service**

I certify that on September 20, 2009, I served the foregoing Petitioner EOIR Holdings LLC's Memorandum in Support of its Superseding Petition to Vacate Arbitration Award electronically with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to Carmine R. Zarlenga, III, Esq., Howrey LLP, 1299 Pennsylvania Ave., NW, Washington, D.C. 20004, counsel for Respondent.

/s/      Steven M. Pyser