## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In the Matter of the Arbitration between:* ) | |
| ) | |
| EOIR HOLDINGS LLC ) | |
| 600 Galleria Parkway, #400 ) | |
| Atlanta, GA 30339, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| and ) | 1:09-cv-01707 RWR |
| ) | |
| TECHNEST HOLDINGS, INC. ) | |
| 10411 Motor City Drive, #650 ) | |
| Bethesda, MD 20817, ) | |
| ) | |
| Respondent. ) | |

## RESPONDENT TECHNEST HOLDINGS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO EOIR HOLDINGS LLC'S PETITION TO VACATE ARBITRATION AWARD

Respondent Technest Holdings, Inc. respectfully submits this Memorandum of

Points and Authorities in Opposition to the Petition of EOIR Holdings LLC to Vacate

Arbitration Award, filed on September 8, 2009 (Docket. No. 1), and served on

Respondent on September 10, 2009, pursuant to Local Civil Rule 7(b).[1]

### PRELIMINARY STATEMENT

Having lost its case via a unanimous award issued by an eminently qualified

three-arbitrator panel, Petitioner EOIR Holdings LLC ("Holdings" or "Petitioner") now

---

[1] Respondent Technest takes exception to Petitioner's untimely and self-styled "Superseding" Petition to Vacate the Arbitration Award (Docket. No. 11), which it filed on Sunday, September 20, 2009, at 7:30 PM, the evening before Respondent's opposition to the originally filed petition was due.  The superseding petition was submitted without leave of Court and without consultation with or even notice to Respondent. To confuse matters further, Petitioner has not withdrawn the original petition.  Accordingly, the "Superseding" Petition should be disregarded unless and until Petitioner obtains leave of Court to file it and addresses the resulting prejudice to Respondent and to the orderly administration of justice that has resulted from Petitioner now having submitted three different petitions to date.

seeks to re-litigate precisely the same failed arguments that led to the award.  Petitioner submitted itself to the jurisdiction of a duly appointed panel of arbitrators pursuant to an integrated Stock Purchase Agreement ("SPA" or "Agreement") specifying "final and binding arbitration" as the applicable dispute resolution mechanism.  If the contract between the parties is to be honored, as Petitioner so fervently demands, Petitioner should not be permitted to now back out of its promise to be bound by the arbitration just because it lost.

Petitioner and Respondent Technest are parties to a fully integrated Stock Purchase Agreement whereby Technest agreed to sell the stock of EOIR Technologies, Inc. ("EOIR") to Holdings on December 31, 2007.  The transaction closed and Petitioner has enjoyed all the benefits of ownership over the last 21 months, including the award of a lucrative government contract and record-setting profits.  Nevertheless, Petitioner Holdings refused to pay Technest two-thirds of the purchase price as provided in the SPA, offering instead an endless litany of ever-changing excuses.  As a result, Technest demanded the dispute be arbitrated in accordance with the Agreement.  There is no dispute that arbitration before the American Arbitration Association ("AAA") was the chosen mode of dispute resolution.

The arbitration proceedings were professional and thorough by any measure.  The parties carefully selected a highly qualified panel of arbitrators with expertise in government contracts and corporate transactions, the two subject matters lying at the heart of the controversy.  There is no dispute over the qualifications of the arbitrators, *one of which was chosen by the Petitioner*, who also had input on the appointment of the third.  Substantial discovery was conducted, even though discovery is not "of right" in

arbitration proceedings. The parties presented their cases to the arbitrators over seven days of hearing in which both sides had an unbridled opportunity to submit evidence and call witnesses. The record generated in the arbitration proceeding was extensive, consisting of approximately 2000 pages of hearing transcript, 2600 pages of deposition transcripts, and 400 exhibits. It is not possible to argue that any evidence germane to the issues was not considered.

On August 21, 2009, the arbitration panel returned a unanimous reasoned award in favor of Technest. As Technest claimed from the beginning of the proceedings until the end, the three conditions of payment specified in the SPA were fully satisfied and it was so proven. The twelve-page award leaves no doubt that the arbitration panel evaluated the evidence presented in light of the contract requirements, element by element, with reference to the exact same conditions that Petitioner Holdings specified repeatedly throughout the hearing.[2]  Even a cursory comparison of the operative contract language and the award demonstrates that the arbitration panel's award drew its substance directly from the language of the Agreement between the parties and did not disregard or alter any written provisions. Nothing more was required.

Under the law of this District, the scope of review of an arbitration award is "the narrowest known in the law." A motion to vacate is not an opportunity to re-litigate issues, which is all that Petitioner seeks to do. Every single substantive argument set forth in the petition to vacate was made, considered, and unanimously rejected by the

---

[2] During its opening statement, Petitioner's counsel presented a demonstrative exhibit specifying the contract language governing the conditions of payment. The demonstrative exhibit was subsequently identified as Joint Exhibit 377 ("JX 377") at Respondent's request and admitted into evidence. Petitioner's counsel repeatedly described the language of JX 377 as the only conditions to payment. *See, e.g.,* Tr. at 52:20-53:13 ("I want to tell you that this case really involves just a very simple straightforward analysis of a simple issue, and that is were the three conditions precedent to payment of the stock from a contingent purchase price met."); *see also* 54:1-15; 759:6-761:1; 849:5-850:17; 1340:18-1341:12; 1931:6-15.

arbitration panel.  It would be contrary to the strong policy favoring arbitration to invade the province of the arbitrators with the sweeping review that Petitioner proposes, replete with arguments that go to the weight of the evidence and are legally insufficient on their face (*e.g.*, that the arbitrators did not adopt the testimony of Petitioner's paid expert as to the meaning of terms in the unambiguous integrated contract (Petitioner EOIR Holdings LLC's Memorandum in Support of Its Petition to Vacate Arbitration Award ("Petition") at 12-13)).

