# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*In the Matter of the Arbitration between:*  )
)
EOIR HOLDINGS LLC,  )
)
                      Petitioner,  )
)      1:09-cv-01707-RWR
     and  )
)
TECHNEST HOLDINGS, INC.,  )
)
                Respondent.  )

## RESPONDENT TECHNEST HOLDINGS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO EOIR HOLDINGS LLC'S SUPERSEDING PETITION TO VACATE ARBITRATION AWARD

Pursuant to Local Civil Rule 7(b), Respondent Technest Holdings, Inc. respectfully submits this Memorandum of Points and Authorities in Opposition to the Superseding Petition of EOIR Holdings LLC to Vacate Arbitration Award, filed on September 20, 2009 (Docket No. 11).

## PRELIMINARY STATEMENT

Having lost its case via a unanimous Award issued by an eminently qualified three-arbitrator Panel, Petitioner EOIR Holdings LLC ("Holdings" or "Petitioner") now seeks to re-litigate virtually all of the same failed arguments that led to the Award. Petitioner submitted itself to the jurisdiction of a duly appointed Panel of arbitrators pursuant to an integrated Stock Purchase Agreement ("SPA" or "Agreement") specifying "final and binding arbitration" as the applicable dispute resolution mechanism.  If the contract between the parties is to be honored, as Petitioner so fervently demands, Petitioner should not be permitted to now back out of its promise to be bound by the arbitration just because it lost.

Petitioner and Respondent Technest are parties to a fully integrated Stock Purchase Agreement whereby Technest agreed to sell the stock of EOIR Technologies, Inc. ("EOIR") to Holdings on December 31, 2007.  The transaction closed and Petitioner has enjoyed all of the benefits of ownership over the last 21 months, including the award of a lucrative government contract and record-setting profits.  Nevertheless, Petitioner Holdings refused to pay Technest two-thirds of the purchase price as provided in the Agreement, offering instead an endless litany of ever-changing excuses.

As a result, Technest demanded the dispute be arbitrated in accordance with the Agreement.  There is no dispute that binding arbitration before the American Arbitration Association ("AAA") was the chosen mode of dispute resolution.  The arbitration Panel consisted of three highly qualified arbitrators with substantial subject matter expertise; the proceedings were professional and exceedingly thorough by any measure.  On August 21, 2009, the arbitration Panel returned a unanimous reasoned Award in favor of Technest in the amount of $23,778,402.83 plus interest.  As Technest claimed from the beginning of the arbitration proceedings until the end, the three conditions of payment specified in the SPA were fully satisfied and it was so proven in every respect.

The twelve-page arbitration Award leaves no doubt that the arbitration Panel evaluated the evidence presented in light of the contract requirements, element by element, with reference to the exact same three conditions that Petitioner Holdings specified repeatedly throughout the hearing, starting with its opening statement:

> I want to tell you that this case really involves just a very simple straightforward analysis of a simple issue, and that is were the ***three conditions precedent*** to payment of the stock from a contingent purchase price met?

The Panel's findings that all three conditions were satisfied were evidentiary in nature and derived based on the testimony of numerous fact and expert witnesses as well as 125 exhibits that were entered into evidence.  The arbitration Panel's subject matter expertise

in government contracts was brought to bear on the issues.  Their findings should not be revisited here.

Under the law of this District, the scope of review of an arbitration award is "the narrowest known in the law."  A petition to vacate is not an opportunity to re-litigate issues, which is all that Petitioner seeks to do.  In fact, every single substantive argument set forth in the Superseding Petition to vacate was made, considered, and unanimously rejected by the Panel.  It would be contrary to the strong policy favoring arbitration to invade the province of the arbitrators with the sweeping review that Petitioner proposes, replete with arguments that go to the weight of the evidence and that are legally insufficient on their face.  It is exceedingly doubtful that a "manifest disregard of the law" is any longer a viable basis for vacating an arbitration award.  In any event, the arbitrators did not act in manifest disregard of the law, rather they faithfully applied it.

Even a cursory comparison of the operative contract language with the Award demonstrates that the arbitration Panel's Award "drew its essence" directly from the language of the Agreement between the parties and did not alter any written provisions.  Nothing more was required.  *See Bhd. of Maint. of Way Employees v. ICC*, 920 F.2d 40, 45 (D.C. Cir. 1990) (arbitrator's award entitled to "extreme deference" where it "draws its essence from the implementing agreement").

Petitioner's argument that the arbitration Panel "refused to consider" the so-called negative covenant (Holdings' Memorandum In Support of Its Superseding Petition to Vacate Arbitration Award (hereinafter "Superseding Petition") (Docket No. 12) at 16-17) cannot be reconciled with the Award or the extensive arbitration record.  On its face, the Award is clear that Petitioner's negative covenant argument was considered and rejected as "not persuasive."  Ultimately, Respondent's own "contract law" expert admitted on cross-examination that the negative covenant was ***not*** one of the three conditions of payment under the SPA.  Other testimony from Petitioner's witnesses that the negative covenant was somehow violated did not withstand scrutiny during the arbitration hearing,

3

leading to the Panel's evidentiary finding that "it has not been demonstrated that the previous rates were better." As such, Petitioner's argument that any labor rates failed to comply with the negative covenant is nothing more than a "weight of the evidence" argument, which is legally insufficient in this procedural context. *Howard Univ. v. Metro. Campus Police Officer's Union*, 519 F. Supp. 2d 27, 37 (D.D.C. 2007) (arbitration awards "cannot be overturned merely because there is disagreement with…factual findings"), *aff'd*, 512 F.3d 716 (D.C. Cir. 2008).

The same is true of Petitioner's arguments that all three conditions of payment were not met. Virtually the entire seven-day arbitration was spent hearing evidence and argument from both sides on whether and how the three conditions of payment were met. The arbitration Panel unanimously so determined. Petitioner's uninformed attorney rhetoric set forth on the last three pages of its memorandum is no substitute for the reasoned conclusions of a highly experienced Panel of neutrals who listened intently to days upon days of testimony, reviewed thirteen depositions, and considered 125 exhibits.

Likewise, Petitioner's argument that the $23 million Award should be vacated because an *allegedly* "privileged" corporate valuation was seen by the Panel is not worthy of serious consideration. The arbitration Award unequivocally states that the corporate valuation had "no bearing" on the Award. By no means was the corporate valuation a "focal point" of Technest's case. The valuation -- which pegged the value of EOIR at the same $34 million amount that Holdings had agreed to pay for the company -- was properly offered to rebut Petitioner's "diminished value" arguments and as additional support for Technest's position. But the arbitrators, in their wisdom, chose not to base their Award on the corporate valuation. In choosing not to put weight on the valuation, the arbitrators did exactly what Petitioner's counsel asked them to do in his closing argument. Petitioner cannot overcome the Panel's unanimous declaration that they did not give weight to the valuation.

Furthermore, Petitioner's argument rests entirely on the flawed assumption that the corporate valuation was somehow privileged. But the arbitration Panel fully considered and rejected Holdings' claim of privilege after Holdings unsuccessfully tried to bury the document in discovery. A mere *ipse dixit* proclamation that a document is privileged does not make it so. Based on the actual facts of record and the applicable law, all of which the Panel considered, the corporate valuation was not privileged.

At bottom, Holdings' Petition should be seen for what it is, just another tactic to avoid its obligation to pay for the valuable company that it received. As a consequence of its breach of the SPA, Holdings has enjoyed all the fruits of ownership of a subsidiary worth $34 million, while only paying $11 million. Thus, in addition to being a correct outcome, the arbitration Award is a just and fair outcome. As the D.C. Circuit has recognized, "public policy favors leaving arbitration awards untouched." That policy should be honored here. Moreover, the policy favoring the finality of arbitration awards should be given further effect by resolving Holdings' Superseding Petition to Vacate Arbitration Award at the earliest possible date.

## STATEMENT OF FACTS

### A.      Events Leading To The Dispute

On September 10, 2007, after extensive due diligence by the parties, Technest entered into the SPA with Holdings pursuant to which Technest agreed to sell the stock of EOIR, its most valuable subsidiary, to Holdings for a total purchase price of *$34 million* in two payments.[1]  The initial payment of $11 million was made at the closing on December 31, 2007.  SPA, § 2.1.  The second payment (defined as the "Contingent

---

[1] The SPA is attached to Holdings' Superseding Petition (Docket No. 12) as Exhibit 1.  The extensive due diligence leading up to the Agreement is fully documented in the arbitration record *See, e.g.*, Arbitration Hearing Transcript (hereinafter "Tr.") (excerpts attached hereto as Exhibit A) at 91:14-99:5, 672:4-673:2, 681:13-682:7, 887:10-888:5, 919:10-920:3, 931:10-22, 933:15-20.  Petitioner was represented by transactional counsel from Womble Carlyle Sandridge & Rice, PLLC through every step of the acquisition. Tr. at 97:1-98:1, 673:3-17, 717:7-13, 968:21-969:4.