Likewise, Petitioner's argument that a $23 million award should be vacated because an *allegedly* "privileged" corporate valuation was seen by the Panel is not worthy of serious consideration.  The arbitration award unequivocally states that the corporate valuation did not serve as a basis for the award.  In choosing not to put weight on the valuation, the arbitrators did exactly what Petitioner's counsel asked them to do in his closing argument.  Petitioner cannot overcome the Panel's unanimous declaration that they did not give weight to the valuation, which in any case was not privileged.

At bottom, Holdings' Petition should be seen for what it is, just another tactic to avoid its obligation to pay for the valuable company that it received.  As the D.C. Circuit has recognized, "public policy favors leaving arbitration awards untouched."  That policy should be honored here.

### STATEMENT OF FACTS

### A.    Events Leading To The Dispute

On September 10, 2007, after extensive due diligence by the parties, Technest entered into the SPA[3] with Holdings pursuant to which Technest agreed to sell the stock

---

[3] The SPA is attached to Holdings' Petition as Exhibit 1.

of EOIR, to Holdings for a total purchase price of *$34 million* in two payments. The first

payment of $11 million was payable at the closing on December 31, 2007. SPA, § 2.1.

The second payment (called the "Contingent Purchase Price") of approximately $23

million was contingent and payable upon the award of a particular government contract

(the "follow-on contract") to EOIR if three conditions listed in the SPA were met. *Id.*

Exhibit A to the SPA contains the operative language. It reads:

> The Contingent Purchase Price will be payable only upon…the award to
> Company of the follow-on [] Contract and expiration of all protest periods
> related thereto and resolution of any protests in favor of [EOIR], if such
> award occurs on or prior to December 31, 2009, on substantially the
> economic terms and conditions set forth in [EOIR]'s final price proposal,
> which price proposal shall be prepared in accordance with Section 3 of
> this Exhibit A and with the past practice of [EOIR] and which proposal, if
> successful, would not, or could not reasonably be expected to, change the
> financial prospects or performance of [EOIR]….

SPA, Ex. A § 2(a). There is no dispute as to the operative language because Technest

adopted Petitioner's demonstrative exhibit containing what Petitioner's own counsel and

expert asserted were the only conditions to payment of the $23 million second

installment. *See* Technest's Post-Hearing Brief (attached hereto as Exhibit A) at 8 n.5

("For purposes of analyzing whether the Contingent Purchase Price conditions were

satisfied, Claimant adopts JX 377, a demonstrative exhibit that Respondent [Holdings]

prepared which contains the pertinent contract provisions as stated in [the SPA]."); *see*

*also* Arbitration Hearing Transcript ("Tr.")[4] at 52:20-54:15; 68:1-2 (Petitioner's counsel

referenced JX 377 in his opening when he said there were "Three conditions that have to

be met that weren't met."); 1706:13-19 (Mr. Pachter testified that he reviewed "portions

[of the SPA] that [he] thought were relevant to [his] task, which was the conditions - the

three conditions that are outlined in [his] estimate….").

---

[4] Pages from the Arbitration Hearing Transcript cited in this opposition are attached hereto as Exhibit B.

On November 24, 2007, EOIR submitted the "final price proposal" in solicitation of an award of the "follow-on contract" referenced in Joint Exhibit ("JX") 377. *See* Award at 2.[5] On August 4, 2008, eight months after Holdings took ownership of EOIR, EOIR was awarded the follow-on contract in accordance with the conditions to payment of the Contingent Purchase Price listed in the SPA. *Id.* EOIR signed and accepted the award within two days and held a party to celebrate it, complete with commemorative items for its guests. *See* Technest's Prehearing Statement at 3.[6] On August 21, 2008, the contingent portion of the purchase price of $22,948,333.33 became due and payable. *Id.* On August 26, 2008, Holdings informed Technest that it would not pay the Contingent Purchase Price. *See* Technest's Post-Hearing Brief at 34. At the same time, Petitioner continued to enjoy all the fruits of ownership of a subsidiary worth $34 million, while only paying $11 million.

On September 24, 2008, Technest filed its Demand for Arbitration with the AAA pursuant to the terms of the Agreement. Holdings did not challenge or object to arbitration as the proper mechanism for resolution of the dispute.

### B.      Selection Of The Arbitration Panel

The parties jointly requested from the AAA a list of potential arbitrators with expertise in "[g]overnment contracts, defense contracts, mergers and acquisitions and earn out provisions." *See* Correspondence from AAA Case Manager C. Scott to the parties, dated October 7, 2008 (attached hereto as Exhibit C) at p. 2. In response, the AAA provided resumes of numerous candidates meeting the specified qualifications. In

---

[5] The arbitration panel's Final Award ("Award") issued on August 21, 2009 is attached to Holdings' Petition as Exhibit 6.

[6] Technest's Prehearing Statement is attached to Holdings' Petition as Exhibit 8.

accordance with the SPA, each party chose one arbitrator from the AAA list and then the two party-chosen arbitrators jointly selected the third arbitrator (together "the Panel"). *See* SPA, Ex. A § 6(d) ("The arbitration shall be heard by a panel of three (3) arbitrators. Each party shall select one arbitrator....The two arbitrators shall then select the third arbitrator within fifteen (15) days after the second arbitrator is chosen.").

There is no question that the arbitrators had more than the requisite qualifications. *See* Arbitrator Resumes (attached as Exhibit D).  Amongst the three Panel members, the arbitrators accounted for over 50 years of experience in the government contracts field. Each of the arbitrators had considerable prior commercial arbitration experience.  In sum, neither the Panel's qualifications nor the Panel's neutrality are in question.

### C.    Pre-Hearing And Hearing Procedures

The parties engaged in substantial discovery over a period of several months that resulted in the production of over 100,000 pages of documents, 13 depositions, and 4 expert reports.  Ultimately, a hearing was held before the Panel on June 22-30, 2009, in Washington, D.C.  The parties prepared a set of joint exhibits for the hearing of nearly 400 documents; nine witnesses were called resulting in a hearing transcript nearly 2000 transcript pages in length.  Petitioner was given every opportunity to call as many witnesses, present as many exhibits, and make every argument it wished.