Purchase Price") of approximately $23 million was payable upon the award of a government contract (defined as the "follow-on contract") to EOIR if three conditions listed in the SPA were met. *Id.* Exhibit A to the SPA contains the operative language.[2]  It reads:

> The Contingent Purchase Price will be payable only upon…the award to Company of the follow-on [] Contract and expiration of all protest periods related thereto and resolution of any protests in favor of [EOIR], if such award occurs on or prior to December 31, 2009, on substantially the economic terms and conditions set forth in [EOIR]'s final price proposal, which price proposal shall be prepared in accordance with Section 3 of this Exhibit A and with the past practice of [EOIR] and which proposal, if successful, would not, or could not reasonably be expected to, change the financial prospects or performance of [EOIR]….

SPA, Ex. A § 2(a).  There is no dispute as to the operative language because Technest adopted Petitioner's demonstrative exhibit containing what Petitioner's own counsel and expert asserted were the only conditions to payment of the $23 million Contingent Purchase Price.  *See* Technest's Post-Hearing Brief (attached hereto as Exhibit B) at 8 n.5 ("For purposes of analyzing whether the Contingent Purchase Price conditions were satisfied, Claimant adopts JX 377, a demonstrative exhibit that Respondent [Holdings] prepared which contains the pertinent contract provisions as stated in [the SPA].").[3]

---

[2] It bears noting that the Contingent Purchase Price constitutes two-thirds of the total Purchase Price as defined in the SPA.  *See* SPA, § 2.1 ("In full payment for the Company Equity, Purchaser shall pay: (a)…the Closing Date Purchase Price….(b) the Contingent Purchase Price…."").  Petitioner's disingenuous attempts to redefine the Contingent Purchase Price as merely a "bonus payment" (Superseding Petition at 14, 21, 23) and "additional funds" (Superseding Petition at 22) cannot be reconciled with the operative contract language.  Nowhere in the SPA is the Contingent Purchase Price ever referred to as a bonus payment because it was not in the nature of a bonus payment.

[3] Petitioner's counsel presented the demonstrative exhibit specifying the contract language governing the conditions of payment during his opening statement and in conjunction with witness examinations.  The demonstrative exhibit was subsequently identified on the arbitration hearing record as Joint Exhibit 377 ("JX 377") at Technest's request and admitted into evidence.  JX 377 (attached hereto as Exhibit C); Tr. at 906:4-907:12, 964:17-965:10.  Petitioner's counsel repeatedly described the language of JX 377 as the only conditions precedent to payment of the contingent Purchase Price.  *See, e.g.,* Tr. at 52:20-53:3, 54:1-15, 759:6-761:1, 849:5-850:17, 1340:18-1341:12, 1931:6-15.  Likewise, Petitioner's contract law expert testified in his deposition that Petitioner's counsel told him there were only the three conditions to payment.  *See* Pachter Deposition (excerpts attached hereto as Exhibit D) at 33:18-34:13.  (Deposition testimony from all thirteen deponents was admitted into evidence in the course of the arbitration hearing and constitutes part of the arbitration hearing record.  Tr. at 2002:5-18.)

On November 24, 2007, EOIR submitted the "final price proposal" in solicitation of an award of the "follow-on contract" referenced in Joint Exhibit ("JX") 377.  *See* Award at 2.[4]  On August 4, 2008, eight months after Holdings took ownership of EOIR, EOIR was awarded the "follow-on contract" in accordance with the conditions to payment of the Contingent Purchase Price listed in the SPA.  *Id.*  EOIR signed and accepted the award within two days and held a party to celebrate it, complete with commemorative items for its guests.  Tr. at 259:2-261:16, 1253:19-1256:13.   On August 21, 2008, the contingent portion of the purchase price of $22,948,333.33 became due and payable.  Award at 2, 21.  On August 26, 2008, Holdings informed Technest that it would not pay the Contingent Purchase Price.

On September 24, 2008, Technest filed its Demand for Arbitration with the AAA pursuant to the terms of the Agreement.  Holdings did not challenge or object to arbitration as the proper mechanism for resolution of the dispute.

### B.        Selection Of The Arbitration Panel

The parties jointly requested from the AAA a list of potential arbitrators with expertise in "[g]overnment contracts, defense contracts, mergers and acquisitions and earn out provisions."  *See* Correspondence from AAA Case Manager to the parties, dated October 7, 2008 (attached hereto as Exhibit E) at p. 2.  In response, the AAA provided resumes of numerous candidates meeting the specified qualifications.  In accordance with the SPA, each party chose one arbitrator from the AAA list and then the two party-chosen arbitrators jointly selected the third arbitrator (together "the Panel").  *See* SPA, Ex. A § 6(d) ("The arbitration shall be heard by a Panel of three (3) arbitrators.  Each party shall select one arbitrator….The two arbitrators shall then select the third arbitrator within fifteen (15) days after the second arbitrator is chosen.").

---

[4] The arbitration Panel's Final Award ("Award") issued on August 21, 2009 is attached to Holdings' Superseding Petition as Exhibit 6.

There is no question that the arbitrators had more than the requisite qualifications. *See* Arbitrator Resumes (attached as Exhibit F).  Amongst the three Panel members, the arbitrators accounted for over 50 years of experience in the government contracts field. Each of the arbitrators also had considerable prior commercial arbitration experience. Neither the Panel's qualifications nor the Panel's neutrality are in question.

### C.      Pre-Hearing And Hearing Procedures

The parties engaged in substantial discovery over a period of several months that resulted in the production of over 100,000 pages of documents, 13 depositions, and 4 expert reports. *See* Arbitration Hearing Joint Exhibit List (attached hereto as Exhibit G). Ultimately, a hearing was held before the Panel on June 22-30, 2009, in Washington, D.C.  The parties prepared a set of joint exhibits for the hearing consisting of 366 documents of which 125 were entered into evidence; nine witnesses testified resulting in a hearing transcript nearly 2000 transcript pages in length.  Petitioner was given every opportunity to call as many witnesses, present as many exhibits, and make every argument it wished:

> Q (Chairman Doyle): At this time, we need to ask the parties if both of you have completed the presentation of your case, or if you have any further evidence or arguments to present.  Claimant?
>
> A (Technest's Counsel): We have completed our case and we have no further evidence.
>
> Q (Chairman Doyle): And Respondent?
>
> A (Petitioner's Counsel):  Likewise.

Tr. at 1998: 7-15.

### D.      The Award In Technest's Favor

Following the hearing, the Panel ruled and issued a unanimous and reasoned written decision and arbitration Award on August 21, 2009 (the "Award").  The Panel determined that each of the three conditions to payment of the Contingent Purchase Price

had been met and that Petitioner had breached the Agreement.  Award at 9.  Accordingly, the Panel awarded Technest a total of $23,778,402.83 plus interest from the date of the Award until paid in full.  *Id*. at 12.  Although Petitioner agreed in the SPA that "[a]ny award by the arbitrators shall be final and binding on the parties" it has yet to pay Technest the Award.  *See* SPA, § 6(f).

## STANDARD OF REVIEW

Judicial review of arbitration awards is extremely limited.  *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509-10 (2001); *Kanuth v. Prescott*, 949 F.2d 1175, 1178 (D.C. Cir. 1991); *Int'l Thunderbird Gaming Corp. v. United Mexican States*, 473 F. Supp. 2d 80, 83 (D.D.C. 2007).  In accordance with these authorities, this District has characterized the scope of review of an arbitration award as "the narrowest known in the law."  *S. Pac. Transp. Co. v. United Transp. Union*, 789 F. Supp. 9, 13 (D.D.C. 1992) (internal quotation marks omitted).

The Federal Arbitration Act ("FAA") provides the ***exclusive*** grounds for vacating an arbitration award.  *See Regnery Publ'g, Inc. v. Miniter*, 601 F. Supp. 2d 192, 194 (D.D.C. 2009).  Under the FAA, a court may vacate an award under only four narrow circumstances which include arbitrator bias, fraud, or misconduct or where the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10 (2009).

Significantly, the bulk of Petitioner's Superseding Petition is not based on any grounds enumerated in the FAA.  Instead it is based predominantly on an asserted "manifest disregard of the law."  While it may have been acceptable at one point in time, "manifest disregard of the law" is almost certainly no longer a viable basis for vacating an arbitration award.  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 128 S. Ct. 1396, 1403 (2008); *see* American Arbitration Association Handbook on Commercial Arbitration (Thomas E. Carbonneau & Jeanette A. Jaeggi eds., 2006) ("The 'manifest disregard'

exception is conservatively construed and rarely employed . . . Therefore, while courts may cite and consider the 'manifest disregard' exception to award enforcement, in reality, the exception is little more than an historical oddity which is rarely, if ever, successfully asserted.").