To be kind, there were massive contradictions in the evidence that Petitioner presented to the Panel.  For example, Petitioner called a contract law expert named John Pachter, who testified that the three conditions of payment set forth in the SPA were "easy to understand" and "not ambiguous." Tr. at 1803:9-1805:20.  Petitioner's contract

law expert further testified that the contract was integrated with legal consequences as follows:

> Q: Maybe I asked that question imprecisely. When there's an integration clause in a contract like Joint Exhibit 101, that means that oral promises, oral presentations and oral agreements that occurred before the contract was signed are not legally enforceable.
>
> A: That's the normal interpretation.
>
> Q: That's the law, right? That's basic contract law, isn't it?
>
> A: Yes.

Tr. at 1815:13-22. Notwithstanding the testimony of Petitioner's "contract law expert," Petitioner presented a different expert to offer his opinion about the meaning of the supposedly unambiguous contract language. *See*, *e.g.*, Tr. at 1344:5-21 (Petitioner's expert Michael Smigocki testified that "economic terms and conditions" really means the "revenue, the cost and the profit related to the contract and related to the price proposal."). Even worse, during the cross-examination of Petitioner's experts, it became clear that there was a battle between Petitioner's *own experts* as to the proper interpretation of the third condition of payment. Tr. at 1817:14-1818:4.[7]

Testimony from Petitioner's fact witnesses fared no better. Petitioner's lead witness testified at length about his wholly unsupported belief that EOIR, while still owned by Technest, had "gamed" the final price proposal. Tr. at 923:22-924:4. But Petitioner's second witness -- who actually managed the price proposal process -- put that fanciful and self-serving testimony to rest when she testified that the final price proposal

---

[7] The contradictory testimony prompted Technest's counsel to ask one of Petitioner's experts "Who's right?" In response to which Petitioner's contract law expert proclaimed "I believe I am...." Tr. at 1818:3-4.

was not "gamed" but instead was "honest, legitimate, and the best possible effort" and was fully expected to be profitable in the future.  Tr. at 1235:11-1236:4; 1236:16-1237:2. Ironically, Petitioner now seeks to take issue with testimony of its own hearing witness.

### D.   The Award In Technest's Favor

Following the hearing, the Panel ruled and issued a unanimous and reasoned written decision and arbitration award on August 21, 2009 (the "Award").  The Panel determined that each of the three conditions to payment of the Contingent Purchase Price had been met and that Petitioner had breached the Agreement.  Award at 9.  Accordingly, the Panel awarded Technest a total of $23,778,402.83 plus interest from the date of the Award until paid in full.  *Id.* at 12.  Although Petitioner agreed in the SPA that "[a]ny award by the arbitrators shall be final and binding on the parties" it has yet to pay Technest the Award.  *See* SPA, § 6(f).

### STANDARD OF REVIEW

Petitioner has downplayed the applicable standard of review governing its Petition.  Judicial review of arbitration awards is extremely limited.  *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509-10 (2001); *Int'l Thunderbird Gaming Corp. v. United Mex. States*, 473. F. Supp. 2d 80, 83 (D.D.C. 2007).  This District has characterized the scope of review of an arbitration award as "the narrowest known in the law." *S. Pac. Transp. Co. v. United Transp. Union*, 789 F. Supp. 9, 13 (D.D.C. 1992) (internal citations omitted).[8]  The Federal Arbitration Act ("FAA")

---

[8] It is telling that in most of the cases that Petitioner cites, the court upheld the arbitration award and in doing so rejected the same species of argument that Petitioner advances.  *See, e.g., Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600 (D.C. Cir. 2001) (upholding arbitration award); *Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 866 (6th Cir. 1990) (holding that "claim amount[ed] merely to allegations of errors in interpretation."); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 39 (1987) (refusing to overturn award when moving party alleged "only improvident, even silly, factfinding"); *U.S. Postal Serv. v. Am. Postal Workers Union*, 553 F.3d 686, 693 (D.C. Cir. 2009); *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960) .

provides the **exclusive** grounds for vacating an arbitration award. *See Hall St. Assoc., L.L.C. v. Mattel, Inc.*, 128 S. Ct. 1396, 1403 (2008); *Regnery Publ'g, Inc. v. Miniter*, 601 F. Supp. 2d 192, 194 (D.D.C. 2009).[9]  Under the FAA, a court may vacate an award under only four narrow circumstances which include arbitrator bias, fraud, or misconduct or where the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *See* 9 U.S.C. § 10 (2009).

Significantly, errors of fact and misinterpretations of law do not warrant vacation of an arbitration award. *See Kurke v. Oscar Gruss & Son, Inc.*, No. 04-0870 (RMC), U.S. Dist. LEXIS 9987, at *8 (D.D.C. Jan. 19, 2005).  Additionally, arbitrators are not required to explain the basis for their awards. *See Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 5-171 (RMC), 2006 U.S. Dist. LEXIS 14967, at *16 (D.D.C. Mar. 31, 2006) (citing *Wilko v. Swan*, 346 U.S. 427, 436 (1953)); *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) (court is bound to confirm award even if the "explanation for an award is deficient or non-existent"). Accordingly, the Supreme Court has long recognized that, when reviewing an arbitration award, "[c]ourts…have no business weighing the merits…[or] considering whether there is equity in a particular claim." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960); *see also Major League Baseball Players Ass'n*, 532 U.S. at 510 (no investigation into merits even if arbitrators deviate from proper procedure to the point of "affirmative misconduct").