In suggesting that "the vast majority of courts have recognized the continuing validity of [the manifest disregard of the law) doctrine" (Superseding Petition at 15 n.10), Petitioner conveniently ignores a long string of decisions in the wake of *Hall Street* in which courts have found that it is no longer a valid ground for vacating arbitral awards in cases brought under the FAA.  *See Ramos-Santiago v. UPS*, 524 F.3d 120, 124 n.3 (1st Cir. 2008) (under *Hall Street*, "manifest disregard of the law is not a valid ground for vacating or modifying an arbitral award in cases brought under the [FAA]"); *Robert Lewis Rosen Assocs. Ltd. v. Webb*, 566 F. Supp. 228, 233 (S.D.N.Y. 2008) (finding that "the manifest disregard of the law standard is no longer good law"); *ALS & Assocs., Inc. v. AGM Marine Constructors, Inc.*, 557 F. Supp. 2d 180, 185 (D. Mass. 2008) (manifest disregard of the law not a valid ground for vacating an arbitral award); *Prime Therapeutics LLC v. Omnicare, Inc.*, 555 F. Supp. 2d 993, 999 (D. Minn. 2008) (after *Hall Street*, courts can no longer vacate an arbitration award based on manifest disregard of the law); *Hereford v. D.R. Horton, Inc.*, 13 So. 3d 375, 380-81(Ala. 2009) ("Under the Supreme Court's decision in *Hall Street Associates* . . . manifest disregard of the law is no longer an independent and proper basis under the Federal Arbitration Act for vacating, modifying, or correcting an arbitrator's award.").[5]  Petitioner's entire argument that there was a "manifest disregard of the law" should be rejected on this ground alone.

---

[5] *See also Grain v. Trinity Health*, 551 F.3d 374, 380 (6th Cir. 2008) ("*Hall Street's* reference to the 'exclusive' statutory grounds for obtaining relief casts some doubt on the continuing vitality of [manifest disregard of the law]"), *petition for cert. filed* (U.S. May 19, 2009) (No. 08-1446); *Martin Marietta Materials, Inc. v. Bank of Oklahoma*, 304 Fed. Appx. 360, 362 (6th Cir. 2008) (*Hall Street* indicates manifest disregard for the law may not be viable ground for vacating an award); *Rogers v. KBR Tech. Servs., Inc.*, No. 08-20036, 2008 U.S. App. Lexis 12320, at *5 (5th Cir. June 9, 2008) (*Hall Street* "calls into doubt the non-statutory grounds" previously recognized for vacatur).  The Supreme Court cast further doubt on the viability of the doctrine in *Improv W. Assocs. v. Comedy Club, Inc.*, where it vacated a Ninth

To the extent this Court finds that manifest disregard of the law is still a basis for review of an arbitration award, the standard of review is "extremely narrow" and requires "much more than failure [of the arbitrators] to apply the correct law." *Kurke v. Oscar Gruss & Son, Inc.*, 454 F. 3d 350, 354 (D.C. Cir. 2006) (quoting *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1182 (D.C. Cir. 1991)).  For an award to be vacated as in manifest disregard of the law, the party challenging the award must demonstrate that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."  *Kurke*, 454 F.3d at 354 (quoting *LaPrade v. Kidder Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001)) (internal quotations omitted). Petitioner does not meet this standard because Petitioner cannot show that the Panel ignored or refused to apply any applicable law.

Notably, the Supreme Court long ago recognized that errors of fact and misinterpretations of law do not warrant vacation of an arbitration award:

> If the award is within the submission and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact.  A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties and would make an award the commencement, not the end, of litigation.

*Burchell v. Marsh*, 58 U.S. 344, 349 (1854); *see Kurke v. Oscar Gruss & Son, Inc.*, No. 04-0870 (RMC), 2005 U.S. Dist. LEXIS 9987, at *8 (D.D.C. Jan. 19, 2005).

Additionally, where an arbitrator is asked to interpret a contract:

> [S]o far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

---

Circuit decision vacating an arbitration award because of manifest disregard of the law.  129 S. Ct. 45 (2008) (remanding for reconsideration in light of *Hall Street*).

*United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599 (1960) (regarding review of labor arbitration award which is equally applicable in the commercial arbitration context); *see also Kurke*, No. 04-0870 (RMC), 2005 U.S. Dist. LEXIS 9987, at * 10 n.3 (noting principles of commercial arbitration and labor arbitration are analogous).

The tight restrictions on judicial review of arbitration awards reflects a "national policy" in favor of arbitration agreements. *See Hall St.*, 128 S. Ct. at 1402. Another fundamental purpose, also applicable here, is to enforce private agreements. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) ("[The Supreme Court] rigorously enforce[s] agreements to arbitrate"). In applying limited review to arbitration awards, courts in this jurisdiction have long recognized these policies. *See, e.g., Regnery*, 601 F. Supp. 2d at 194; *LaPrade v. Kidder, Peabody & Co.*, 94 F. Supp. 2d 2, 4 (D.D.C. 2000) ("[P]ublic policy favors leaving arbitration awards untouched."), *aff'd*, 246 F.3d (D.C. Cir. 2001).

## ARGUMENT

As a preliminary matter, Petitioner's self-styled "Superseding" Petition to Vacate the Arbitration Award (Docket. No.11), which it filed on Sunday, September 20, 2009, at 7:30 PM, the evening before Respondent's opposition to the originally filed petition was due, is untimely, improper, and has resulted in a confusing record.[6] Petitioner claims that it amended its original petition under Rule 15 of the Federal Rules of Civil Procedure.

---

[6] Further complicating the proceedings, Petitioner has filed a Motion For Consolidated Briefing Schedule (Docket No. 16) on September 30, 2009, seeking leave to file a consolidated reply to Technest's Opposition to Holdings' Petition to Vacate Arbitration Award (Docket No. 15) and this Opposition to Superseding Petition to Vacate Arbitration Award. The motion to consolidate should be denied for the several reasons. First, Petitioner's Motion For Consolidated Briefing Schedule is moot since it was not granted before the October 1 deadline to submit a reply to Technest's Opposition to Petition To Vacate had passed. Second, Holdings' two petitions are different and contain different exhibits bearing the same exhibit numbers and so a consolidated reply will only create more confusion. Finally, Petitioner claims it has "withdrawn" its original petition; if that is true, a reply in further support of a withdrawn petition would serve no purpose other than to burden the record.

However, Rule 15 only applies to "pleadings," not to "petitions." Petitions are not defined as a "pleading" and should not be considered pleadings for purposes of Rule 15. *See* Fed. R. Civ. P. 15 & 7 (enumerating six narrow categories of "pleadings," none of which is a "petition")*; cf. Albany Ins. Co. v. Almacenadora Somex, S.A.,* 5 F.3d 907 (5th Cir. 1993) (motion to dismiss was not pleading). Although some courts have treated them as such, other courts have held that Rule 15 is not applicable to post-arbitration filings.[7] *See, e.g., Halliburton Energy Servs., Inc. v. NL Indus.*, 618 F.Supp.2d 614, 633 (S.D. Texas 2009). Moreover, Petitioner has not cited any authority in this jurisdiction equating a petition to a pleading under Fed. R. Civ. P. 15.[8]

I.    **THE PANEL THOROUGHLY CONSIDERED, ADDRESSED AND DISPATCHED WITH PETITIONER'S IRRELEVANT NEGATIVE COVENANT" ARGUMENT APPROPRIATELY**

Petitioner complains that the Panel acted in manifest disregard of the law by "declining to apply fundamental principles of contract interpretation" when it did not construe the negative covenant referenced in its Petition as an additional condition precedent to payment of the Contingent Purchase Price. Superseding Petition at 2, 12. Petitioner's confusing attempt to conflate a contractual covenant with a condition precedent to payment was properly rejected in the arbitration and should suffer the same

---

[7] Courts that treat post-arbitration motion as pleadings do so on the basis that "papers filed by a party seeking to confirm or vacate an arbitration award function as the initial pleadings in post-arbitration proceedings in the district court." *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1382 (11th Cir. 1988). Here, the petition to vacate does not "function as the initial pleadings in post-arbitration proceedings" because Technest first filed a Petition and Motion to Confirm Arbitration Award and for Entry of Judgment Thereon in the United States District Court for the Eastern District of Virginia *(In re Technest Holdings, Inc. v. EOIR Holdings LLC,* No. 1:09-mc-00037-AJT-TCB) which was subsequently transferred to this Court. Therefore, if any post-arbitration papers are analogous to Rule 7 pleadings in this situation, they would only be Technest's Petition and Motion to Confirm Arbitration Award and for Entry of Judgment Thereon serving as the "complaint" and Petitioner's opposition to it serving as the "answer."