The tight restrictions on judicial review of arbitration awards reflects a "national policy" in favor of arbitration agreements. *See Hall St.*, 128 S. Ct. at 1402. The primary purpose of this policy is the need for efficiency and finality. *See id.* at 1405 (limited

---

[9] Some courts have recognized "manifest disregard of the law" as a fifth ground for vacating an award, but it is doubtful that this basis for vacatur exists any longer. *See* discussion *infra* at Part II.

review necessary to "maintain arbitration's essential virtue of resolving disputes straightaway"). Another fundamental purpose is to enforce private agreements. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219-21 (1985) ("...[The Supreme Court] rigorously enforce[s] agreements to arbitrate"). In applying limited review to arbitration awards, courts in this jurisdiction have long recognized these policies. *See, e.g., Regnery*, 601 F. Supp. 2d at 194 (quoting *Hall St.*, 128 S. Ct. at 1405); *LaPrade v. Kidder, Peabody & Co.*, 94 F. Supp. 2d 2, 4 (D.D.C. 2000) ("[P]ublic policy favors leaving arbitration awards untouched."), *aff'd*, 246 F.3d (D.C. Cir. 2001).

## ARGUMENT

Like its evidence and arguments at the arbitration hearing, Petitioner's pleas for vacatur do not withstand scrutiny. Petitioner first complains that the Panel exceeded its power by "ignoring unambiguous language and altering key provisions" and "omitting terms" from the Agreement between the parties. Petition at 10, 13. Upon inspection, however, Petitioner's actual complaint is that the Panel did not read ***extra*** provisions into the Agreement that were nowhere written in the Agreement. *Id.* at 12-14. The Panel rightly interpreted the Agreement ***as written***, giving the SPA the plain meaning of its words, and was therefore well within the powers accorded to it by the Agreement in doing so. *See* SPA, Ex. A § 6(g) ("The arbitrators shall be limited to interpreting []the applicable provisions of the Agreement").[10]

Second, Petitioner complains that the Award is in manifest disregard of the law because the Panel admitted into evidence a document that Petitioner maintains is privileged. However, regardless of whether the document was privileged, unprivileged, or otherwise, ***it had no bearing on the Panel's Award***. Award at 11 ("while interesting" the document has "no bearing" on whether the conditions for payment were met under

---

[10] In further opposition to the Petition, Technest herein incorporates by reference its Post-Hearing Brief and the evidence cited therein.

the Agreement). Petitioner has failed to explain how a document that had "no bearing" on the Panel's Award could possibly evidence a manifest disregard for the law such that the Award should be vacated. Accordingly, as discussed in more detail below, there exists no basis to vacate the Award.

## I. PETITONER'S CONTRACT INTERPRETATION ARGUMENTS ARE INSUFFICIENT AS A MATTER OF LAW AND OTHERWISE UNSUPPORTABLE

If an arbitrator's award "draw[s] its essence from the implementing agreement," courts must give the arbitrator's interpretation of an agreement "extreme deference." *Bhd. of Maint. of Way Employees v. I.C.C.*, 920 F.2d 40, 45 (D.C. Cir. 1990) (internal quotations omitted). Applying this standard, the court in *Kurke* held that "[i]n the absence of an arbitrator's manifest disregard of the law, a court should defer to his or her reading of a private contract, *even if that reading is implausible*." U.S. Dist. LEXIS 9987, at *14 (internal citations omitted) (emphasis added); *see also E. Assoc. Coal Corp. v. United Mine Workers of Am. Dist.*, 531 U.S. 57, 62 (2000) (even if a court believes that an arbitrator has committed serious error, the court should not vacate the award if the arbitrator "is even arguably construing or applying the contract and acting within the scope of his authority") (internal quotations omitted).

It is undisputed that the provisions of the SPA regarding conditions to payment of the Contingent Purchase Price are clear and unambiguous. Indeed Petitioner's own expert on contract law, John Pachter, testified that the three conditions are not ambiguous and not difficult to understand. Tr. at 1803:9-1804:20. Given the unambiguous terms, the Panel made a straightforward interpretation of the conditions well within the bounds of their authority as arbitrators. The language of the Panel's Award leaves no doubt that the Award squarely "draw[s] its essence" from the Agreement. *I.C.C.*, 920 F.2d at 45.

### A.    The Panel Acted Within Its Power In Holding The First Condition To Payment Was Met

Petitioner's allegation that the Panel exceeded its power by "ignoring unambiguous language and altering key provisions" is unfounded.  Petitioner complains that the Panel did not interpret the first condition that the follow-on contract be "on substantially the economic terms and conditions set forth in [EOIR's] final price proposal" to include an unwritten requirement that the "revenues, costs and profits" upon which the final price proposal was based *also* be reflected in the follow-on contract.[11] Petition at 11-12; *see* SPA, Ex. A § 2(a).  Thus, Petitioner's true complaint is not that the Panel ignored or altered contract terms but that it refused to add terms.  The Panel, implementing basic principles of contract interpretation, addressed this issue plainly in the Award, holding that "[w]hile the rates in the final price proposal may have been premised or predicated on certain assumptions...*these assumptions were not set forth in the final price proposal*."  Award at 5 (emphasis added).  That conclusion was based on extensive evidence elicited at the hearing.  Petitioner's lead witness and experts repeatedly attempted to espouse a long list of additional "variables" as contract requirements, only to be proven wrong on cross-examination.[12]  As the unwritten variables were not set forth in the final price proposal (or the SPA), there can be no invisible requirement that the follow-on contract reflect those unwritten assumptions and the Panel so found.  *See* Award at 5.

Additionally, Petitioner is incorrect when it alleges that the Panel substituted the term "rates" for "substantially the economic terms and conditions."  Petition at 11.

---

[11] Petitioner also alleges that it  "presented uncontradicted expert and fact witness testimony and evidence" on this point.  Petition at 11.  Technest submits that it fully and successfully contradicted Petitioner's evidence through the cross-examination testimony of Petitioner's witnesses John Pachter and Jason Rigoli who both agreed that regardless of whether Petitioner had certain "expectations" - such as what would be contained in the price proposal and must be reflected in the follow-on contract to meet the first condition to payment of the Contingent Purchase Price - if those "expectations" were not written into the SPA, then they will not be given effect.  *See* Tr. 899:14-20; 1815:13-22.

[12] *See* Technest's Post-Hearing Brief at 10-12.