[8] The cases Petitioner does cite allowed for amending motions to vacate an arbitration award for reasons very different than Petitioner presents here. *See, e.g. Bonar*, 835 F.2d at 1381 (allowing amendment where movant had newly discovered evidence of fraud during the arbitration). The only reason presented by Petitioner seems to be that it has engaged new counsel without any supporting explanation of why that would necessitate a new petition.

fate here.  The terms "negative covenant" and "condition precedent" have distinct legal meaning under the applicable Delaware law and no amount of alchemy can transform one into the other.  The provisions are set forth in separate locations in the SPA and, unlike numerous other provisions, are not cross-referenced.  In accordance with basic principles of contract law, the Panel appropriately gave the separate terms separate meaning, thus reading the Agreement as a whole and honoring the terms as they were written.  As such, the Panel did not act in manifest disregard the law or exceed its authority.

A.   **The Panel's Ruling is Fully Consistent with the Applicable Delaware Law Governing Contact Interpretation**

Petitioner's allegation that "the Panel created its own *ad hoc* rule for contract interpretation" (Superseding Petition at 14, 16) is nothing more than uninformed attorney rhetoric bereft of even a shred of support.  Technest fully agrees with Petitioner's recitation of Delaware[9] law that contracts "must be construed as a whole" and "in a way that gives effect to every term of the instrument."  *See id*. at 13-14 (quoting *Nw. Nat'l Ins. Co. v. Esmark, Inc*, 672 A.2d 41, 43 (Del. 1996) and *Council of the Dorsett Condo. Apts. v. Gordon*, 801 A.2d 1, 7 (Del. 2002) among others).  Technest disagrees, however, with Petitioner's attempted  misapplication of that legal principle.

In order to interpret the Agreement "as a whole" and "give effect to every term of the instrument," the unambiguous ***differences*** in the terms and structure of the Agreement must be given meaning, too.  Thus, reading the ***negative covenants*** (contained in section 5 of the Agreement at page 57) as ***conditions precedent*** to payment of the Contingent Purchase Price (contained in Exhibit A of the Agreement 30 pages later) as Petitioner urges would be a violation of black letter law and inconsistent with

---

[9] The Stock Purchase Agreement provides that Delaware law applies.  SPA § 21 ("This agreement is to be construed and governed by the Laws of the State of Delaware (without giving effect to principles of conflicts of laws").  Petitioner agreed.  *See* Holdings' Post-Hearing Brief, attached to its Superseding Petition as Exhibit 2, at 9 n.6.

the notion of construing the contract as a whole.  Under Delaware law, "conditions" and "covenants" are discernable concepts, with different legal consequences.  A condition is "[a] future and uncertain event on which the existence or extent of an obligation or liability depends; an uncertain act or event that triggers or negates a duty to render a promised performance."  Black's Law Dictionary at 333 (9th ed. 2009).  Under Delaware law, a **condition precedent** is an act or event that must exist or occur before a duty to perform something promised arises.  *AES Puerto Rico, L.P. v. Alstom Power, Inc.*, 429 F. Supp. 2d 713, 717 (D. Del. 2006); *Westway Holdings Corp. v. Tate & Lyle PLC*, No. 08-cv-841, 2009 U.S. Dist. LEXIS 41022, at **18-19 (D. Del. May 13, 2009) (performance by one party is required before the other must perform).

In contrast, a covenant is a "formal agreement or promise…in a contract or deed" and a **negative covenant** is therefore a formal agreement or promise that "requires a party to refrain from doing something."  Black's Law Dictionary at 419.  Significantly, conditions are mutually exclusive of covenants and Delaware courts construe the absence of conditional language as a covenant.  *See SLMsoft.com, Inc. v. Cross Country Bank*, No. 00C-09-163-JRJ, 2003 Del. Super. LEXIS 112, at **50-51 (Del. Super. Ct. April 2, 2003); *see also Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.*, No. Civ. A. 15478, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (omission of a term "speaks volumes" when other terms are expressly included).

Accordingly, the negative covenant contained in the SPA at Section 5.2(o) is completely **irrelevant** to whether the Contingent Purchase Price is due because the negative covenant is **not** a condition precedent to payment.  Remarkably Petitioner's own contract expert admitted this during his deposition and again on cross examination at the arbitration hearing, testifying about the negative covenant as follows:

Q: But you said they aren't conditions, they aren't express conditions --

A: They're not express conditions.

Q:   -- to the payment of the contingent purchase price; am I right, sir?

A: That's right.

Tr. at 1843:3-8; *see also* Pachter Deposition at 47:13-19.[10]   Accordingly, the Panel was correct in holding that the mere existence of the negative covenant elsewhere in the contract did not create an extra condition precedent to payment.   Award at 10-11.

In addition to respecting legal differences between a "condition precedent" and a "negative covenant," the Panel was correct in holding that the negative covenant does not apply to the conditions to payment of the Contingent Purchase Price based on the structure of the contract.   The SPA contains numerous "cross-references" throughout the document, which are highlighted in a specific manner.   *See, e.g.*, SPA § 11.7(e) (underlining cross-references to other sections within the contract).   However, Exhibit A, the Contingent Purchase Price provision, contains no cross-references to the negative covenant.   As Petitioner's own contract law expert, Mr. Pachter, further testified:

Q: But when you look at Joint Exhibit 377, the contingent purchase price provisions --

A: Yes, sir.

Q:  -- there's no cross references to the negative covenants, right?

A: That's right.

Tr. at 1845:15-20; *see also* Tr. at 905:11-908:21 (same testimony from Petitioner's lead fact witness).   This lack of any cross-reference is fatal to Petitioner's misguided effort to supplement the express conditions of payment.[11]   *See Usinor v. U.S.*, 342 F. Supp. 2d

---

[10] Respondent's attempt to tack on additional conditions to payment fails for yet another reason that was fully aired during the arbitration hearing.   The negative covenant in Section 5.2(o) applies only to government bids that result in contracts.   SPA, § 5.2(o).   "Government bid" is a defined term in the contract.   *Id.* at § 1.1.   "Final Price Proposal" is not.   Thus, "government bid" cannot have the same meaning as "final price proposal" as Petitioner suggests.   *See* Superseding Petition at 12.   Even if the terms were synonymous, the negative covenants would not apply because a final price proposal results in an "award," not a "contract."   Tr. at 1847:10-19.   Here again the subject matter expertise of the arbitration Panel in dealing with government contract concepts should be accorded extreme deference.

[11] If the Parties wanted the negative covenant to be a condition to payment of the Contingent Purchase Price, they could have easily included cross-references to it.   *See* Tr. 909:13-910:5 (Mr. Rigoli agreed with

1267, 1279 (Ct. Int'l Trade 2004) ("This seemingly explicit omission is telling; *the lack of an explicit cross reference suggests that the requirement does not exist.*") (emphasis added); *Input/Output Tech., Inc. v. U.S.*, 44 Fed. Cl. 65, 70 (1999) ("[T]he absence of a cross-reference to the Table I drawings…stands in marked contrast to several other paragraphs in the RFP that *expressly* referred the bidder to the Table I drawings for guidance."). The Panel did not exceed its authority or act in manifest disregard of the law by giving the SPA its plain meaning, consistent with Delaware law and the testimony of Petitioner's own witnesses, all of which disassociates the conditions to payment of the Contingent Purchase price from the negative covenant.

### B.      Based on the Evidence, The Negative Covenant Was Not Violated

Even if the negative covenant was somehow found to be a condition precedent to payment of the Contingent Purchase Price, ***it was not violated***. The Panel made an explicit evidentiary finding to this effect. Award at 11. This evidentiary finding should not be revisited. *Howard Univ.*, 519 F. Supp. 2d at 37 (arbitration awards "cannot be overturned merely because there is disagreement with [the arbitrator's] factual findings or ultimate decisions"). Even more, Petitioner's own contract expert Mr. Pachter so testified in deposition testimony that is part of the arbitration hearing record:

> Tell me if I'm wrong, but I don't think that I said the negative covenants as such were violated . . . I don't think that in my opinion I said that the negative covenants were violated.

Pachter Deposition at 51:10-19. Ironically, a substantial portion of Petitioner's arguments for vacatur cannot be reconciled with the testimony of Petitioner's own contract law expert.

---

Technest's counsel that it would have taken only a "millisecond" to include cross references in Exhibit A to the negative covenants).

Petitioner's allegation that the Panel "refused to consider [the negative covenants]" is completely unfounded.[12]  *See* Superseding Petition at 16.  To the contrary, the Panel heard Petitioner's negative covenant arguments and evidence *ad naseum* and after doing so properly found its negative covenant argument was "not persuasive." Award at 11.