Rather, the Panel used the fact of the incorporation of the rates as evidence that the follow-on contract was on substantially the economic terms and conditions as the price proposal. Award at 4 ("In pertinent part, the Government solicitation for the follow-on [] contract required each offeror to identify…loaded labor rates….The follow-on award explicitly incorporated EOIR's proposal rates.), and at 5 ("EOIR's rates were set forth in the final price proposal, and were specifically incorporated into the award.").

Even more conclusive, the follow-on contract incorporated not just the labor rates but the *entire* final price proposal by reference and therefore the Panel was well supported in holding that the follow-on contract was awarded "on substantially the economic terms and conditions set forth in [the] final price proposal." That the award incorporated all terms and conditions in the "final price proposal" is confirmed by the language of the award,[13] by questions from the Panel Chair to Petitioner's lead witness,[14]

---

[13] The follow-on contract explicitly incorporates the final price proposal by reference. *See* follow-on contract (attached hereto as Exhibit E) at 2. ("EOIR's proposed estimates by contract year are hereby incorporated into this contract as stated and as described in the referenced proposal;" "EOIR's proposed labor and G&A rates for all contract years and all team members are hereby incorporated, in their entirety….;" "EOIR's Management Plan is hereby incorporated into this contract….").

[14] Chairman Doyle asked just what the award incorporates, and Jason Rigoli, Chief Operating Officer of EOIR, testified as follows:

> Q: (Chairman Doyle): And you were referred to Section A, part 1C, that says EOIR's proposed labor and G&A rates for all contract years and all team members are incorporated?
>
>                      \*     \*     \*
>
> A: Yes.
>
> Q: (Chairman Doyle): Okay. Right above that, B says EOIR's proposed estimates by contract year are hereby incorporated into this contract. Just a point of clarification, what estimates are being referred to?
>
> A: They are looking at the -- to be frank with you, I'm not 100 percent sure. I can give you my opinion, which is I think they are looking at -- they're incorporating the actual hourly labor rates, and what they're saying is if this level of effort were to be fully awarded to you all, we would expect the annual dollar amounts to equal what you have totaled up.
>
> Q: (Chairman Doyle): Thanks.
>
> Q: (Mr. Zarlenga): Which would be $454 million, right, Mr. Rigoli?

and by expert testimony in the record.[15]  There is no merit whatsoever to Petitioner's

argument, which was also made repeatedly during the arbitration (Tr. at 1187:6-1190:5;

1980:17-1982:15; 1344:5-1346:18), and correctly rejected.  Such a clear cut evaluation of

evidence by neutral arbitrators with heavy expertise in the subject matter was well within

the Panel's power to make.  *See LaPrade*, 94 F. Supp. 2d at 4 (as long as some justifiable

ground or "colorable support for the award" can be inferred from the facts of the case, an

arbitration award should stand).

Remarkably, Petitioner also alleges that the Panel exceeded its authority by

ignoring the opinion of one of its expert witnesses, Michael Smigocki.  Petition at 12.

This argument is doubly flawed.  First, the Panel as the finder of fact is free to disregard

any expert's testimony - Mr. Smigocki's included.  *See Smith v. Haden*, 872 F. Supp.

1040, 1054 (D.D.C. 1994) ("When faced with conflicting expert testimony, the trial court

may credit one expert over the other or even disregard both in rendering its judgment.")

(quoting *Rock Creek Plaza Woodner Ltd. P'ship v. District of Columbia*, 466 A.2d 857,

859 (D.C. 1983)), *aff'd*, 69 F.3d 606 (D.C. Cir. 1985); *McReynolds v. Sodexho Marriott*

*Servs.*, 349 F. Supp. 2d 1, 13 (D.D.C. 2004).  Presented with Technest's contrary

position, the Panel was free to credit one position over the other or even disregard both.

As such, the Panel did not exceed its authority when it chose to interpret the SPA

differently than Petitioner's paid expert.

---

A: Right....

Tr. at 1021:19-22, 1022:5-1023:1.

[15]  Technest expert Kevin Carroll testified that EOIR's entire price proposal was incorporated into the
follow-on contract. Tr. at 394:18 - 395:7.  Therefore, the first condition was met - not because "rates"
equals "economic terms and conditions"  but because the first condition requires that the follow-on contract
be on "substantially the economic terms and conditions set forth in [EOIR]'s final price proposal."  Since
the entire price proposal was incorporated into the follow-on contract, there can be no doubt that everything
set forth in the price proposal was also contained in the follow-on contract.  This obviates the need to parse
which parts of the price proposal represent the "economic terms and conditions" because **all** the terms and
conditions from the price proposal were incorporated.

Second, Petitioner's own contract law expert testified that the Contingent Purchase Price obligations were clear and unambiguous and contained within an integrated agreement. Therefore, under the applicable Delaware law,[16] extrinsic evidence of the contract's meaning is not admissible. *See Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003); *Dittrick v. Chalfant*, 948 A.2d 400, 406 (Del. Ch. 2007). Petitioner's contract law expert agreed with these legal principles and their implications. Tr. at 1815: 13-22.  Given the applicable law, the Panel could not possibly have erred by failing to consider the expert's testimony, or any other testimony, on what the contract language "means."

### B.     The Panel Acted Within Its Power In Holding The Third Condition To Payment Was Met

Petitioner alleges that the Panel did not interpret the third condition of payment correctly because it failed to interpret "financial prospects or performance" to include not only current performance but also "EOIR's ability to grow, increase labor rates, and relatedly, increase profits in the years to come." Petition at 13-14.  Again, Petitioner seeks to engraft considerable additional requirements to the SPA that were not explicitly written into the Agreement.  And again, the Panel addressed this issue and rejected Petitioner's argument in the Award utilizing basic principles of contract interpretation and by reference to the operative contract language.