The events that transpired during the arbitration hearing with respect to Petitioner's negative covenant argument  -- which is that the labor rates in the "final price proposal" were somehow less favorable than in previous proposals -- demonstrate more than anything else why arbitration awards should be accorded extreme deference.  ***Every single witness*** that Petitioner presented to testify that the labor rates were less favorable was decimated on the witness stand.  *See* Technest's Post-Hearing Brief at 25-29.[13]  For example, Petitioner's lead witness, Jason Rigoli, testified at length about his wholly unsupported belief that EOIR, while still owned by Technest, had somehow "gamed" the labor rates contained in the final price proposal resulting in unprofitable rates.  Tr. at 923:22-924:4.  But Petitioner's second witness -- who actually managed the price proposal process -- put that self-serving testimony to rest when she testified that the final price proposal was not "gamed" but instead was "honest, legitimate, and the best possible effort" and was fully expected to be profitable in the future.  Tr. at 1235:11-1236:4, 1236:16-1237:7.

---

[12] The Panel most certainly did not "refus[e] to ***hear*** evidence pertinent and material to the controversy" (FAA, 9 U.S.C. § 10(a)(3) (emphasis added)) as Petitioner seems to allege (which Petitioner then conflates with refusing to rule in Petitioner's favor).  Petitioner cites three cases in support of this argument in which arbitrators plainly violated the parties' arbitration agreement.  *See Chem-Met Co. v. Metaland Int'l, Inc.*, No. Civ. A. 96-02548, 1998 WL 35272368 (D.D.C. March 25, 1998) (arbitrators made decision based only on motions for summary judgment and oral argument of the same; "the parties presented no live testimony, and the arbitrators admitted no documents into evidence"); *McDonald v. Rodriguez*, 184 B.R. 514, 517 (S.D. Tex. 1995) (arbitrator explicitly "declared himself 'not constrained' by the [parties'] Agreement"); *Timken Co. v. Local Union No. 1123, United Steelworkers of Am.*, 482 F.2d 1012, 1015 (6th Cir. 1973) (arbitrator sought conflicting meaning for terms already defined in the agreement).  The Panel here made no such errors.

[13] In further opposition to the Superseding Petition, Technest herein incorporates by reference its Post-Hearing Brief and the evidence cited therein.

Mr. Rigoli's other attempt to show the labor rates were less favorable hinged on a demonstrably superficial spreadsheet that compared the labor rates contained in the final price proposal. *See* Rigoli Analysis: JX 357 (attached hereto as Exhibit H). However, upon cross-examination it became clear that Mr. Rigoli's rate comparison was wholly unreliable because it was overly simplistic and incomplete. *See* Tr. at 1006:6-1007:22 (Rigoli analysis erroneously included categories for which EOIR does not employ personnel), 1008:17-1008:21 (analysis is only "quantitative in nature"), 1135:20-1136:1 (qualitative analysis could have been performed); *see also* Technest's Post-Hearing Brief at 25-29.

Remarkably, Petitioner's own expert witness even acknowledged that Mr. Rigoli's labor rate analysis had proven ***nothing*** about the actual profitability of the labor rates:

> Q: So my question is, did you ask Mr. Rigoli to see anything in writing that showed this analysis of these unprofitable -- very unprofitable rates?
>
> A: None other than what he gave me that's attached to my statement.
>
> Q: Which just compares the rates -- just the rates, not the hours, just the rates --
>
> A: There are no hours.
>
> Q: -- from one contract to the next?
>
> A: There are no hours. It's unweighted averages.
>
> Q: ***And you could look at that document for a hundred years, and it's not going to tell you anything about the profitability of those rates to the company?***
>
> A: ***No, it won't, because it won't tell you how many hours will be ordered or whether any hours will be ordered*** . . ..

Tr. 1828:15-1829:20 (emphasis added).

In contrast to Petitioner's shoddy and inadequate proofs, Technest introduced the testimony of Colonel Larry Bramlette, who was the person that had actually developed the labor rates in the final price proposal as well as previous proposals.  In fact, Colonel Bramlette was identified as the person with the most price proposal experience of any witness whose testimony was presented.  Colonel Bramlette conducted a far superior, "robust" profitability analysis of the labor rates that was quantitative, qualitative, and multi-variate.  *See* Bramlette Deposition (excerpts attached hereto as Exhibit I) at 193:12-16, 185:8-192:18 (describing analysis).  At his deposition, Colonel Bramlette testified unequivocally about his profitability analysis of the labor rates:

> Q: And are you confident that you did this right?
>
> A: Yes.
>
> Q: You think this is a robust analysis?
>
> A: Most definitely.

*Id*. at 193:12-16.  Unlike Petitioner's defective analysis, Colonel Bramlette's analysis incorporated only those labor categories for which EOIR had personnel and accounted for the effects of "slotting" employees into various positions.  Tr. at 1822:15-1823:15; Bramlette Deposition at 28:12-29:1, 185:8-192:18 (describing analysis).  Ultimately, Colonel Bramlette concluded that EOIR would be in a ***better*** position under the follow-on contract than the previous government contract, a conclusion which was documented in a contemporaneous e-mail to the President of EOIR long before any dispute arose.  Bramlette Profitability Analysis: JX 176 (attached hereto as Exhibit J) at EOIR0028734-35; *see also* Tr. at 1820:11-1824:10; Technest's Post-Hearing Brief at 23-24; Bramlette Deposition at 193:15-16.

The President of EOIR, whose testimony was also introduced into the record, agreed with the Bramlette profitability analysis.  *See* Mackin Deposition (excerpts attached hereto as Exhibit K) at 261:13-263:9.  Thus it was really no surprise that the Panel credited the testimony of Colonel Bramlette and Dr. Mackin.  *See* Award at 9, 11.

In sum, the overwhelming evidence presented during the arbitration hearing shows that the labor rates were *not less favorable* and therefore the negative covenant was not violated. Award at 11 ("As a substantive matter, it has not been demonstrated that the previous rates were better."). Petitioner is simply not entitled to revisit evidentiary findings made against it in the context of a petition to vacate. *Howard Univ.*, 519 F. Supp. at 37 (arbitration awards "cannot be overturned merely because there is disagreement with [the arbitrator's] factual findings or ultimate decisions").

### C.    The Panel Addressed Petitioner's Negative Covenant Argument Fully In The Award

There are no "critical issues unanswered by the Award" regarding the negative covenant or any other issue, as claimed by Petitioner.[14] *See* Superseding Petition at 17. Petitioner's question set forth on page 17 of its Superseding Petition asking if "should Holdings prevail on an offsetting claim for damages" is easily and definitively answered based on the record. Holdings never made a claim for damages for breach of the negative covenant or otherwise. Petitioner's Answering Statement (attached hereto as Exhibit L). American Arbitration Association Commercial Arbitration Rule R-6 requires that "[a]fter filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA." AAA Commercial Arbitration Rule R-6. Petitioner made no counterclaim at all. The Panel cannot and should not be faulted for "failing to consider" a claim that was never made. The Panel did consider and address the issues framed by the Demand and every single argument that Petitioner made during the hearing. Consequently, there are no "open issues" to "address outside the arbitration." *See id.*

---

[14] The cases cited for Petitioner's proposition that this Court should "stay confirmation of the Panel's award pending a determination of the damages caused by Technest's [alleged] breach of Section 5.2(o)" are inapposite. *See* Superseding Petition at 17-18; *see also Stone v. INS*, 514 U.S. 386 (regarding immigration matter not involving arbitration); *Anderson v. Nyack Hosp.*, No. 02 Civ 2985, 2002 WL 1149443 (S.D.N.Y. May 30, 2002) (confirming arbitration award and denying motion to stay).

## II.   THE PANEL'S ADMISSION OF A VALUATION PREPARED BY EOIR'S CONSULTANT WAS PROPER AND DOES NOT PROVIDE GROUNDS FOR VACATUR OF THE AWARD

The Panel's admission of an allegedly privileged valuation is not grounds for vacatur of the Award because it was not misbehavior or manifest disregard of the law. To the contrary, the Panel's decision to admit the valuation was a legitimate exercise of its discretion, a proper application of privilege law, and was not unfairly prejudicial to Petitioner.

### A.   The Corporate Valuation Did Not "Bear on" The Award

In the Award, not only did the Panel carefully document the fact that the corporate valuation had "no bearing" on its Award, but also explained the reasoning underling this conclusion in the same paragraph. Award at 11. Petitioner cites no authority supporting the notion that an arbitration award should be vacated because an interested party wishes to second guess what a unanimous Panel of neutral arbitrators have stated unequivocally in an Award. There is no reason, and certainly no case authority, to support the notion that the unequivocal holding of a Panel of highly qualified arbitrators can be so easily side-stepped. This is especially so when the actual grounds supporting the Award are set forth in writing for all the world to see. There simply is not an inkling of proof that the arbitrators were unduly influenced by the corporate valuation and their Award should not be disturbed.