More specifically, the Panel analyzed the time at which compliance with the third condition (requiring that the final price proposal, "if successful, would not, or could not reasonably be expected to, change the financial prospects or performance of [EOIR]") should be assessed and concluded that the phrase "proposal, if successful" requires that it be measured "before it is known whether or not it is 'successful,' but assuming it will

---

[16] The Stock Purchase Agreement provided that Delaware law applied.  SPA § 21 ("This agreement is to be construed and governed by the Laws of the State of Delaware (without giving effect to principles of conflicts of laws")."  Petitioner agreed. *See* Holdings' Post-Hearing Brief, attached to its Petition as Exhibit 2, at 9 n.6.

be." Award at 8.  The Panel continued, "[i]n any event, the third condition does not

involve making an assessment of the financial prospects or performance of EOIR based

on information which only becomes available after award." *Id.* at 8.  Thus, the Panel's

award "drew its essence" from the Agreement, (*I.C.C.*, 920 F.2d at 45) and is entitled to

deference (*Kurke*, U.S. Dist. LEXIS 9987, at *4).

    As with its complaint about the interpretation of the first condition, Petitioner also

complains that the Panel exceeded its authority by not crediting its expert's testimony.

Petitioner's expert Michael Smigocki opined in contradictory testimony that

measurement of the third condition should take place at the time of proposal, but that

post-award profitability should also be taken into account.  Tr. at 1672:12-22; 1673:20-

1674:3.[17]  In an effort to hedge its bets, Petitioner itself introduced evidence of the post-

award financial performance of EOIR.  *See* Tr. at 1422:22-1423:10;[18]  Report of Michael

---

[17]    ARBITRATOR RUBINO:  So are you suggesting a point in time that we are to then say
has EOIR met the contingent requirement or -- well, that's my question.  At what point in
time are you suggesting that the panel sort of draw that line?

MR. SMIGOCKI:  It's really at the proposal stage there.  At the proposal stage, you can
see that there is going to be -- no matter what happens going forward, there is going to be
a change in the overall profitability of the performance under this contract.

Tr. at 1672:12-22.

ARBITRATOR KINOSKY:  So you're saying that the snapshot in response to Mr.
Rubino's question is you look at it at the proposal stage and it's not relevant at the
performance stage, the profitability analysis?

MR. SMIGOCKI:  Well, the award of this is relevant because you've got a couple factors
that occurred at award.

Tr. at 1673:20-1674:3.

[18]    HOLDINGS' COUNSEL: And what was your goal in looking additionally at the contract after it's
been awarded?

MR. SMIGOCKI:  Well, when the contract was awarded and with the program ceiling going in
there, as well as all the assumptions that were kind of built into it, I wanted to try to gauge what
was reality against those assumptions. So, in other words, what was occurring from the contract
award up until my most recent information...

Tr. at 1422:22 -1423:10.

Smigocki (attached to Holdings' Petition as Exhibit 7) at 8, 10-11.  However, as
discussed above, EOIR's financial performance after the award was held not germane to
satisfaction of the conditions as written.  Under the applicable law, the Panel was not
required to credit any expert's opinion, as cited above.

 Remarkably, Petitioner states that its evidence on this topic was "unchallenged."
Petition at 14.  It is difficult to believe that Petitioner failed to recall that its second expert
contradicted its first expert on this very point.  The contradiction led to the following
exchange between Technest's counsel and Petitioner's expert, Mr. Pachter, at the
arbitration hearing:

> Q: But at the barest minimum, you would agree, then, that you certainly
> wouldn't look at the profitability after the award?
>
> A: I think the award date is the governing date, yes.
>
> Q: So Mr. Smigocki -- and we could all read his testimony -- I pretty
> clearly remember he said time of the proposal --
>
> A: Yes.  I remember that, yeah.
>
> Q: -- and you say time of the award?
>
> A: Correct.
>
> Q: Who's right?
>
> A: I believe I am....

Tr. at 1817:14-1818:4.  Petitioner should not be heard to complain about an Award that is
consistent with one of its own expert's testimony, even if Petitioner's other expert
disagrees.

 Petitioner's complaint that the Panel paid undue credit to the "deposition
testimony of an EOIR engineer" instead of Petitioner's paid expert regarding the third
condition to payment is also unavailing.  *See* Petition at 14-15.  That "EOIR engineer" is
Colonel Larry Bramlette, the person responsible for determining the rates in the final

price proposal, and the person with the most price proposal experience of any witness whose testimony was presented. Col. Bramlette conducted a "robust" profitability analysis. *See* JX 176 (attached hereto as Exhibit F) at EOIR0028734-35 ("I have completed the evaluation of our new rates verses [sic.] our costs of personnel in comparison to our present rates against the const of personnel....Even though, on average, our new rates are lower than our present ones, we have improved our margin...."); Larry Bramlette Deposition (excerpts attached hereto as Exhibit G) at 193:15-16. Ultimately, he concluded that EOIR would be in a better position under the follow-on contract than the previous government contract. *See also* Tr. at 1820:11-1824:10; Technest's Post-Hearing Brief at 23-24. And EOIR's President agreed. *See* Joseph Mackin Deposition (excerpts attached hereto as Exhibit H) at 261:13-20. That the Panel credited the testimony of these two knowledgeable fact witnesses (as opposed to a paid expert with no firsthand knowledge) is not error and was within the Panel's province.

Petitioner disagrees with the Panel's interpretation but that is not enough to require vacatur of the Award. Indeed, even if the Court finds it might have interpreted the Agreement a different way, it should not vacate the Award merely because it disagrees with the Panel's construction of the contract. *See, e.g., United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) ("...[C]ourts have no business overruling [the arbitrator] because their interpretation of the contract is different from his."); *U.S. Postal Serv. v. Am. Postal Workers Union*, 553 F.3d 686, 693 (D.C. Cir. 2009) ("Although the Postal Service may have an arguable ground to disagree with the arbitrator's decision, this is no basis for a court order vacating the [award]."). These principles are fully applicable here.

## II.      THE CORPORATE VALUATION WAS NOT A BASIS FOR THE AWARD, BUT NONETHELESS WAS PROPERLY RECEIVED INTO EVIDENCE

The admission of an allegedly privileged valuation does not provide grounds for vacatur of the Award. Because the valuation ultimately did not bear on the Panel's Award, its admission does not require vacatur. Further, even if the Panel improperly admitted a privileged document or failed to articulate a basis for its decision, such admission does not amount to "manifest disregard of the law."