### B.   The Panel Employed Fair and Reasonable Procedures in Evaluating Petitioner's Claim of Privilege

The Panel's admission of the allegedly privileged valuation was a legitimate exercise of discretion that was neither misbehavior nor manifest disregard of the law. An arbitrator's decisions on evidentiary issues are entitled to "great deference." *Howard Univ.*, 519 F. Supp. 2d at 36. Even if the court disagreed with the Panel's privilege and relevance determinations, the court's power to review the Panel's evidentiary rulings is

limited to determining if the Panel engaged in misconduct or misbehavior, not deciding whether it would come to the same conclusion regarding the relevance or admissibility of the valuation.  *Id.* at 39 (evidentiary determinations can be the basis for vacating an arbitration award only where they deprived a party of a fundamentally fair hearing) (internal quotations omitted).

Petitioner's assertion that an unidentified AAA rule was broken (Superseding Petition at 2) is without basis.  The Panel's treatment of Petitioner's privilege claim was well within the AAA rules governing arbitrations, which do not require the Panel to make detailed privilege findings when denying a claim of privilege.  The rules simply direct arbitrators to "take into account applicable principles of legal privilege" when making determinations regarding evidence presented in an arbitration proceeding.  AAA R.31(c). The Panel clearly did so and much more.

The Panel heard, considered, and rejected Petitioner's privilege claim during the discovery process and again during the arbitration hearing.  During the arbitration hearing, Petitioner had the unbridled opportunity to present facts and argument on its claim of privilege and did so.[15]  After hearing extensive argument from counsel and convening a special recess to consider Petitioner's privilege claim, the Panel rejected Petitioner's claim of privilege and admitted the valuation.  Petitioner's argument that there were no "findings" on the privilege issue is wrong and flatly belied by the hearing transcript.  As the Panel Chair clearly noted on the record:

> During the break, the Panel has conferred about the proffer by [Technest Holdings] of the [valuation] marked for identification as Exhibit 327.  The Panel has decided to – ***having considered the arguments of the parties concerning the claim of privilege***, the Panel has decided to admit the

---

[15] During the hearing, Technest submitted a nine-page memorandum demonstrating that the corporate valuation was not privileged by reference to the applicable facts and law.  The memorandum is incorporated herein by reference and attached hereto as Exhibit M.  Petitioner submitted no contrary or opposing memorandum.

document.  And in so doing, however, we make no comment whatever concerning the weight which may be attributed to the document.

Tr. at 750:17-751:3 (emphasis added).  The process for considering Petitioner's claim of privilege was a fair and reasonable administration of justice.[16]  Indeed, it is well-settled that arbitrators have broad discretion to determine the admissibility and relevancy of evidence.  *Howard Univ.*, 519 F. Supp. 2d at 37; *Lessin*, 2006 U.S. Dist. LEXIS 14967, at **20-21.  Therefore, the Panel's evidentiary ruling on the admissibility of the valuation is not a valid basis for vacating the Award.

### C.   Based on the Evidence and the Applicable Law the Corporate Valuation was Not Privileged

As it did at the arbitration hearing, the Petitioner here again has not supported its *ipse dixit* assertions of privilege.  The applicable law is clear that a party asserting a privilege bears the burden to establish all the elements of the claimed privilege.  *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F. Supp.156, 159 (E.D.N.Y. 1994) (citation omitted).  The facts underlying the privilege claim do not support a finding that the valuation contains either work-product or attorney-client communication entitling it to privileged treatment.

Petitioner's argument that a corporate valuation somehow became privileged because "an attorney said so" is wholly unavailing.  Merely claiming that a document is "privileged" does not make it privileged.  *Neuder v. Battelle Pac. Nw.  Nat'l Lab.*, 194 F.R.D. 289, 295 (D.D.C. 2000) ("The recitation of the phrase 'confidential and privileged attorney-client communication' is not dispositive in determining whether a document is privileged.");  *see also Gold Standard, Inc. v. Am. Barrick Res. Corp.*, 801 P.2d 909, 911

---

[16] In rendering its findings in this manner, the Panel actually went above and beyond the call of duty. Arbitrators are not required to explain their resolution of every question of law and, if any grounds for a decision can be inferred, then the award must be confirmed.  *See Howard Univ.*, 519 F. Supp. 2d at 38; *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 5-171 (RMC), 2006 U.S. Dist. LEXIS 14967, at *18 (D.D.C. March 31, 2006), *aff'd*, 418 F.3d 813 (D.C. Cir. 2007); *see also Merrill Lynch, Pierce, Fenner & Smith v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995); *Raiford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 1410, 1413 (11th Cir. 1990).

(Utah 1990); *United States v. Tel. & Data Sys., Inc.*, No. 02-C-0030-C, 2002 U.S. Dist. LEXIS 15510, at **5-6 (W.D. Wis. July 16, 2002) ("[s]imply transmitting information to an attorney does not cloak it in the privilege").

The bare-bones "attorney affidavit" was not the only evidence bearing on the privilege issue.  Significantly, Technest submitted facts to the Panel on the applicability of the claimed privilege.  This necessarily renders Petitioner's assertion that the corporate valuation was privileged dependent upon a "weight of the evidence" simply not subject to review.  Technest's evidence showed that Petitioner's ***non-lawyer valuation consultant*** Taylor Consulting Group, Inc. prepared the valuation at the direction of Petitioner's ***non-lawyer manager*** for EOIR's annual goodwill impairment test in compliance with ***accounting standards*** promulgated by the Financial Accounting Standards Board ("FASB").[17]  Not surprisingly, the corporate valuation contains no legal advice or any other content that would be fairly characterized as legal in nature.

Despite numerous opportunities, Petitioner has never identified any attorney-provided content or legal advice in the valuation and a review of the valuation shows none.  Tellingly, the Petitioner has not submitted the valuation to this Court along with either one of its Petitions.  Petitioner does not want this Court to see that the corporate valuation is a routine business document containing not one iota of legal advice, analysis, or opinion.

---

[17]  Technest's CEO testified about the accounting standards (not legal standards) referenced in the valuation.  Tr. at 143:4-145:8; Statement of Financial Accounting Standards No. 142, Goodwill and Other Intangible Assets ("SFAS 142"), *available at* http://www.fasb.org/summary/stsum142.shtml (last visited September 25, 2009).  According to the Financial Accounting Standards Board, its Statement Number 142 "addresses financial accounting and reporting for acquired goodwill and other intangible assets…[and]…how intangible assets that are acquired individually or with a group of other assets (but not those acquired in a business combination) should be accounted for in financial statements upon their acquisition."  It also "addresses how goodwill and other intangible assets should be accounted for after they have been initially recognized in the financial statements."

Even more remarkably, evidence was submitted showing that the corporate valuation was used for ordinary business purposes (as would normally be expected). [18] Two witnesses testified that the valuation formed the basis for an operative incentive-based executive compensation plan.  *See* Tr. at 858:16-859:19; Mackin Deposition at 53:12-18.  Where a document was prepared for mixed purposes, as is alleged by Petitioner, work product protection depends on a showing that the primary motivating purpose for the creation must have been to assist in pending or impending litigation. *McEwen v. Digitran Systems, Inc.*, 155 F.R.D. 678, 682 (D. Utah 1994) (citing *U.S. v. Gulf Oil Corp.*, 760 F. 2d 292, 296 (Temp. Emer. Ct. App. 1985).

It is clear on the face of the valuation and supporting affidavit that the valuation was prepared for and used for business purposes unconnected to any specific threat of litigation.  It is well-settled that the attorney work-product privilege only applies to documents prepared in the reasonable anticipation of litigation, not the mere possibility of litigation.[19]  *See In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998); *Coastal States Gas Corp. v. Dep't. of Energy*, 617 F.2d 854, 864-65 (D.C. Cir. 1980).  Here, there is no attorney-client communication reflected in the valuation.  *See Reliant Energy Power Generation, Inc. v. Fed. Energy Regulatory Comm'n*, 520 F. Supp. 2d 194, 206 (D.D.C. 2007) (attorney-client privilege requires a request for or the provision of legal advice in the context of an attorney-client relationship).  The valuation contains neither attorney-client communication nor attorney work-product entitled to privilege protection, thus the

---

[18] Ms. Cleveland's affidavit confirms that the valuation was prepared for business purposes, specifically, to ensure that an "equity ownership program for selected employees and other service providers" she was designing complied with the tax code and related regulations.  Cleveland Affidavit (attached to Superseding Petition as Exhibit 5) at 3-4.

[19] Although Ms. Cleveland stated that "a relatively high potential for litigation" with participants existed and there was a "significant risk of litigation with the IRS," Cleveland Aff. at 7, the mere possibility of litigation is insufficient to meet the standard.  Moreover, nothing in the valuation conveys thoughts, mental impressions, opinions, legal theories or strategies that were prepared in anticipation of litigation and are entitled to protection.  *W. Trails, Inc. v. Camp Coast to Coast, Inc.*, 139 F.R.D. 4, 13 (D.D.C. 1991).

Panel's decision to admit the valuation was neither misbehavior nor manifest disregard of the law and does not provide a basis for vacating the Award.