As a procedural matter, manifest disregard of the law is almost certainly no longer a viable basis for vacating an arbitration award. The doctrine was called into question by the Supreme Court's recent decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 128 S.Ct. 1396 (2008), an unquestionably important decision that is conspicuously absent from Holdings' Petition. In the wake of the *Hall Street* decision, numerous courts have held that manifest disregard is no longer a valid basis for challenging arbitration awards.[19] Petitioner's entire argument that there was a "manifest disregard of the law" should be rejected on this ground alone.

To the extent this Court finds that manifest disregard of the law is still a basis for review of an arbitration award, the standard of review is "extremely narrow" and requires "much more than failure [of the arbitrators] to apply the correct law." *Kurke v. Oscar Gruss & Son, Inc.*, 454 F. 3d 350, 354 (D.C. Cir. 2006) (quoting *Kanuth v. Prescott, Ball & Turban, Inc.*, 949 F.2d 1175, 1182 (D.C. Cir. 1991). For an award to be vacated as in manifest disregard of the law, the party challenging the award must demonstrate that "(1)

---

[19] *See e.g., Robert Lewis Rosen Assoc. Ltd. v. Webb*, 566 F. Supp. 2d 228, 233 (S.D.N.Y. 2008) (finding that, in light of *Hall Street*, manifest disregard of the law is no longer a valid basis for overturning or modifying arbitral awards under the FAA); *ALS & Assoc., Inc. v. AGM Marine Constructors, Inc.*, 557 F. Supp. 2d 180, 185 (D. Mass. 2008) (same); *Prime Therapeutics LLC v. Omnicare, Inc.*, 555 F. Supp. 2d 993, 999 (D. Minn. 2008) (same); *Millmaker v. Bruso*, No.07-3837, 2008 U.S. Dist. LEXIS 79480 (S.D. Tex. Oct. 9, 2008) (noting that *Hall Street* put the viability of manifest disregard of the law in doubt). The Supreme Court further undermined the viability of the doctrine in *Improv W. Assocs. v. Comedy Club, Inc.*, where it vacated a Ninth Circuit decision vacating an arbitration award because of manifest disregard of the law. 129 S. Ct. 45 (2008). The Supreme Court remanded the case for reconsideration in light of *Hall Street*.

the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Kurke*, 454 F.3d at 354 (*quoting LaPrade v. Kidder Peabody & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001)) (internal quotations omitted). Petitioner does not meet this standard because Petitioner cannot show that the Panel ignored or refused to apply applicable law.[20]

The decision to admit the valuation cannot be grounds for vacating the award because the Panel did not even rely on the valuation. In its twelve-page reasoned award, the arbitrators dispensed with the valuation in one sentence.[21] Petitioner consistently argued that the valuation was irrelevant and ultimately the arbitrators agreed, leaving Petitioner with no grounds for relief. *See* Tr. 1932:16-18; Holdings' Post-Hearing Brief[22] at 37, 38 (arguing the valuation had "absolutely no relevance to a determination of whether the three conditions to payment of the Contingent Purchase Price have been met"). The arbitrators acted within their discretion by considering the valuation and determining it was irrelevant. *See Howard Univ.*, 519 F. Supp. 2d at 37; *Lessin*, 2006 U.S. Dist. LEXIS 14967, at * 20-21. As the valuation was not a basis for the Award, its admission - rightly or wrongly - cannot be a basis to vacate the Award.

---

[20] Instead of demonstrating how the arbitrators ignored well defined, explicit, clearly applicable law, Petitioner cites decisions with detailed analysis of complex privilege claims applicable to hundreds of documents and complains that the Panel did not make similarly specific findings. Unsurprisingly, faced with an uncomplicated and unmeritorious privilege claim applicable to only one document, the Panel did not provide the same detailed findings as those in the decisions cited by Petitioner; nor was it required to do so. *Howard Univ. v. Metro. Campus Police Officer's Union*, 519 F. Supp. 2d 27, 38 (D.D.C. 2007) (arbitration panels are not required to explain the basis of their awards) (citations omitted), *aff'd*, 512 F.3d 716 (D.C. Cir. 2008); *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 5-171 (RMC), 2006 U.S. Dist. LEXIS 14967 (D.D.C. Mar. 31, 2006) (lack of explanation for the award is not a ground for vacatur).

[21] "While interesting, such valuations have no bearing on the conditions described above, all of which had to be determined without regard to actual performance of EOIR following the STES award." Award at 11.

[22] Holdings' Post-Hearing Brief is attached to its Petition as Exhibit 2.

The Panel was presented with, considered, and rejected Petitioner's privilege claim twice, first during the discovery process. During the arbitration hearing, Petitioner was again given an unbridled opportunity to present argument on its claim of privilege and did so.[23]  After hearing argument and convening a special recess to consider Petitioner's privilege claim, the Panel rejected Petitioner's claim of privilege and admitted the valuation. Petitioner's repeated arguments that there were no "findings" on the privilege issue is wrong and flatly belied by the hearing transcript. As the Panel Chair clearly noted on the record:

> During the break, the panel has conferred about the proffer by [Technest Holdings] of the [valuation] marked for identification as Exhibit 327. The panel has decided to – having considered the arguments of the parties concerning the claim of privilege, the panel has decided to admit the document. And in so doing, however, we make no comment whatever concerning the weight which may be attributed to the document.