### D.    There Was No Conceivable Prejudice to Petitioner

To be sure, the corporate valuation was not the "linchpin" of Technest's case.  *See* Superseding Petition at 2.  The valuation was only one of 125 exhibits entered into evidence.  It was not offered as proof that Technest met any of the three conditions at issue in the proceeding.  Instead, Technest offered the valuation to rebut Petitioner's claim that the value of the subsidiary it had purchased had declined because of diminished future prospects.  *See, e.g.*, Tr. at 52:8-11, 824:18-825:21, 1453:20-1454:15, 1995:12-18.[20]  The assessment of ***Petitioner's own consultant,*** which valued the subsidiary at the same $34 million Petitioner agreed to pay, was directly responsive to Petitioner's "diminished value" argument.  As such, Petitioner has only itself to blame for introducing the issue of EOIR's value by repeatedly claiming the subsidiary was not worth the amount Petitioner agreed to pay in the SPA.  Regardless, the Panel was not prejudiced by the valuation; instead, the Panel was quite careful, stating at the time of its ruling that it was not commenting on the weight to be accorded to the valuation (Tr. at 750:17-751:3) and ultimately holding that the valuation was irrelevant to the question of whether conditions to payment of the Contingent Purchase Price had been met.  Award at 11.

Petitioner's unsupported argument that the Panel was prejudiced by the admission of the valuation is virtually frivolous.  *See* Superseding Petition at 21 (claiming "extreme prejudice").  No case law is cited to support the hyperbole.  Courts and arbitrators acting as factfinders routinely make determinations as to whether the necessity and probative

---

[20] Petitioner protests that it was incorrect to consider the post award financial performance of EOIR but fails to inform the Court that Petitioner itself submitted expert testimony on this very topic.  Report of Holdings' expert Michael Smigocki (attached hereto as Exhibit N) at 10-12; *see also* Answering Statement at 7-8 (allegations of actual post award developments as evidence of diminished financial prospects). Having "opened the door," Petitioner is in no position to complain about counter-evidence.

value of evidence is outweighed by its potentially prejudicial nature.  Arbitrators making those determinations while acting in their judicial capacity, like judges, are presumed to disregard any improper influence from potentially prejudicial evidence when reaching a decision.  *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) (a judge can "exclude … improper influences from his mind in reaching a decision"); *cf. Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("For a bench trial, we are confident that the district court can hear relevant evidence, weigh its probative value and reject any improper inferences.").

### III.        PETITIONER'S CONTRACT INTERPRETATION ARGUMENTS ARE INSUFFICIENT AS A MATTER OF LAW AND OTHERWISE UNSUPPORTABLE

If an arbitrator's award "draw[s] its essence from the [implementing] agreement," courts must give the arbitrator's interpretation of an agreement "extreme deference." *ICC*, 920 F.2d at 45 (internal quotation marks omitted).  Applying this standard, the court in *Kurke* held that "[i]n the absence of an arbitrator's manifest disregard of the law, a court should defer to his or her reading of a private contract, *even if that reading is implausible*." 2005 U.S. Dist. LEXIS 9987, at *14 (citations omitted; emphasis added); *see also E. Associated Coal Corp. v. UMWA  Dist. 17*, 531 U.S. 57, 62 (2000) (even if a court believes that an arbitrator has committed serious error, the court should not vacate the award if the arbitrator "is even arguably construing or applying the contract and acting within the scope of his authority") (internal quotation marks omitted).

It is undisputed that the provisions of the SPA regarding conditions to payment of the Contingent Purchase Price are clear and unambiguous.  At the arbitration hearing Petitioner called contract law expert John Pachter, who testified that the three conditions of payment set forth in the SPA were "not difficult to understand" and "not ambiguous." Tr. at 1803:9-1805:20.  Petitioner's contract law expert further testified that the contract was fully integrated, with legal consequences as follows:

Q: Maybe I asked that question imprecisely. When there's an integration clause in a contract like Joint Exhibit 101, that means that oral promises, oral presentations and oral agreements that occurred before the contract was signed are not legally enforceable.

A: That's the normal interpretation.

Q: That's the law, right? That's basic contract law, isn't it?

A: Yes.

Tr. at 1815:13-22. Therefore, under the applicable Delaware law, extrinsic evidence of the contract's meaning is not admissible and the contract language should be given its plain meaning. *See Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003); *Dittrick v. Chalfant*, 948 A.2d 400, 406 (Del. Ch.), aff'd, 935 A.2d 255 (Del. 2007). Mr. Pachter agreed with these legal principles and their implications. Tr. at 1815:13-22.

### A.    The Panel Acted Within Its Power In Holding The First Condition To Payment Was Met

The first condition of payment requires that the award "occur[]…on substantially the economic terms and conditions set forth in [the] final price proposal…." SPA, Exhibit A, § 2(a) (emphasis added). Despite the foregoing law and the testimony of Petitioner's own contract law expert on the "unambiguous" language of the SPA, Petitioner complains that with respect to the first condition to payment of the Contingent Purchase Price, the Panel refused to read in an additional contractual requirement that the award give EOIR a $454 million dedicated ceiling. *See* Superseding Petition at 22-23. The phantom ceiling requirement is not set forth anywhere in the contract or the final price proposal. The Panel, implementing basic principles of contract interpretation, addressed this issue plainly in the Award, holding that "[w]hile the rates in the final price proposal may have been premised or predicated on certain assumptions [such as a dedicated $454 million ceiling] . . . *these assumptions were not set forth in the final price proposal*." Award at 5 (emphasis added). The Panel's conclusion was based on

29

extensive evidence elicited at the hearing.  Tr. at 128:14-130:11, 134:7-16, 392:5-8, 393:22-394:10; *see also* Tr. 1963:18-1964:3 (closing argument).

Petitioner's lead witness and experts repeatedly attempted to espouse a long list of additional "variables" as contract requirements, only to be proven wrong on cross-examination.[21]  If Petitioner wanted to make the award of a dedicated $454 million ceiling a requirement to the first condition of payment, it should have included it in the SPA.  As the unwritten variable of a dedicated $454 million ceiling was not set forth in the final price proposal (or the SPA), however, there can be no invisible requirement that the follow-on contract reflect that unwritten assumption and the Panel so found.  *See* Award at 5.  The language of the Panel's Award leaves no doubt that the Award squarely "draw[s] its essence" from the Agreement.  *See ICC*, 920 F.2d at 45.

Additionally, Petitioner is incorrect when it alleges that the Panel substituted the term "rates" for "economic terms and conditions."  Superseding Petition at 22-23.  Rather, the Panel used the fact of the incorporation of the rates as evidence that the follow-on contract was on **"*substantially*"** the economic terms and conditions set forth in the price proposal.[22]  Award at 4 ("In pertinent part, the Government solicitation for the follow-on [] contract required each offeror to identify . . . loaded labor rates . . .. The follow-on award explicitly incorporated EOIR's proposal rates.), and at 5 ("EOIR's rates were set forth in the final price proposal, and were specifically incorporated into the award.").

Significantly, the follow-on contract incorporated not just the labor rates but the *entire* final price proposal by reference and therefore the Panel was well supported in holding that the follow-on contract was awarded "on substantially the economic terms

---

[21] *See also* Technest's Post-Hearing Brief at 10-12.

[22] Significantly, the first condition to payment requires that the award "occur[]…on **substantially** the economic terms and conditions set forth in [the] final price proposal" not the "same" economic terms and conditions as Petitioner implies.  *See* Superseding Petition at 22-23; SPA, Exhibit A §2.

and conditions set forth in [the] final price proposal." That the follow-on contract incorporated all terms and conditions in the "final price proposal" is confirmed by the language of the follow-on contract,[23] by questions from the Panel Chair to Petitioner's lead witness,[24] and by expert testimony in the record.[25] There is no merit whatsoever to Petitioner's argument, which was also made repeatedly during the arbitration (Tr. at

---

[23] The follow-on contract explicitly incorporates the final price proposal by reference. *See* follow-on contract (attached to Superseding Petition as Exhibit 10) at 2. ("EOIR's proposed estimates by contract year are hereby incorporated into this contract as stated and as described in the referenced proposal;" "EOIR's proposed labor and G&A rates for all contract years and all team members are hereby incorporated, in their entirety….;" "EOIR's Management Plan is hereby incorporated into this contract….").