Tr. at 750:17-751:3. There is absolutely nothing wrong with this procedure, which falls well within the fair and reasonable administration of justice. Furthermore, Petitioner agreed to arbitration pursuant to AAA Rules; there is no AAA rule requiring "findings" on privilege issues.[24]  Indeed, it is well-settled that arbitrators have broad discretion to determine the admissibility and relevancy of evidence. *Howard Univ.*, 519 F. Supp. 2d at 37; *Lessin*, 2006 U.S. Dist. LEXIS 14967, at *20-21. Therefore, the Panel's evidentiary ruling on the admissibility of the valuation is not a valid basis for vacating the award. *Id.*

Second, Petitioner's entire argument rests on the flawed assumption that the corporate valuation was somehow privileged. However, ***the valuation was not privileged***

---

[23] During the hearing, Technest submitted a nine-page memorandum demonstrating that the corporate valuation was not privileged by reference to the applicable facts and law. The memorandum is incorporated herein by reference and attached hereto as Exhibit I. Petitioner submitted no contrary or opposing memorandum.

[24] Arbitrators are not required to explain their resolution of every question of law and, if any grounds for a decision can be inferred, then the award must be confirmed. *See Howard Univ.*, 519 F. Supp. 2d at 38; *Lessin*, 2006 U.S. Dist. LEXIS 14967, at *18; *see also Merrill Lynch, Pierce, Fenner & Smith v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995); *Raiford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 1410, 1413 (11th Cir. 1990).

by any stretch of the imagination.  If anything, the record supports the notion that Petitioner attempted to conceal the valuation by appending to it a bogus claim of privilege resting on the thinnest of reeds.  The arbitrators were more than kind not to sanction Petitioner for its actions.

The facts relating to the preparation and purpose of the valuation show beyond doubt that it was not "privileged."  Petitioner's *non-lawyer manager* directed its *non-lawyer valuation consultant* Taylor Consulting Group, Inc. to prepare the valuation for EOIR's annual goodwill impairment test in compliance with *accounting standards* promulgated by the Financial Accounting Standards Board ("FASB").[25]  Conspicuously absent from the valuation itself and the affidavit supporting the privilege claim was any indication that the valuation was prepared in anticipation of actual or anticipated litigation or that an attorney had prepared or had any input into the valuation.  The valuation contains no legal advice whatsoever.  No attorney-provided content was ever identified, despite numerous opportunities to provide same.

Even more remarkably, it is undisputed that the corporate valuation was used for ordinary business purposes.  Two of Petitioner's own witnesses testified that the valuation formed the basis for their incentive-based compensation plan.  *See* Tr. at 858:16-859:19; Joseph Mackin Deposition at 53:12-18.  Petitioner's argument that a corporate valuation somehow became privileged because it was transmitted by an attorney is wholly unavailing.  Merely labeling a document "privileged" does not make it privileged.  *See Gold Standard, Inc. v. Am. Barrick Res. Corp.*, 801 P.2d 909, 911 (Utah

---

[25] Statement of Financial Accounting Standards No. 142, Goodwill and Other Intangible Assets ("SFAS 142").  According to the Financial Accounting Standards Board, its Statement Number 142 "addresses financial accounting and reporting for acquired goodwill and other intangible assets...[and]...how intangible assets that are acquired individually or with a group of other assets (but not those acquired in a business combination) should be accounted for in financial statements upon their acquisition."  It also "addresses how goodwill and other intangible assets should be accounted for after they have been initially recognized in the financial statements."  Available at http://www.fasb.org/summary/stsum142.shtml (last visited September 17, 2009).

1990); *see also United States v. Tel. & Data Sys., Inc.*, No. 02-C-0030-C, 2002 U.S. Dist. LEXIS 15510, at *5-6 (W.D. Wis. July 16, 2002) ("Simply transmitting information to an attorney does not cloak it in the privilege").

It is clear on the face of the valuation and supporting affidavit that the valuation was prepared for and used for business purposes unconnected to any specific threat of litigation. It is well-settled that the attorney work-product privilege only applies to documents prepared in the reasonable anticipation of litigation, not the mere possibility of litigation. *See In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998); *Coastal States Gas Corp. v. Dept. of Energy*, 617 F.2d 854, 864-65 (D.C. Cir. 1980). Here, there is no attorney-client communication reflected in the valuation. *See Reliant Energy Power Generation, Inc. v. Fed. Energy Regulatory Comm.*, 520 F. Supp. 2d 194, 206 (D.D.C. 2007) (attorney-client privilege requires a request for or the provision of legal advice in the context of an attorney-client relationship). The valuation contains neither attorney-client communication nor attorney work-product entitled to privilege protection, thus the Panel's decision to admit the valuation was not in manifest disregard of the law.

Whatever complaints Petitioner may have about the valuation are largely its own doing. Petitioner repeatedly tried to claim that the value of the subsidiary it had purchased had declined dramatically because of diminished future prospects. *See, e.g.*, Tr. at 824:18-825:21; 1453:20-1454:15. The corporate valuation, which valued the subsidiary at the same $34 million Petitioner agreed to pay, was directly responsive to Petitioner's value argument. As it turned out, however, the actual value of the company after the government contract was not deemed relevant and the Panel found it unnecessary to address the valuation issue. This was hardly a "manifest disregard of the law," rather it was a thoughtful application of it.

Accordingly, the Panel's decision to admit the valuation was not manifest disregard of the law and the Court should deny Petitioner EOIR Holdings LLC's Petition to Vacate the Arbitration Award.

## CONCLUSION

For all the reasons stated above, Technest respectfully requests that this Court deny Petitioner EOIR Holdings LLC's Petition to Vacate Arbitration Award.


Respectfully submitted,


/s/ Carmine R. Zarlenga
_____

Carmine R. Zarlenga (DC Bar # 386244)
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004-2402
(202) 783-0800
(202) 383-6610 (fax)

*Attorney for Petitioner Technest Holdings, Inc.*

## CERTIFICATE OF SERVICE

I certify that on September 21, 2009, I served the foregoing Respondent Technest Holdings, Inc.'s Memorandum Of Points And Authorities In Opposition To EOIR Holdings LLC's Petition To Vacate Arbitration Award electronically with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel for Petitioner:

John K. Villa
John J. Buckley, Jr.
Kenneth C. Smurzynski
Steven M. Pyser
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.   20005

Gary H. Nunes
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, Fourth Floor
Tysons Corner, VA   22182

/s/  Carmine R. Zarlenga