[24] Chairman Doyle asked just what the award incorporates, and Jason Rigoli, Chief Operating Officer of EOIR, testified as follows:

> Q: (Chairman Doyle): And you were referred to Section A, part 1C, that says EOIR's proposed labor and G&A rates for all contract years and all team members are incorporated?
>
>           *     *     *
>
> A: Yes.
>
> Q: (Chairman Doyle): Okay. Right above that, B says EOIR's proposed estimates by contract year are hereby incorporated into this contract. Just a point of clarification, what estimates are being referred to?
>
> A: They are looking at the -- to be frank with you, I'm not 100 percent sure. I can give you my opinion, which is I think they are looking at -- they're incorporating the actual hourly labor rates, and what they're saying is if this level of effort were to be fully awarded to you all, we would expect the annual dollar amounts to equal what you have totaled up.
>
> Q: (Chairman Doyle): Thanks.
>
> Q: (Technest's Counsel): Which would be $454 million, right, Mr. Rigoli?
>
> A: Right….

Tr. at 1021:19-22, 1022:5-1023:1.

[25] Technest expert Kevin Carroll testified that EOIR's entire "final price proposal" was incorporated into the "follow-on contract." Tr. 394:18 - 395:7. Therefore, the first condition was met -- not because "rates" equals "economic terms and conditions" -- but because the first condition requires that the follow-on contract be on "substantially the economic terms and conditions set forth in [EOIR]'s final price proposal." Since the entire price proposal was incorporated into the follow-on contract, there can be no doubt that everything set forth in the price proposal was also contained in the follow-on contract. This obviates the need to parse which parts of the price proposal represent the "economic terms and conditions" because **all** the terms and conditions from the price proposal were incorporated.

1187:6-1190:5, 1344:5-1346:18, 1980:17-1982:15), and correctly rejected in the Award. Such a clear cut evaluation of evidence by neutral arbitrators with heavy expertise in the subject matter was well within the Panel's power to make.  *See LaPrade*, 94 F. Supp. 2d at 4 (as long as some justifiable ground or "colorable support for the award" can be inferred from the facts of the case, an arbitration award should stand).

Accordingly, the Panel was well within its authority when it concluded that the first condition had been met.

### B.      Panel Acted Within Its Power In Holding The Second Condition To Payment Was Met

Petitioner next claims that the arbitrators exceeded their power by determining that the second condition to payment was met without considering whether the negative covenant contained in Section 5.2(o) of the SPA was violated.  Superseding Petition at 23.  For all of the reasons discussed above, however, the negative covenant is not germane to whether the express conditions of the SPA were met.  *See supra*.  Even if the negative covenant were somehow relevant, the Panel unanimously found it was not violated.  *Id*.

Similarly, Petitioner alleges that "a contract with 'terms less favorable' than a prior contract simply cannot meet the second condition" to payment.  Superseding Petition at 23.  Contrary to Petitioner's assertions, the unambiguous terms of the second condition did not require the labor rates in the final price proposal to be identical to those in the previous proposal.  Rather, the SPA requires that the "price proposal shall be prepared in accordance…with the past practice of [EOIR]."  SPA, Ex. A § 2(a). Petitioner cannot so easily escape the actual language of the contract.

During the course of the arbitration hearing, the arbitrators evaluated reams of evidence and testimony regarding the historical past practice of EOIR.  Tr. at 393:22-397:4, 829:5-17, 1052:21-1053:3, 1233:13-1234:10; Prior Price Proposal: JX 14 (attached hereto as Exhibit O); Prior Award: JX 19 (attached hereto as Exhibit P); *see*

*also* Bramlette Deposition at 54:21-55:14, 125:5-21, 137:11-22, 152:20-153:5, 161:18-162:5, 171:15-19; Mackin Deposition at 166:2-168:16, 177:6-14, 241:3-242:6. Based on that evidence, the Panel determined that the second condition was met because the "final price proposal was prepared based on the same considerations as in previous [] proposals." Award at 7. These include knowledge of existing personnel; location of the work; availability of personnel; existing labor rates' costs of labor; and core technologies." *Id.*

Regardless, as also discussed above, the terms of the final price proposal were ***not*** less favorable as determined by Col. Bramlette, accepted by EOIR President Joseph Mackin, and further endorsed by proposal manager Diane Moulton (Petitioner's own hearing witness). *See supra.*; *see also* Tr. at 1220:20-1221: 21, 1225:14-1228:4, 1235:11-1236:4. As such, there was a veritable mountain of evidence to support the Panel's unanimous holding. Accordingly, the Panel was well within its authority when it concluded that the second condition had been met.[26]

### C.   The Panel Acted Within Its Power In Holding The Third Condition To Payment Was Met

Regarding the third condition to payment, Petitioner complains that the Panel improperly considered the valuation because the "essence" of the SPA "stands in stark contrast" to that document. Superseding Petition at 23. For the reasons discussed above, the valuation is not privileged, was properly received into evidence, and had **"*no bearing on the conditions [to payment]*."** Award at 11 (emphasis added); *see supra.* Accordingly, the Panel cannot have exceeded its authority in its treatment of the valuation with respect to finding the third condition to payment had been met because the Panel did not consider the valuation in evaluating whether the third condition was met.

---

[26] The Panel did not reverse the burden of proof as Petitioner claims without support. During Technest's case in chief, Technest's expert witness Kevin Carroll testified that all three conditions precedent to payment had been satisfied. The Panel merely rejected Petitioner's arguments and testimony to the contrary, which was well within the Panel's province to do.

Petitioner also claims that the Panel ignored evidence of the alleged reduced labor rates and promised $25 million cost reduction to the government listed in the introduction to the final price proposal.  *See* Superseding Petition at 24.  The Panel certainly received evidence regarding the alleged reduced labor rates from both parties (including Colonel Bramlette's profitability analysis, discussed above, which showed that "we [EOIR] have improved our margin [by] slot[ting] people in positions that will cover their costs plus provide for a margin.").  *See* Bramlette Profitability Analysis: JX 176 at EOIR0028734-35.

Petitioner does not, and cannot, point to anything in the record or Award that demonstrates that the Panel ignored any of this evidence.  To the contrary, the Panel addressed this issue and rejected it in a detailed analysis.  Award at 8-9 ("Technest has shown that, while some rates were reduced, these reductions were more than offset by increases in the rates for the labor categories which in EOIR's experience were likely to dominate the delivery orders under the contract;" "Bramlette, who prepared the rates, believed that the proposed award was likely to be more profitable than prior contracts.").  The Panel acted well within its authority when it credited the profitability analysis completed by the preparer of the labor rates as a reasonable explanation of how allegedly reduced labor rates could still lead to an increase in margin or profit.  As such, no part of the Panel's ruling regarding the third condition to payment exceeds its authority.

In sum, the Panel found that each of the three conditions to payment was met by reference to the operative contract language and the evidence presented at the hearing.  Therefore, the Panel's Award "[drew] its essence from the agreement" and should not be revisited.  *ICC*, 920 F.2d at 45.

## IV.     TECHNEST IS ENTITLED TO ATTORNEYS' FEES INCURRED IN ENFORCING ARBITRATION AWARD

The SPA expressly provides that "Any party unsuccessfully refusing to comply with an order of the arbitrators shall be liable for costs and expenses, including attorney's

fees, incurred by the other party in enforcing such award." SPA (attached to Superseding Petition as Ex. 1) at Exhibit A, § 6(i). Delaware law also endorses awarding attorneys' fees if a contract provides for those fees. *See AHS New Mexico Holdings, Inc. v. Healthsource, Inc.*, No. Civ.A. 2120-N, 2007 WL 431051, at *9 (Del. Ch. Feb. 2, 2007) ("Delaware courts routinely enforce contract provisions allocating costs of legal actions arising from the breach of a contract."). Therefore, if the Court denies Holdings' Superseding Petition to Vacate Arbitration Award, Technest seeks an award of its attorneys' fees and costs incurred in enforcing the Award, in the amount of $170,201. The underlying computation of attorneys' fees is set forth in the supporting Declaration of Carmine R. Zarlenga submitted herewith.

## CONCLUSION

For all the reasons stated above, Technest respectfully requests that this Court deny Petitioner EOIR Holdings LLC's Superseding Petition to Vacate Arbitration Award and order Petitioner to pay additional attorneys' fees and costs to Technest Holdings, Inc. in the amount of $170,201.

Dated: October 5, 2009                           Respectfully submitted,


                                                 /s/ Carmine R. Zarlenga
                                                 _____

                                                 Carmine R. Zarlenga (DC Bar # 386244)
                                                 HOWREY LLP
                                                 1299 Pennsylvania Ave., N.W.
                                                 Washington, D.C.  20004-2402
                                                 (202) 783-0800
                                                 (202) 383-6610 (fax)

                                                 *Attorney for Petitioner Technest Holdings, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 5, 2009, I served the foregoing Respondent Technest Holdings, Inc.'s Memorandum Of Points And Authorities In Opposition To EOIR Holdings LLC's Superseding Petition To Vacate Arbitration Award electronically with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel for Petitioner:

John K. Villa
John J. Buckley, Jr.
Kenneth C. Smurzynski
Steven M. Pyser
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.   20005

Gary H. Nunes
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, Fourth Floor
Tysons Corner, VA   22182

/s/  Carmine R. Zarlenga